**WO**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Puente Arizona, et al.,

          Plaintiffs,

v.

Joseph M. Arpaio, et al.,

          Defendants.

No. CV-14-01356-PHX-DGC

**ORDER**

This case involves the constitutionality of two statutes that criminalize the act of identity theft done with the intent to obtain or continue employment.  Plaintiffs claim that the purpose of these statutes is to discriminate against unauthorized aliens and that this purpose makes the statutes unconstitutional under the Supremacy and Equal Protection Clauses of the United States Constitution.  Plaintiffs have moved for a preliminary injunction that would enjoin Defendants from enforcing portions of these statutes.  Doc. 30.  Defendants have responded and filed motions to dismiss.  Docs. 53, 55.  The Court heard oral arguments on October 16, 2014.  For reasons set forth below, the Court will grant the motion for a preliminary injunction and deny Defendants' motions to dismiss.

**I.**    **Background.**

    **A.**    **Federal Immigration Law.**

The federal government has broad and plenary powers over the subject of immigration and the status of aliens.  *Arizona v. United States*, 132 S. Ct. 2492, 2498 (2012).  This authority rests, in part, on the federal government's constitutional power to

1    establish a uniform rule of naturalization, U.S. Const. art. I, § 8, cl. 4, and its inherent

2    power as a sovereign to control and conduct relations with foreign nations, *Arizona*, 132

3    S. Ct. at 2498.   In accordance with these powers, Congress passed the Immigration

4    Reform and Control Act ("IRCA") in 1986.  Pub. L. No. 99-603, 100 Stat. 3359 (1986).

5    IRCA "made combating the employment of illegal aliens in the United States central to

6    '[t]he policy of immigration law.'"  *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S.

7    137, 147 (2002) (quoting *INS v. Nat'l Ctr. For Immigrants' Rights, Inc.*, 502 U.S. 183,

8    194 & n.8 (1991)).

9          IRCA established a "comprehensive framework" for regulating the employment of

10   unauthorized aliens.[1]  *Arizona*, 132 S. Ct. at 2504.  It did so by establishing an extensive

11   "employment verification system," 8 U.S.C. § 1324a(b), to deny employment to

12   unauthorized aliens, *Hoffman*, 535 U.S. at 147.  IRCA requires employers to verify the

13   "employment authorization and identity" of new employees before they begin work.  8

14   U.S.C. § 1324a(b).  An individual may prove his or her employment authorization by

15   providing a document evidencing United States citizenship or an alien registration card.

16   *Id.* § 1324a(b)(1)(B)-(C).  An individual may prove his or her identity by a variety of

17   documents, including a state driver's license.   *Id.* § 1324a(b)(1)(D).   All of these

18   requirements are now formalized in the Form I-9 that millions of Americans fill out every

19   year.  *See* 8 C.F.R. § 274a.2.  The government has complemented the I-9 process with the

20   E-Verify program, "an internet-based system that allows an employer to verify an

21   employee's work-authorization status."  *Chicanos Por La Causa, Inc. v. Napolitano*, 558

22   F.3d 856, 862 (9th Cir. 2009).

23         IRCA makes it unlawful for an employer to knowingly hire a person who cannot

24   satisfy the employment verification system.  8 U.S.C. § 1324a(a)(1).  This requirement is

---

26   [1] The parties use various phrases to describe an unauthorized alien, including
     "undocumented worker" and "illegal immigrant."  The Court uses the term "unauthorized
27   alien" as it is defined in IRCA: "As used in this section, the term 'unauthorized alien'
     means, with respect to the employment of an alien at a particular time, that the alien is
28   not at that time either (A) an alien lawfully admitted for permanent residence, or
     (B) authorized to be so employed by this chapter or by the Attorney General."  8 U.S.C.
     § 1324a.

"enforced through criminal penalties and an escalating series of civil penalties tied to the number of times an employer has violated the provisions." *Arizona*, 132 S. Ct. at 2504; 8 U.S.C. § 1324a(e)-(f).  IRCA expressly preempts state or local laws that impose civil or criminal sanctions – other than through licensing and similar laws – on those who employ unauthorized aliens. *Id.* § 1324a(h)(2).

IRCA does not impose criminal penalties on unauthorized aliens who merely seek or engage in unauthorized work, *Arizona*, 132 S. Ct. at 2504, but it does criminalize the act of using an "identification document" that is not lawfully issued, or is false, for the purpose of satisfying the employment verification system, 18 U.S.C. § 1546(b).  With the Immigration Act of 1990, Congress also imposed civil penalties on persons who use falsified documents to satisfy the employment verification system.  Pub. L. No. 101–649, 104 Stat. 4978 (1990) (adding 8 U.S.C. § 1324c).  Congress has also made the use of false documents for employment a deportable offense.  *See* 8 U.S.C. § 1227(a)(1)(B).  "Congress has made clear, however, that any information employees submit to indicate their work status 'may not be used' for purposes other than prosecution under specified federal criminal statutes for fraud, perjury, and related conduct." *Arizona*, 132 S. Ct. at 2504 (citing 8 U.S.C. §§ 1324a(b)(5), (d)(2)(F)-(G)).

A "primary purpose in restricting immigration is to preserve jobs for American workers." *Nat'l Ctr. for Immigrants' Rights*, 502 U.S. at 194 (1991) (quoting *Sure–Tan, Inc. v. NLRB,* 467 U.S. 883, 893 (1984)).  But in passing IRCA, "Congress made a deliberate choice not to impose criminal penalties on aliens who seek, or engage in, unauthorized employment." *Arizona*, 132 S. Ct. at 2504.  "IRCA's framework reflects a considered judgment that making criminals out of aliens engaged in unauthorized work – aliens who already face the possibility of employer exploitation because of their removable status – would be inconsistent with federal policy and objectives." *Id.*

## B.  Arizona's Identity Theft Laws.

Arizona passed its first identity theft statute in 1996, making it a crime to "knowingly take[] the name, birth date or social security number of another person,

- 3 -

without the consent of that person, with the intent to obtain or use the other person's identity for any unlawful purpose or to cause financial loss to the other person."  1996 Ariz. Legis. Serv. Ch. 205 (H.B. 2090) (West).  Over the next decade, Arizona repeatedly amended this statute – now codified at A.R.S. § 13-2008 – by expanding the definition of identity theft.  *See, e.g.*, 2000 Ariz. Legis. Serv. Ch. 189 (H.B. 2428) (West); 2004 Ariz. Legis. Serv. Ch. 109 (H.B. 2116) (West).  Arizona also created a new crime of aggravated identity theft under A.R.S. § 13-2009.  2005 Ariz. Legis. Serv. Ch. 190 (S.B. 1058) (West).

Plaintiffs challenge two bills that amended these identity theft laws to make them applicable to employment of unauthorized aliens.  In 2007, Arizona passed H.B. 2779, known as the "Legal Arizona Workers Act."  2007 Ariz. Legis. Serv. Ch. 279 (H.B. 2779) (West).  The bulk of the bill concerned a new statute, A.R.S. § 13-212, relating to the employment of unauthorized aliens.  This new statute prohibited employers from hiring unauthorized aliens and threatened the suspension of licenses if an employer failed to comply.  This statute ultimately was held to be constitutional by the United States Supreme Court in *Chamber of Commerce of U.S. v. Whiting*, 131 S. Ct. 1968 (2011).

H.B. 2779 also amended Arizona's aggravated identity theft statute, A.R.S. § 13-2009, by adding the following italicized language:

A.   A person commits aggravated taking the identity of another person or entity if the person knowingly takes, purchases, manufactures, records, possesses or uses any personal identifying information or entity identifying information of either . . .

   3.   *Another person, including a real or fictitious person, with the intent to obtain employment.*

*Id.* (amendment in italics).

In 2008, Arizona passed H.B. 2745, titled "Employment of Unauthorized Aliens." 2008 Ariz. Legis. Serv. Ch. 152 (H.B. 2745) (West).  The bill amended and created statutes relating to the employment of unauthorized aliens.  *Id.* (amending A.R.S. § 23-212; creating A.R.S. § 23-212.01).  The bill also contained provisions that ensured employers' participation in the federal government's e-verify program.  As relevant here,

H.B. 2745 amended A.R.S. § 13-2008(a) to add the following italicized language:

> A person commits taking the identity of another person or entity if the person knowingly takes, purchases, manufactures, records, possesses or uses any personal identifying information or entity identifying information of another person or entity, including a real or fictitious person or entity, without the consent of that other person or entity, with the intent to obtain or use the other person's or entity's identity for any unlawful purpose or to cause loss to a person or entity whether or not the person or entity actually suffers any economic loss as a result of the offense, *or with the intent to obtain or continue employment.*

*Id.* (amendment in italics).

### C.     This Lawsuit.

This lawsuit concerns § 13-2009(A)(3), created by H.B. 2779, and the language added to § 13-2008(A) by H.B. 2745.  For the sake of simplicity, the Court will refer to these challenged provisions as "the identity theft laws."

Plaintiffs argue that the identity theft laws are unconstitutional in two ways.  First, they claim that both laws are preempted by federal immigration law under the Supremacy Clause of the United States Constitution.  Doc. 23, ¶¶ 180-85.  Second, they claim that the identity theft laws "constitute impermissible discrimination against noncitizens on the basis of alienage" and are facially invalid under the Equal Protection Clause of the Constitution.  Doc. 23, ¶¶ 186-91; *see* Doc. 83 at 18 (agreeing to dismiss their as-applied equal protection challenge).

Plaintiffs include Sara Cervantes Arreola, who was arrested and charged under the identity theft laws and ultimately convicted under § 13-2009(A)(3).  Doc. 23, ¶¶ 147-56.[2] She asks the Court to declare the identity theft laws unconstitutional and to expunge the record of her arrest and conviction.  Doc. 23, ¶ 192.  Plaintiffs also include Reverend Susan Frederick-Gray, a Maricopa County taxpayer, and Puente Arizona, a "grassroots" organization that serves the immigrant community.  *Id.*, ¶¶ 9, 12.  They ask the Court to declare the identity theft laws unconstitutional and to permanently enjoin their

---

[2] Guadalupe Arredondo was also a Plaintiff at the beginning of this case.  After discovering that she had been arrested by Chandler Police, and not by the Maricopa County Sheriff's Office, Ms. Arredondo agreed to dismiss her claims without prejudice under Rule 41(a).  Doc. 83 at 12 n.5.

enforcement by the Maricopa County Defendants.  *Id.*, ¶ 192.  They also seek to represent a class of unauthorized aliens who could be arrested and prosecuted under the identity theft laws, as well as a class of Maricopa County taxpayers who object to Maricopa County's use of their tax dollars to fund enforcement of the identity theft laws.  Doc. 23, ¶ 169.  Finally, Plaintiffs ask the Court to permanently enjoin the Maricopa County Defendants from "using information or documents undocumented workers submit to show federal authorization to work as the basis for any arrest or prosecution."  Doc. 23, ¶ 192.  Plaintiffs have sued Joseph M. Arpaio, Sheriff of Maricopa County; Bill Montgomery, County Attorney for Maricopa County; Maricopa County; and the State of Arizona.  Doc. 23, ¶¶ 13-16.

Plaintiffs' motion for a preliminary injunction asks the Court to enjoin Defendants from enforcing the identity theft laws during the duration of this lawsuit.  Doc. 30.  The motion is based only on the Supremacy Clause claim.  Defendants have responded and have also filed motions to dismiss.  Docs. 53, 55.  Defendants argue that (1) Plaintiffs lack standing; (2) Plaintiffs have failed to state a claim under the Equal Protection Clause; (3) Maricopa County is not a proper party under 42 U.S.C. § 1983; and (4) the Court should strike Plaintiffs' complaint in whole or in part for containing impertinent and irrelevant information.  The Court will address the question of standing, the motion for a preliminary injunction, and then the remainder of Defendants' arguments.

**II.    Standing.**

"In order to invoke the jurisdiction of the federal courts, a plaintiff must establish 'the irreducible constitutional minimum of standing,' consisting of three elements: injury in fact, causation, and a likelihood that a favorable decision will redress the plaintiff's alleged injury."  *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  The injury in fact must constitute "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Lujan,* 504 U.S. at 560 (citations omitted).  Plaintiffs must prove standing for each claim they seek to press and for each

form of relief that is sought. *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008).

A plaintiff must prove standing "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.  Ordinarily, "'[f]or purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party.'" *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011) (quoting *Warth v. Seldin,* 422 U.S. 490, 501 (1975)). But since Plaintiffs Puente Arizona and Frederick-Gray[3] are moving for a preliminary injunction, they must make "a clear showing of each element of standing." *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013); *see Lopez*, 630 F.3d at 785 ("Therefore, at the preliminary injunction stage, a plaintiff must make a 'clear showing' of his injury in fact.").

### A.      Sara Cervantes Arreola.

Sara Cervantes Arreola claims she has standing based on the collateral consequences flowing from her conviction under the identity theft laws. *See* Doc. 83 at 4.  Defendants argue that Ms. Arreola has not shown an injury in fact sufficient to confer standing.  Doc. 53 at 5.  Generally, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974); *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) ("Once the convict's sentence has expired, . . . some concrete and continuing injury . . . – some 'collateral consequence' of the conviction – must exist if the suit is to be maintained.").

The Supreme Court has recognized a presumption "that a wrongful criminal conviction has continuing collateral consequences[.]" *Spencer*, 523 U.S. at 8 (citing *Sibron v. New York*, 392 U.S. 40, 55-56 (1968)).  "Once convicted, one remains forever

---

[3] Plaintiff Sara Cervantes Arreola is seeking declaratory relief and a separate injunction that is not at issue in Plaintiffs' motion for a preliminary injunction. *See* Doc. 83 at 12 (explaining relief sought by Plaintiff Arreola); Doc. 23, ¶ 192.

subject to the prospect of harsher punishment for a subsequent offense as a result of federal and state laws that either already have been or may eventually be passed." *Chacon v. Wood*, 36 F.3d 1459, 1463 (9th Cir. 1994); *see also Chaker v. Crogan*, 428 F.3d 1215, 1219 (9th Cir. 2005) (recognizing an "irrefutable presumption that collateral consequences result from any criminal conviction"). Therefore, "there is a presumption of collateral consequences sufficient for standing if the correctness of the conviction is at issue." *United States v. Palomba*, 182 F.3d 1121, 1123 n.3 (9th Cir. 1999).

Plaintiff Arreola continues to suffer the "collateral consequences" of her allegedly unconstitutional conviction. She faces "the prospect of harsher punishment for a subsequent offense[.]" *Chaker*, 428 F.3d at 1219. This injury is traceable to the identity theft laws challenged in this case. Should the Court find the laws unconstitutional, the Court would have the power to redress Ms. Arreola's injury by expunging her criminal records. *See United States v. Sumner*, 226 F.3d 1005, 1014 (9th Cir. 2000); *United States v. Smith*, 940 F.2d 395, 396 (9th Cir. 1991) ("[W]e have sanctioned the remedy of expunction of [local] criminal records in civil rights cases involving unconstitutional state convictions."). The Court agrees with Defendants that the power to expunge criminal records is narrow, but the Court need not decide whether to exercise that power at this stage in the litigation. Ms. Arreola has alleged sufficient facts to establish standing.

**B.    Puente Arizona.**

Puente Arizona argues that it has both associational standing to sue on behalf of its members and direct standing to sue on its own behalf. Doc. 83 at 6-11. The Court will address each of these arguments.

**1.    Associational Standing.**

An organization has standing to sue on behalf of its members if "'(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000)

1   (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).   In

2   assessing whether an association's members would otherwise have standing to sue in

3   their own right, the Court need only find that one member would have standing for each

4   type of relief sought.   *United Food & Commercial Workers Union Local 751 v. Brown*

5   *Grp., Inc.*, 517 U.S. 544, 546 (1996); *Valle del Sol*, 732 F.3d at 1014-19.

6                                   **a.   Standing to Sue in Their Own Right.**

7               For the first factor of associational standing, Plaintiffs argue that at least three of

8   Puente's members would have standing to sue in their own right because there is a

9   "credible threat" that they will be prosecuted under the identity theft laws.   A credible

10  threat of prosecution can be an injury-in-fact sufficient to confer standing.   *Thomas v.*

11  *Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000).   Specifically, a

12  member of Puente could satisfy the injury-in-fact requirement by showing an "'intention

13  to engage in a course of conduct arguably affected with a constitutional interest, but

14  proscribed by a statute, and [that] there exists a credible threat of prosecution

15  thereunder.'"   *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014) (quoting

16  *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).   The Ninth Circuit has established a

17  three-part test for identifying a credible threat of prosecution: "(1) whether the plaintiffs

18  have articulated a 'concrete plan' to violate the law in question; (2) whether the

19  government has communicated a specific warning or threat to initiate proceedings; and

20  (3) the history of past prosecution or enforcement under the statute."   *Oklevueha Native*

21  *Am. Church of Hawaii, Inc. v. Holder*, 676 F.3d 829, 835 (9th Cir. 2012) (citing *Thomas*,

22  220 F.3d at 1138).   Although *Oklevueha* used this test for the issue of constitutional

23  ripeness, earlier cases have used it for the issue of standing.   *See Thomas*, 220 F.3d at

24  1138; *San Diego Cnty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1127 (9th Cir. 1996).

25                                   **i.   Credible Threat of Prosecution.**

26              The Court finds that three of Puente's members face a credible threat of

27  prosecution under the identity theft laws.   Plaintiffs have submitted anonymous affidavits

28

1    from three members.   Doc. 130-1.[4]   Each affiant declares that he or she is living in

2    Arizona, is an active member of Puente, and has used the social security number and

3    green card of another to obtain his or her current job.   *Id.*   This conduct falls within the

4    purview of the identity theft laws.   The affiants have not only "articulated a 'concrete

5    plan' to violate the law in question," *Oklevueha*, 676 F.3d at 835, they are currently

6    violating it.

7          There is also a "history of past prosecution or enforcement under the statute."

8    *Oklevueha*, 676 F.3d at 835.   Law enforcement officials in Arizona have arrested and

9    charged thousands of people for identity theft.   Doc. 60-4 at 12 (Matthew Bileski and

10   Phillip Stevenson, *Identity Theft Arrest and Case Processing Data* (2013)).   In 2010

11   alone, law enforcement charged approximately 1,900 people with identity theft under

12   A.R.S. § 13-2008 and 590 people with aggravated identity theft under A.R.S. § 13-2009.

13   *Id.* at 12-16.   These charges led to over 160 convictions.   *Id.*   Since November 22, 2010,

14   the Maricopa County Attorney's Office has filed approximately 194 cases under A.R.S.

15   § 13-2008(A) where there was a known victim.   Doc. 85 at 3.   As a method of enforcing

16   the identity theft laws, the Maricopa County Sheriff's Office has at times raided private

17   establishments and arrested individuals who were using fraudulent identification.   *See,*

18   *e.g.*, Doc. 30-7 (Declaration of Sara Arreola).   Many, though not all, of the people

19   charged under these statutes are unauthorized aliens.   *See, e.g.*, *id.*; Doc. 30-3 at 51.

20         For the remaining prong of the credible threat test, Defendants argue that they

21   have not "communicated a specific warning or threat to initiate proceedings" against

22   Plaintiffs.   Doc. 132.   They emphasize that "the mere existence of a proscriptive statute

23

24         [4] Plaintiffs initially submitted affidavits of Puente's director, stating that members
     of Puente were violating the identity theft laws and faced a credible threat of prosecution.

25   Docs. 30-4, 95-2.   The Court found these affidavits insufficient, Doc. 129 (citing
     *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009)), and permitted Plaintiffs to submit

26   anonymous affidavits of Puente members, Doc. 129 (citing *Does I thru XXIII v.*
     *Advanced Textile Corp.*, 214 F.3d 1058 (9th Cir. 2000)).   Defendants argue that they did

27   not have an opportunity to be heard on the issue of anonymous affidavits.   Doc. 132 at 2.
     The Court does not agree.   The issue was first raised in Plaintiffs' motion for preliminary

28   injunction.   Doc. 30 at 28.   The issue was also raised during oral argument.   Doc. 111 at
     30-32.   Defendants had the opportunity to address this issue in their responses to the
     motion for preliminary injunction and in the various briefs they filed after oral argument.

[or] a generalized threat of prosecution," *Thomas*, 220 F.3d at 1139, is not sufficient to confer standing.  They also point to a recent decision by the Maricopa County Sheriff's Office ("MCSO") to stop enforcing the identity theft laws.  And they argue that Plaintiffs do not face a threat of prosecution because they will be eligible for employment authorization documents under the federal government's recent expansion of its deferred action policy.

The Court is not persuaded by these arguments.  The question of "whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings" is merely one factor in "evaluating the genuineness of a claimed threat to initiate proceedings."  *Valle del Sol*, 732 F.3d at 1016 (quoting *Thomas*, 220 F.3d at 1139).  It is less relevant when there is a clear history of enforcing the law in question.  "[A] history of past enforcement against parties similarly situated to the plaintiffs cuts in favor of a conclusion that a threat is specific and credible."  *Lopez*, 630 F.3d at 786-87; *see also Susan B. Anthony*, 134 S. Ct. at 2345 ("[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical'") (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)).  Here, Plaintiffs currently are violating the identity theft laws and there is a long history of enforcement of those laws.  This is sufficient for a pre-enforcement challenge.

The MCSO's recent decision to stop enforcing the identity theft laws does not alter this conclusion.  Other law enforcement agencies within Maricopa County remain capable of enforcing these laws.  Although Defendants argue that enforcement by other agencies "is not redressable because none of those other agencies are defendants," Doc. 132 at 4, the Maricopa County Attorney remains a defendant and he may prosecute persons arrested by city police departments within Maricopa County, *see* A.R.S. § 11-109 (defining boundaries of Maricopa County); A.R.S. § 11-532 (defining powers of the county attorney).  In addition, the MCSO's recent decision is not yet in effect.  Doc. 131-1 at 3 ("[T]he Criminal Employment Unit (CEU) will be disbanded after the current identity theft investigation concludes in the end of January or early February of 2015.").

1    As of the date of this order, Plaintiffs continue to face a threat of prosecution.  Finally,
2    Defendants have identified nothing that would prevent the MCSO from resuming
3    enforcement of the identity theft laws at a later date.

4            Nor have Defendants clearly shown that the anonymous affiants are eligible for
5    employment authorization documents. The federal government did recently expand its
6    deferred action program.  *See* Memorandum of Secretary of Department of Homeland
7    Security, *Exercising Prosecutorial Discretion* (Nov. 20, 2014) (available at http://www.
8    dhs.gov/sites/default/files/publications/14_1120_memo_deferred_action.pdf). But even if
9    the affiants meet some of the requirements of that program, their receipt of deferred
10   action is not guaranteed.  "[T]he ultimate judgment as to whether an immigrant is granted
11   deferred action will be determined on a case-by-case basis."  *Id.* at 5.  Furthermore, the
12   newly expanded program may not begin until May of 2015.  *Id.*  Until that time, the three
13   members of Puente who submitted anonymous affidavits face a credible threat of
14   prosecution under the identity theft laws.

15                   **ii.      Constitutional Interests Factor.**

16           The Supreme Court has said that a pre-enforcement challenge may be brought by a
17   plaintiff who alleges "'an intention to engage in a course of conduct *arguably affected*
18   *with a constitutional interest*[.]'"  *Susan B. Anthony*, 134 S. Ct. at 2342 (quoting *Babbitt*,
19   442 U.S. at 298) (emphasis added).  Although courts often quote this language in pre-
20   enforcement challenge cases, they have not explained its meaning or whether it is always
21   required.  Some cases appear to treat this language as a threshold requirement for pre-
22   enforcement challenges, *see, e.g.*, *Sturgeon v. Masica*, 768 F.3d 1066, 1071-72 (9th Cir.
23   2014), while others ignore it entirely, *see, e.g.*, *Holder v. Humanitarian Law Project*, 561
24   U.S. 1, 15 (2010), *Thomas*, 220 F.3d 1134, *San Diego Cnty. Gun Rights Comm.*, 98 F.3d
25   1121.  Without deciding whether this constitutional interest requirement applies to all
26   pre-enforcement challenges, the Court notes that the Ninth Circuit has found it satisfied
27   when a plaintiff challenges a law on constitutional grounds.  In *Valle del Sol*, the plaintiff
28   brought a pre-enforcement challenge to an immigration-related law on Supremacy Clause

grounds.  732 F.3d at 1015.  The Ninth Circuit cited the constitutional interest language and then found that the plaintiff had standing because she "has established a credible threat of prosecution under this statute, which she challenges on constitutional grounds." *Id*.  Here also, Puente's members have established a credible threat of prosecution and challenge the identity theft laws under the Supremacy Clause.

### iii.    First Factor Conclusion.

Three of Puente's members have shown that they are suffering an injury-in-fact due to the credible threat of prosecution they face under the identity theft laws.  This injury is traceable to Defendants who are enforcing the laws, and a favorable decision for Plaintiffs would redress this injury by enjoining such enforcement.  Plaintiffs have made a clear showing that the three members of Puente would have standing to sue in their own right.

### b.    Remaining Factors of Associational Standing.

The second factor for associational standing is whether "the interests [Puente] seeks to protect are germane to the organization's purposes."  *Ecological Rights*, 230 F.3d at 1147.  This prong requires only "mere pertinence between litigation subject and organizational purpose."  *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1159 (9th Cir. 1998) (quoting *Humane Soc'y of the United States v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988)).  Puente's mission is to "develop, educate, and empower migrant communities to enhance the quality of life of our community members."  Doc. 104 at 5; Doc. 30-4, ¶¶ 6, 9.  The subject matter of this litigation – identity theft laws applied to unauthorized aliens – is pertinent to this organizational mission.

The third factor is also satisfied because "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Ecological Rights*, 230 F.3d at 1147.  The individual members of Puente would assert the same right being asserted by Plaintiffs – the right not to be prosecuted under unconstitutional laws – and their individual backgrounds and circumstances would be irrelevant to determining the constitutionality of the identity theft laws.

1   The Court finds that Puente has made a clear showing that it satisfies the three

2   requirements for associational standing.

3                    **2.      Direct Standing of Puente.[5]**

4   A "concrete and demonstrable injury to the organization's activities – with the

5   consequent drain on the organization's resources –" is sufficient to confer direct standing

6   on an organization. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). The

7   Ninth Circuit has "interpreted *Havens* to stand for the proposition that an organization

8   may satisfy the Article III requirement of injury in fact if it can demonstrate:

9   (1) frustration of its organizational mission; and (2) diversion of its resources to combat

10  the [effects of the particular law] in question." *Smith v. Pac. Properties & Dev. Corp.*,

11  358 F.3d 1097, 1105 (9th Cir. 2004) (citing *Fair Hous. of Marin v. Combs*, 285 F.3d 899,

12  905 (9th Cir. 2002)). An organization cannot, however, "'manufacture the injury by

13  incurring litigation costs or simply choosing to spend money fixing a problem that

14  otherwise would not affect the organization at all. It must instead show that it would

15  have suffered some other injury if it had not diverted resources to counteracting the

16  problem.'" *Valle del Sol*, 732 F.3d at 1018 (quoting *La Asociacion de Trabajadores de*

17  *Lake Forest v. Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) (citations omitted)).

18  Puente Arizona has established standing under this test. The declaration of Carlos

19  Garcia, the executive director of Puente, establishes that Puente is a community-based

20  organization with more than two-hundred members, many of whom are unauthorized

21  aliens. Doc. 30-4. Puente serves its members through English classes, "know-your rights

22  workshops," and other educational programs. Mr. Garcia knows many members who

23  have used false information to obtain employment and who face prosecution under the

24  identity theft laws. Mr. Garcia's declaration shows that enforcement of the identity theft

25

─────────────────

26      [5] The Court need "only conclude that one of the plaintiffs has standing in order to
27  consider the merits of the plaintiffs' claim," *Valle del Sol*, 732 F.3d at 1014, but the Court
    will address the standing of all Plaintiffs because Defendants' motion to dismiss
28  challenges that standing, Doc. 53 at 5.

laws has injured Puente Arizona in two ways.  First, many Puente members, including leaders, have reduced their participation in Puente's activities because the identity theft laws have caused financial difficulties and made them afraid of arrest and retaliation. *See, e.g.*, Doc. 30-4, ¶¶ 16, 20-21, 24, 26.  Second, Puente has diverted substantial resources to respond to the workplace raids through which the MCSO has enforced the identity theft laws.  *See, e.g.*, *id.* ¶¶ 28-40.  The declaration of Noemi Romero, a member of Puente, corroborates Mr. Garcia's declaration.  Doc. 30-6 (describing how Puente helped Ms. Romero after she had been arrested during a workplace raid).

These are the kind of injuries that the Ninth Circuit has found sufficient to confer direct standing on an organization.  In *Valle del Sol*, a group of plaintiffs challenged an Arizona law that criminalized the act of harboring or transporting unauthorized aliens. 732 F.3d at 1012-13.  Through written declarations, various organizations claimed that the law deterred participation and required them to divert resources to educate their members.  *Id.* at 1018.  *Valle del Sol* found that the organizations had made a clear showing of injury.  *Id.*; *see also Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012) (finding organizational standing at the preliminary injunction stage because the organization had "investigated Roommate's alleged violations and, in response, started new education and outreach campaigns targeted at discriminatory roommate advertising").

Puente has shown that enforcement of the identity theft laws has deterred participation, thereby frustrating its mission, and forced it to divert resources.  This is an injury fairly traceable to the conduct of Defendants that would be redressed by a favorable decision.  Puente has made a clear showing of its direct standing.

### C.     Reverend Frederick-Gray.

Reverend Frederick-Gray claims standing as a Maricopa County taxpayer. Doc. 23, ¶¶ 165-68.  She objects to the Maricopa County Defendants' enforcement of the identity theft laws as an illegal expenditure of county taxpayer funds.  *Id.*; *see* Doc. 30-8 (Reverend Frederick-Gray's Declaration).  Defendants argue that Reverend Frederick-

Gray's status as a taxpayer is insufficient to confer standing.  Doc. 53 at 7-10.  But Defendants conflate the standards for federal and state taxpayer standing with the standards for municipal taxpayer standing.  Taxpayers generally are not able to challenge an illegal expenditure of federal or state funds.  *See Frothingham v. Mellon*, 262 U.S. 447, 487-88 (1923) (finding that the "relation of a taxpayer of the United States to the federal government . . . . is shared with millions of others, [and] is comparatively minute and indeterminable"); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344-46 (2006) (finding that state taxpayers have no standing to challenge state tax or spending decisions simply by virtue of their status as taxpayers).

The Supreme Court has recognized a different standard for municipal taxpayer standing:

> The interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate.  It is upheld by a large number of state cases and is the rule of this court. . . .  The reasons which support the extension of the equitable remedy to a single taxpayer in such cases are based upon the peculiar relation of the corporate taxpayer to the corporation which is not without some resemblance to that subsisting between stockholder and private corporation.

*Frothingham*, 262 U.S. at 486-87 (citations omitted); *see also DaimlerChrysler*, 547 U.S. at 349 (noting the separate standard for municipal taxpayer standing).  Although the reasoning in *Frothingham* "could be questioned in an age in which some cities boast populations in the millions," *Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 210 (6th Cir. 2011), courts still adhere to its holding on municipal taxpayer standing.  *See id.*; *Pelphrey v. Cobb Cnty., Ga.*, 547 F.3d 1263, 1280-81 (11th Cir. 2008); *United States v. City of New York*, 972 F.2d 464, 470-71 (2d Cir. 1992); *Cammack v. Waihee*, 932 F.2d 765, 770 (9th Cir. 1991); *D.C. Common Cause v. D.C.*, 858 F.2d 1, 4-5 (D.C. Cir. 1988).[6]

---

[6] In his reply brief, Defendant Arpaio argues that the term 'municipal' can only mean a city or town and does not apply to county taxpayers.  Doc. 116 at 6.  But courts have applied the doctrine of municipal taxpayer standing to county taxpayers.  *See Pelphrey v. Cobb Cnty., Ga.*, 547 F.3d 1263 (11th Cir. 2008); *We Are Am./Somos Am., Coal. of Arizona v. Maricopa Cnty. Bd. of Supervisors*, 809 F. Supp. 2d 1084 (D. Ariz. 2011).  This is consistent with how Black's Law Dictionary (9th ed. 2009) defines the term 'municipal': "Of or relating to a city, town, or local governmental unit."  Furthermore, courts in other contexts have found that the term municipal includes county

The Ninth Circuit has applied the "requirement of a pocketbook injury" to municipal taxpayer standing. *Cammack*, 932 F.2d at 770. This means that "municipal taxpayer standing simply requires the 'injury' of an allegedly improper expenditure of municipal funds[.]" *Id.*; *see also Barnes–Wallace v. City of San Diego*, 530 F.3d 776, 786 (9th Cir. 2008) ("[M]unicipal taxpayers must show an expenditure of public funds to have standing."); *We Are Am./Somos Am., Coal. of Arizona v. Maricopa Cnty. Bd. of Supervisors*, 809 F. Supp. 2d 1084, 1108 (D. Ariz. 2011) (finding that "'improper expenditure of public funds' is the crux of any claim that a municipal taxpayer satisfies the injury in fact prong of constitutional standing"). This standard is less stringent than that applied for federal and state taxpayer standing, as there is a "direct and immediate" relation of a taxpayer with her municipality. *See DaimlerChrysler*, 547 U.S. at 349.

There is some uncertainty as to whether a municipal taxpayer must prove the amount that a municipality has spent enforcing an unconstitutional law. *See, e.g.*, *Cammack*, 932 F.2d at 771 (noting that plaintiffs "specifically have stated the amount of funds appropriated and allegedly spent"); *We Are Am.*, 809 F. Supp. 2d at 1110 (noting that although an allegation of improper expenditure is sufficient to survive a motion to dismiss, proof of the amount expended may be necessary later in the case). The Court finds that proof of the amount expended on enforcing the identity theft laws is not necessary for Reverend Frederick-Gray to make a clear showing of standing. The record shows that the Maricopa County Defendants spent taxpayer dollars arresting, jailing, and convicting Plaintiff Sara Arreola under A.R.S. § 13-2009(A)(3). *See* Doc. 69-1 at 34; Doc. 30-7. The precise amount that Defendants spent on this action is irrelevant to the essential nature of Reverend Frederick-Gray's alleged injury – the improper expenditure of taxpayer funds. This injury is fairly traceable to Defendants' conduct in enforcing the identity theft laws, and a favorable decision would redress Reverend Frederick-Gray's injury by preventing further expenditures for enforcement of the identity theft laws. *See,*

governments. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397 (1997) (finding that municipal liability under § 1983 applied to a county government).

*e.g.*, *We Are Am.*, 809 F. Supp. 2d at 1111; *Hinrichs v. Bosma*, 440 F.3d 393, 397-98 (7th Cir. 2006) ("Such an injury is redressed not by giving the tax money back . . . but by ending the unconstitutional spending practice.") (citations omitted).  The Court finds that Reverend Frederick-Gray has made a clear showing of standing.

### III.    Preliminary Injunction.

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quoting 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948, 129-130 (2d ed. 1995)). An injunction may be granted when the movant shows that "'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'"  *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  In this circuit, a preliminary injunction may also be issued when a plaintiff shows that "'serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor.'"  *Alliance for the Wild Rockies v. Cottrell*, 632 F. 3d 1127, 1134-35 (9th Cir. 2011) (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008)).  The movant has the burden of proof on each element of the test.  *Envtl. Council of Sacramento v. Slater*, 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).

### A.    Likelihood of Success on the Merits.

Plaintiffs base their request for a preliminary injunction on their claim that the identity theft laws are preempted under the Supremacy Clause.  "The Supremacy Clause provides a clear rule that federal law 'shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, anything in the Constitution or Laws of any State to the Contrary notwithstanding.'"  *Arizona*, 132 S. Ct. at 2500 (quoting U.S. Const. art. VI, cl. 2).  Under this rule, "Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).  "'[T]he purpose of Congress is

the ultimate touchstone in every pre-emption case.'" *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).   The preemption doctrine consists of three well-recognized classes: express, field, and conflict preemption. *Arizona,* 132 S. Ct. at 2500-01.   Express preemption occurs when Congress "withdraw[s] specified powers from the States by enacting a statute containing an express preemption provision." *Id.* (citing *Whiting*, 131 S. Ct. at 1974-75).   Field preemption precludes states "from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Id.* at 2501 (citing *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 115 (1992)).   Conflict preemption occurs "where 'compliance with both federal and state regulations is a physical impossibility,' *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963), and in those instances where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' *Hines v. Davidowitz,* 312 U.S. 52, 67 (1941)." *Id.*   In resolving preemption challenges to state laws, "courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

Plaintiffs do not claim that the identity theft laws are expressly preempted.   They rely instead on field and conflict preemption.

### 1.    Purpose and Effect of Identity Theft Laws.

Before discussing field and conflict preemption, the Court must address Defendants' argument that preemption analysis does not apply because the identity theft laws are facially neutral as to immigration and unauthorized aliens. *See, e.g.*, Doc. 60 at 9-12; Doc. 75 at 11-13.   The challenged laws are facially neutral.   They criminalize use of the personal identifying information of another person, whether real or fictitious, with the intent to obtain or continue employment, regardless of the immigration status of the person using the information.   A.R.S. §§ 13-2008(A), 13-2009(A).   They apply equally to unauthorized aliens and United States citizens.

1     In a preemption case, however, the Court may consider not only the face of a state

2     law, but also its purpose and effect.[7]  *See New York State Conference of Blue Cross &*

3     *Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 658 (1995) (considering the

4     "purpose and the effects" of the challenged state law).  This requires consideration of the

5     "purpose and intent of the body passing the law at issue," *Tillison v. City of San Diego*,

6     406 F.3d 1126, 1129 (9th Cir. 2005), and "any specific expressions of legislative intent in

7     the statute itself as well as the legislative history," *Cal. Tow Truck Ass'n v. City & Cnty.*

8     *of San Francisco*, 693 F.3d 847, 859 (9th Cir. 2012).

9     In assessing the impact of a state law on a federal scheme, courts "have refused to

10    rely solely on the legislature's professed purpose and have looked as well to the effects of

11    the law."  *Gade*, 505 U.S. at 105; *see also English v. Gen. Elec. Co.*, 496 U.S. 72, 84

12    (1990).  "[W]hen considering the purpose of a challenged statute, [courts are] not bound

13    by '[t]he name, description or characterization given it by the legislature or the courts of

14    the State,' but will determine for [themselves] the practical impact of the law." *Hughes v.*

15    *Oklahoma,* 441 U.S. 322, 336 (1979) (cited by *Gade*, 505 U.S. at 106) (citation omitted).

16    A state law may not "frustrate the operation of federal law [even if] the state legislature in

17    passing its law had some purpose in mind other than one of frustration."  *Perez v.*

18    *Campbell*, 402 U.S. 637, 651-52 (1971).

19    Here, a primary purpose and effect of the identity theft laws is to impose criminal

20    penalties on unauthorized aliens who seek or engage in unauthorized employment.  The

21    titles of H.B. 2779 and H.B. 2745 – the "Legal Arizona Workers' Act" and "Employment

22    of Unauthorized Aliens" – reflect a clear intent to regulate employment of unauthorized

23    aliens.  The bills that enacted the identity theft laws included other provisions that related

24    almost entirely to employment of unauthorized aliens, as discussed above.  The identity

25    _____

26        [7] Defendants argue that because the language of the identity theft laws is
    unambiguous, the Court should not consider legislative purpose and history.  The cases

27    they cite, however, address issues of statutory construction, not preemption. *See, e.g.*,
    *United States v. James*, 478 U.S. 597, 606 (1986); *Rubin v. United States*, 449 U.S. 424,

28    430 (1981); *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108
    (1980).

theft laws will also have the most impact on unauthorized aliens, who often use the "personal identifying information" of another person to "obtain or continue" employment.  *See, e.g.*, Doc. 30-3 at 51 (MCSO News Release, stating that "100% of all suspects found to be committing identity theft to gain employment were illegal aliens").

The legislative history also indicates a purpose to regulate unauthorized aliens who seek employment.  When arguing in support of H.B. 2779's amendment to A.R.S. § 13-2009(A), Senator O'Halleran stated that people convicted under the identity theft law would be encouraged to "self-deport" instead of serving long prison sentences. Doc. 30-3 at 45.  Senator Robert Burns supported H.B. 2779 because it would show that Arizona was tough on illegal immigration.  *Id.* at 42.  Similarly, Representative Russell Pearce – a sponsor of H.B. 2779 and H.B. 2745 (Doc. 30-2 at 55, 69) – made clear that H.B. 2779 was designed to address the problem of illegal immigration.  Doc. 30-3 at 4-7. When signing H.B. 2779 into law, Governor Napolitano noted that a "state like Arizona [has] no choice but to take strong action to discourage the further flow of illegal immigration through our borders."  2007 Ariz. Legis. Serv. Ch. 279 (H.B. 2779) (West).

Defendants provide no legislative history that shows a contrary intent.  Indeed, Defendants suggested during oral argument that there simply is no legislative history pertaining to the identity theft laws.  Doc. 111 at 51-52.  They argued that because H.B. 2779 and H.B. 2745 contain multiple provisions, the Court cannot connect the legislative history to the specific identity theft provisions at issue in this case.  The Court finds this argument unpersuasive because the various provisions of the bills all relate to the employment of unauthorized aliens.

Considering the text, purpose, and effect of the identity theft laws, the Court finds that they are aimed at imposing criminal penalties on unauthorized aliens who seek or engage in unauthorized employment in the State of Arizona.  It is therefore appropriate to consider the preemptive effect of federal immigration law.

### 2. Field Preemption.

"States are precluded from regulating conduct in a field that Congress, acting

within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 132 S. Ct. at 2501. "[F]ield preemption can be inferred either where there is a regulatory framework 'so pervasive . . . that Congress left no room for the States to supplement it' or where the 'federal interest [is] so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Valle del Sol*, 732 F.3d at 1023 (quoting *Arizona*, 132 S. Ct. at 2501). "Where Congress occupies an entire field, . . . even complementary state regulation is impermissible." *Arizona*, 132 S. Ct. at 2501.

When asked during oral argument to identify the precise field occupied by Congress, Plaintiffs' counsel identified two: the regulation of unauthorized-alien employment and the regulation of unauthorized-alien fraud to circumvent the federal employment verification system. Doc. 111 at 18. In *Arizona*, the Supreme Court did not conclude that Congress had occupied the field of unauthorized-alien employment. Although it noted that Congress has regulated that field extensively, it applied conflict preemption in striking down an Arizona law that made it a crime for unauthorized aliens to seek employment. *Arizona*, 132 S. Ct. at 2503-05. If the Supreme Court did not find the field of unauthorized-alien employment preempted, this Court is not likely to either.

The narrower field identified by Plaintiffs – unauthorized-alien fraud in seeking employment – has been heavily and comprehensively regulated by Congress. As noted above, Congress requires employers to verify the authorized status of aliens seeking employment and has established an entire federal system for employment verification. Employers must comply with the program and verify that applicants are authorized to work in the United States, and applicants must submit specified documents for use in the verification system. To combat fraud in obtaining employment, IRCA makes it a federal crime for an applicant to use a false identification document for the purpose of satisfying the federal employment verification system. 18 U.S.C. § 1546(b). IRCA also expands the crimes for selling, making, or using fraudulent immigration documents to include those used "as evidence of authorized . . . employment in the United States." *Id.*

§ 1546(a).  And IRCA specifically identifies other federal criminal statutes that can be applied to fraud in the employment verification process.  *See* Pub. L. 99-603, § 101 (adding 8 U.S.C. § 1324a(b)(5) and listing applicable statutes in Title 18, §§ 1001 [false statements], 1028 [fraud in connection with identity documents], 1546, and 1621 [perjury]).

Congress has also enacted laws that impose civil penalties on persons who use false documents to satisfy the employment verification system.  8 U.S.C. § 1324c.  And Congress has made the use of false employment documents a basis for deportation.  8 U.S.C. § 1227; *see also id.* § 1182(a)(6)(C) (making those who make false claims to citizenship, including for purposes of establishing eligibility for employment, inadmissible and thus ineligible for adjustment of status to that of a lawful permanent resident).

Congress has even regulated the law enforcement use that may be made of documents submitted for federal employment verification.  IRCA provides that any information employees submit to indicate their work status "may not be used" for purposes other than prosecution under specified federal criminal statutes for fraud, perjury, and related conduct – an evident attempt to limit states from using these documents to prosecute crimes.  *See* 8 U.S.C. §§ 1324a(b)(5), (d)(2)(F)-(G).

These provisions evince an intent to occupy the field of regulating fraud against the federal employment verification system.  Congress has imposed every kind of penalty that can arise from an unauthorized alien's use of false documents to secure employment – criminal, civil, and immigration – and has expressly limited States' use of federal employment verification documents.  The Court concludes that Congress has occupied the field of unauthorized-alien fraud in obtaining employment.  As a result, the identity theft laws, which have the purpose and effect of regulating the same field, are likely preempted.

In *United States v. South Carolina*, 720 F.3d 518 (4th Cir. 2013), the Fourth Circuit interpreted the same federal laws that are at issue here and found that they

occupied the field of creating, possessing, and using fraudulent immigration documents. At issue was a South Carolina law that made it unlawful for a person to display or possess a false form of identification for the purpose of proving lawful presence in the United States. *Id.* at 532. South Carolina argued that the law did not relate to immigration and instead addressed ordinary fraud. *Id.* The Fourth Circuit disagreed, finding that the law was "field preempted in that Congress has passed several laws dealing with creating, possessing, and using fraudulent immigration documents." *Id.* at 533 (citing 8 U.S.C. § 1324c(a)(1)-(2); 18 U.S.C. § 1546). Although the state law in *South Carolina* dealt with use of false identification to "prove lawful presence" – not to "obtain or continue employment" – the reasoning in *South Carolina* supports the Court's conclusion that Plaintiffs are likely to prevail on their claim that Congress has occupied the field of regulating fraud in the employment verification process. Other cases also support this conclusion. *See, e.g.*, *Arizona*, 132 S. Ct. at 2503 (finding that federal alien registration laws occupied a field); *Hines*, 312 U.S. at 66-67 (same); *Valle del Sol*, 732 F.3d at 1026 (finding that 8 U.S.C. § 1324 occupied the field of regulating the transportation and harboring of unauthorized aliens).

### 3. Conflict Preemption.

Conflict preemption may occur if a state law "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona*, 132 S. Ct. at 2501 (quoting *Hines*, 312 U.S. at 67). But direct conflict between the state and federal law is not required. Even when state and federal laws have the same general objective, an "inconsistency of sanctions" between the two laws may "undermine[] the congressional calibration of force." *Crosby*, 530 U.S. at 380. As the Supreme Court has explained, a "'[c]onflict in technique can be fully as disruptive to the system Congress enacted as conflict in overt policy.'" *Arizona*, 132 S. Ct. at 2505 (quoting *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 287 (1971)).

Arizona's identity theft laws pursue essentially the same purpose as the federal statutes described above – they seek to deter unauthorized aliens from obtaining

1   employment through the use of fraudulent documents.  But the two sets of laws adopt
2   different sanctions.  The Arizona identity theft laws include only a criminal sanction.
3   They make the use of false documents to obtain employment a felony offense punishable
4   by a prison term that may exceed five years.  *See* A.R.S. §§ 13-2008, 13-2009; 13-702,
5   13-703 (sentencing statutes).  Under the federal scheme, federal authorities have a range
6   of options.  They may impose civil penalties under 8 U.S.C. § 1324c or immigration
7   consequences under 8 U.S.C. § 1227 and § 1182(a)(6)(C).  They may pursue criminal
8   sanctions under 18 U.S.C. § 1546, but only for prison sentences of five years or less.  *Id.*
9   § 1546(b).

10      The overlapping penalties created by the Arizona identity theft statutes, which
11  "layer additional penalties atop federal law," likely result in conflict preemption.
12  *Georgia Latino Alliance for Human Rights v. Governor of Georgia*, 691 F.3d 1250, 1267
13  (11th Cir. 2012).  The Arizona laws "conflict[] with the federal scheme by divesting
14  federal authorities of the exclusive power to prosecute these crimes."  *Valle del Sol*, 732
15  F.3d at 1027.  As the Supreme Court has explained, "'conflict is imminent' whenever
16  'two separate remedies are brought to bear on the same activity.'"  *Wisconsin Dep't of*
17  *Indus., Labor & Human Relations v. Gould Inc.*, 475 U.S. 282, 286 (1986) (quoting
18  *Garner v. Teamsters*, 346 U.S. 485, 498-99 (1953)).

19      In *Arizona*, the Supreme Court considered an Arizona law similar in nature to the
20  identity theft laws.  The law made it a state misdemeanor for "an unauthorized alien to
21  knowingly apply for work, solicit work in a public place or perform work as an employee
22  or independent contractor."  132 S. Ct. at 2503.  After analyzing the relevant provisions
23  of IRCA, the Court found:

24          Arizona law would interfere with the careful balance struck by Congress
            with respect to unauthorized employment of aliens.  Although [the Arizona
25          law] attempts to achieve one of the same goals as federal law – the
            deterrence of unlawful employment – it involves a conflict in the method of
26          enforcement.  The Court has recognized that a "[c]onflict in technique can
            be fully as disruptive to the system Congress enacted as conflict in overt
27          policy."

28  *Id.* at 2504-05 (citations omitted).  This reasoning applies here.  The Court finds that

1    Plaintiffs are likely to succeed in their claim that the identity theft laws are conflict
2    preempted.

3                    **4.    Defendants' Arguments.**

4            In addition to their argument regarding the laws' facial neutrality, Defendants
5    make four arguments for why there is no preemption in this case.  The Court will address
6    each.

7            First, Defendants argue that because there are constitutional applications of the
8    identity theft laws – namely, to United States citizens – Plaintiffs' facial preemption
9    challenge must fail.  Doc. 60 at 11-12.  Relying on *United States v. Salerno*, 481 U.S.
10   739, 745 (1987), Defendants argue that a facial preemption challenge can succeed only if
11   the challenger can show "that no set of circumstances exists under which the act would
12   be valid."  The same argument was made in *Lozano v. City of Hazleton*, 724 F.3d 297
13   (3rd Cir. 2013), another case involving a preemption challenge to an immigration-related
14   law.  The Third Circuit found that "no part of the majority opinion in *Arizona,* and no
15   part of *Whiting,* references *Salerno* at all. . . .  That approach would reject a conflict
16   preemption claim in a facial challenge whenever a defendant can conjure up just one
17   hypothetical factual scenario in which implementation of the state law would not directly
18   interfere with federal law."  *Id.* at 313 n.22.  The Court agrees.  A law "is not saved from
19   pre-emption simply because the State can demonstrate some additional effect outside of
20   the [preempted area]."  *Gade*, 505 U.S. at 107.

21           Second, Defendants emphasize that IRCA expressly preempts "any State or local
22   law imposing civil or criminal sanctions (other than through licensing and similar laws)
23   upon those who employ, or recruit or refer for a fee for employment, unauthorized
24   aliens."  8 U.S.C. § 1324a(h)(2).  Defendants argue that because the express preemption
25   provision is silent as to laws that impose sanctions on unauthorized employees, Congress
26   has impliedly permitted states to pass such laws.  Doc. 69 at 11-12.  The Supreme Court
27   rejected this argument in *Arizona*: "the existence of an 'express pre-emption provisio[n]
28   does *not* bar the ordinary working of conflict pre-emption principles' or impose a 'special

1   burden' that would make it more difficult to establish the preemption of laws falling

2   outside the clause."  132 S. Ct. at 2504-05 (quoting *Geier v. American Honda Motor Co.*,

3   529 U.S. 861, 869-72 (2000)) (emphasis in original).

4          Third, Defendant Montgomery argues that because he applies the identity theft

5   laws in a nondiscriminatory manner, without reference to a person's immigration status,

6   the laws cannot be preempted.  Doc. 75 at 14-22.  Defendant Montgomery emphasizes

7   that he did not lobby for the identity theft laws and has no control over how Sheriff

8   Arpaio enforces the laws.  *Id.*  These points may well be true, but the issue is not how Mr.

9   Montgomery enforces the identity theft laws.  The issue is whether federal immigration

10  law preempts those laws, a question that does not turn on Mr. Montgomery's

11  enforcement practices.

12         Finally, Defendants argue that Plaintiffs have not overcome the presumption

13  against preemption.  Doc. 60 at 12; Doc. 69 at 7; Doc. 75 at 7-8;  As the Supreme Court

14  explained in *Arizona*, "[i]n preemption analysis, courts should assume that the historic

15  police powers of the States are not superseded unless that was the clear and manifest

16  purpose of Congress."  132 S.Ct. at 2501 (citation and quotation marks omitted).  The

17  Court need not decide at this stage whether the regulation of fraud in employment by

18  unauthorized aliens is an area of historic state police powers.  Even applying the

19  presumption, the Court finds that Plaintiffs are likely to succeed on the merits because

20  comprehensive regulation of unauthorized-alien fraud in obtaining employment is a clear

21  and manifest purpose of Congress.[8]

22         **B.    Likelihood of Irreparable Harm.**

23         Having established Plaintiffs' likelihood of success on the merits, the next issue is

24  whether Plaintiffs are likely to suffer irreparable harm absent the protection of a

25  preliminary injunction.  Generally, courts of equity should not act when the moving party

26  _____

27  [8] Defendant Arizona argues that the presumption against preemption requires a
    finding that the state law is preempted "beyond a reasonable doubt," Doc. 60 at 12 (citing
28  *Zadrozny v. Bank of New York Mellon*, 720 F.3d 1163 (9th Cir. 2013)), but this is a state-
    law standard, not the standard that applies in this federal case.  *See, e.g.*, *Arizona v.
    Brown*, 85 P.3d 109, 114 (Ariz. Ct. App. 2004).

"will not suffer irreparable injury if denied equitable relief." *Younger v. Harris,* 401 U.S. 37, 43-44 (1971). Plaintiffs have the burden to establish that there is a likelihood – not just a possibility – that they will suffer irreparable harm if a preliminary injunction is not entered. *See Winter,* 555 U.S. at 21-23. As the Supreme Court has explained, "[t]he key word in this consideration is *irreparable.* Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray,* 415 U.S. 61, 90 (1974) (emphasis in original) (citation omitted); *see also Rent–A–Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991).

As discussed above, three members of Puente face a credible threat of prosecution under the identity theft laws. Furthermore, Plaintiffs have shown that these laws are likely to be found unconstitutional. "[I]f an individual or entity faces the imminent threat of enforcement of a preempted state law and the resulting injury may not be remedied by monetary damages, the individual or entity is likely to suffer irreparable harm." *Valle del Sol v. Whiting*, No. CV 10-1061-PHX-SRB, 2012 WL 8021265, at *6 (D. Ariz. Sept. 5, 2012), *aff'd*, 732 F.3d at 1029 ("[Plaintiffs have] demonstrated a credible threat of prosecution under the statute . . . . Thus, the plaintiffs have established a likelihood of irreparable harm."). The irreparable injury stems from the emotional, reputational, and work-related harms that accompany an illegitimate prosecution. Thus, the Court "may properly enjoin "state officers 'who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected [by] an unconstitutional act, violating the Federal Constitution.'" *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (quoting *Ex parte Young*, 209 U.S. 123, 156 (1908)).

Defendants argue that Plaintiffs' six-year delay in bringing this lawsuit shows that their injury is not irreparable. Doc. 69 at 18-20; Doc. 75 at 22-23.   A plaintiff's delay

in bringing suit can indicate that the asserted injury is not irreparable.  "'A preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights.  By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action.'"  *Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) (quoting *Gillette Co. v. Ed Pinaud, Inc.*, 178 F. Supp. 618, 622 (S.D.N.Y. 1959)).  Delay, however, "is but a single factor to consider in evaluating irreparable injury; courts are 'loath to withhold relief solely on that ground.'"  *Arc of California v. Douglas*, 757 F.3d 975, 990-91 (9th Cir. 2014) (quoting *Lydo*, 745 F.2d at 1214).  "Although a plaintiff's failure to seek judicial protection can imply 'the lack of need for speedy action,' such tardiness is not particularly probative in the context of ongoing, worsening injuries."  *Id.* at 990 (citations omitted).

Delay is not decisive here.  As Plaintiffs explain, the case law concerning the preemptive effect of federal immigration law has dramatically expanded over the past few years.  Two cases that are key to Plaintiffs' arguments – *Arizona* and *Valle del Sol* – were decided recently.  "[W]aiting to file for preliminary relief until a credible case for irreparable harm can be made is prudent rather than dilatory."  *Arc of California*, 757 F.3d at 991.  Puente, suing on behalf of its members, has shown a credible threat of prosecution and, therefore, a likelihood of irreparable harm.[9]

### C.    Balance of Equities and the Public Interest.

The Court finds that the balance of equities tips in favor of Plaintiffs.  Enjoining the enforcement of laws that are likely preempted will impose little hardship on Defendants.  This is particularly true where Defendants will continue to have other laws with which they can combat identity theft.  *See* A.R.S. §§ 13-2002, 13-2008, 13-2009.  Plaintiffs, in contrast, have shown a likelihood of irreparable harm if the laws are not enjoined.

---

[9] Because the Court finds that Plaintiffs have shown a likelihood of irreparable harm to the members on whose behalf Puente is suing, the Court need not address the likelihood of irreparable harm to other Plaintiffs.

The Court also finds that the public interest favors an injunction.  The public has little interest in the enforcement of laws that are unconstitutional.  The Court recognizes that the crime of identity theft affects the lives of many Arizonans.  *See* Doc. 75 at 25-26. But the injunction does not leave Defendants unequipped to combat that crime.

### D.      Preliminary Injunction Conclusion.

Plaintiffs have shown that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of a preliminary injunction, and that the balance of equities and public interest favor an injunction.  The Court therefore will grant Plaintiffs' request for a preliminary injunction and enjoin Defendants from enforcing A.R.S. § 13-2009(A)(3) and the portion of A.R.S. § 13-2008(A) that addresses actions committed "with the intent to obtain or continue employment."[10]

## IV.    Motions to Dismiss.

Defendants argue that Plaintiffs have failed to state a claim under the Equal Protection Clause and against Maricopa County, and that the Court should strike Plaintiffs' complaint in whole or in part for containing impertinent and irrelevant information.  Doc. 53, Doc. 55.  Defendants also make standing arguments the Court has addressed above.

### A.      Equal Protection Claim.

"The first step in determining whether a law violates the Equal Protection Clause is to identify the classification that it draws."  *Coal. for Econ. Equity v. Wilson*, 122 F.3d 692, 702 (9th Cir. 1997).  The classification will help the Court determine whether

---

[10] Defendant Arizona argues that the injunction should be limited to the named plaintiffs.  Doc. 60 at 17 (citing *Zepeda v. INA*, 753 F.2d 719 (9th Cir. 1983)).  The Ninth Circuit has held that a preliminary injunction should be limited to individual plaintiffs unless the court has certified a class.  *Zepeda*, 753 F.2d at 727.  The Ninth Circuit has also held, however, that an injunction is not overbroad because it extends benefits to persons other than those before the Court "if such breadth is necessary to give prevailing parties the relief to which they are entitled."  *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501-02 (9th Cir. 1996).  Because Puente seeks relief on behalf of all its members, the Court concludes that the preliminary injunction should apply to the identity theft laws generally.  As in *Easyriders*, requiring law enforcement officials to distinguish between unauthorized aliens who are members of Puente and those who are not would be impractical, and a less than complete preliminary injunction would therefore likely deny Puente the complete relief to which it is entitled.  *Id.* at 1502.

1   "members of a certain group [are] being treated differently from other persons based on

2   membership in that group."  *United States v. Lopez-Flores*, 63 F.3d 1468, 1472 (9th Cir.

3   1995).  "Second, if it is demonstrated that a cognizable class is treated differently, the

4   court must analyze under the appropriate level of scrutiny whether the distinction made

5   between the groups is justified."  *Id.* (citing *Plyer v. Doe*, 457 U.S. 202, 217-18 (1982)).

6                                **1.      Classification.**

7           A court may determine a law's classifications by how the law discriminates (*i.e.*,

8   differentiates) between groups.  A law may discriminate against a group of people in one

9   of three ways.  First, the law may discriminate on its face, that is, by its explicit terms.

10  *See, e.g.*, *Loving v. Virginia*, 388 U.S. 1 (1967).  Second, the law, although neutral on its

11  face, may be administered in a discriminatory way.  *See, e.g.*, *Yick Wo v. Hopkins*, 118

12  U.S. 356 (1886).  Third, the law, although neutral on its face and applied in accordance

13  with its terms, may have been enacted with a purpose of discriminating.  *See, e.g.*, *Hunter

14  v. Underwood*, 471 U.S. 222 (1985).

15          Plaintiffs argue that the identity theft laws were enacted with a purpose of

16  discriminating.  *See* Doc. 83 at 27-30.  Specifically, they argue that the identity theft laws

17  discriminate against unauthorized aliens by penalizing conduct in which unauthorized

18  aliens are more likely to engage.  *Id.* at 27.  In proving a discriminatory purpose, "[p]roof

19  of discriminatory intent is required to show that state action having a disparate impact

20  violates the Equal Protection Clause."  *McLean v. Crabtree*, 173 F.3d 1176, 1185 (9th

21  Cir. 1999) (citing *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252,

22  265 (1977)).  Plaintiffs must show that the State "selected or reaffirmed a particular

23  course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects

24  upon an identifiable group."  *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279

25  (1979).  The Court may consider various sources of evidence in determining whether a

26  law was adopted "because of" its adverse effects on a group.  *Arlington Heights*, 429 U.S.

27  at 264-68.  "The historical background of the [law] is one evidentiary source, particularly

28  if it reveals a series of official actions taken for invidious purposes."  *Id.* at 267.  "The

1    legislative or administrative history [also] may be highly relevant, especially where there

2    are contemporary statements by members of the decisionmaking body, minutes of its

3    meetings, or reports." *Id.* at 268.

4         Plaintiffs allegations, which must be taken as true in ruling on the motion to

5    dismiss, make a plausible claim that the identity theft laws were adopted "because of"

6    their adverse effects on unauthorized aliens.  Plaintiffs allege that unauthorized aliens are

7    more likely than other people to use the "personal identifying information" of another to

8    "obtain or continue employment."  A.R.S. § 13-2008; *see* Doc. 83 at 27.  Because of this,

9    Plaintiffs argue, there is no other group of employees as uniformly disadvantaged by the

10   identify theft statutes as unauthorized aliens.  *See* Doc. 23, ¶¶ 97-98, 101-05, 126-27

11   (alleging that Defendants systematically enforce the identity theft laws against

12   unauthorized aliens).  "[W]hen the adverse consequences of a law upon an identifiable

13   group are [inevitable], a strong inference that the adverse effects were desired can

14   reasonably be drawn."  *Feeney*, 442 U.S. at 279 n.25.[11]

15        Plaintiffs also allege discriminatory intent.  The historical background of the

16   identity theft laws shows that the Arizona Legislature was passing numerous bills

17   directed at problems associated with unauthorized aliens.  Doc. 23, ¶¶ 35-50.  The

18   legislative history indicates that the legislature hoped the identity theft laws would

19   encourage unauthorized aliens to leave the country.  *See* Doc. 23, ¶¶ 38-39, 55-64

20   (alleging that the identity theft laws were passed as part of a strategy of "attrition through

21   enforcement" towards unauthorized aliens).  Plaintiffs plausibly allege that the identity

22   theft laws were passed with a purpose of discriminating against unauthorized aliens.[12]

23

24        [11] In their reply brief, Defendants argue that Plaintiffs have failed to allege
     sufficient facts to assert disparate impact and discriminatory purpose.  Doc. 118 at 5-10.
25   Defendants also point to legislative history that shows a lack of discriminatory purpose.
     *Id.*  In so arguing, Defendants mistake the appropriate standard for a motion to dismiss.
26   When analyzing a complaint for failure to state a claim under Rule 12(b)(6), the well-
     pled factual allegations are taken as true and construed in the light most favorable to the
27   nonmoving party.  *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009).  Here,
     Plaintiffs have alleged sufficient facts in support of their equal protection claim.

28        [12] Numerous Ninth Circuit cases state that "'[o]nce the plaintiff establishes
     governmental classification, it is necessary to identify a 'similarly situated class' against

2.      **Level of Scrutiny.**

The level of scrutiny applied in an equal protection analysis depends on the classification at issue. If a law classifies on the basis of race or alienage, the law must satisfy strict scrutiny by a showing that the classification is necessary to achieve a compelling government purpose. *See, e.g.*, *Palmore v. Sidoti*, 466 U.S. 429, 432-33 (1984). If a law classifies on the basis of gender or legitimacy, the law must satisfy intermediate scrutiny by a showing that classification has a substantial relationship to an important government purpose. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 533 (1996). For all other classifications, a law must satisfy rational basis review by a showing that the classification is rationally related to a legitimate government purpose. *See, e.g.*, *Pennell v. City of San Jose*, 485 U.S. 1, 14 (1988). Plaintiffs argue that either a "heightened scrutiny" or a rigorous rational basis review should apply. Doc. 83 at 30-34. These are standards of review that do not fit neatly within the traditional categories.

a.      **Heightened Scrutiny.**

Plaintiffs initially argue that some form of "heightened scrutiny" should apply. Doc. 83 at 30. Relying on *Plyer v. Doe*, 457 U.S. 202 (1982), they argue that the Court should assess whether the identity theft laws further a substantial or important state interest. Doc. 83 at 31. While "states must generally treat *lawfully* present aliens the

---

which the plaintiff's class can be compared.'" *Rosenbaum v. City & Cnty. of San Francisco*, 484 F.3d 1142, 1153 (9th Cir. 2007) (quoting *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995)). Plaintiffs have not identified a similarly situated class and Defendants argue that this is a threshold requirement. *See* Doc. 118 at 4. The Court concludes that the requirement of identifying a "similarly situated class" is a threshold requirement in only a minority of as-applied equal protection cases. *See, e.g.*, *Rosenbaum*, 484 F.3d at 1153 (as-applied challenge to a noise ordinance); *United States v. Arenas-Ortiz*, 339 F.3d 1066, 1068-69 (9th Cir. 2003) (as-applied selective prosecution claim); *Freeman*, 68 F.3d at 1187 (as-applied challenge to police practices). Otherwise, the "similarly situated" requirement is simply a restatement of core Equal Protection concerns, namely, that "'all persons similarly circumstanced shall be treated alike.'" *Plyer v. Doe*, 457 U.S. 202, 216 (1982) (quoting *F.S. Royster guano Co. v. Virginia*, 253 U.S. 412, 415 (1920)). In many cases involving an equal protection challenge to a statute based on its discriminatory purpose, the Supreme Court has not discussed or applied the "similarly situated" requirement. *See, e.g.*, *Feeney*, 442 U.S. at 256; *Arlington Heights*, 429 U.S. at 252; *see also* Giovanna Shay, *Similarly Situated*, 18 Geo. Mason L. Rev. 581, 598 (2011) (noting that the 'similarly situated' requirement "has never been viewed by the U.S. Supreme Court as a threshold hurdle to obtaining equal protection review on the merits").

same as citizens, and state classifications based on alienage are subject to strict scrutiny review," *Korab v. Fink*, 748 F.3d 875, 881 (9th Cir. 2014) (emphasis added) (citing *In re Griffiths*, 413 U.S. 717, 719-22 (1973)), the same is not true for unauthorized aliens. "Undocumented aliens cannot be treated as a suspect class because their presence in this country in violation of federal law is not a 'constitutional irrelevancy.'" *Plyler*, 457 U.S. at 223. *Plyler* considered the constitutionality of a Texas law that denied undocumented alien children a free public school education. *Id.* at 205. The Court explained that "undocumented status is not irrelevant to any proper legislative goal. Nor is undocumented status an absolutely immutable characteristic since it is the product of conscious, indeed unlawful action." *Id.* at 220. The Court ultimately applied a form of rational basis review to the law, finding that the law could not "be considered rational unless it furthers some substantial goal of the State." *Id.* at 224.

This language of furthering "some substantial goal" is different from traditional rational basis review, under which a court "will uphold the legislative classification so long as it bears a rational relationship to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996). Plaintiffs argue that this "substantial goal" test should apply here. The Court disagrees. *Plyler*'s holding was expressly grounded on the unique vulnerability of children and the importance of education. The Court emphasized that the Texas law was "directed against children, and imposes its discriminatory burden on the basis of a legal characteristic over which children can have little control." *Plyler*, 457 U.S. at 220. The Court contrasted this with the situation of adult unauthorized aliens, whose presence is "the product of conscious, indeed unlawful, action." *Id.* Because the present case does not involve children and public education, the Court finds that a heightened scrutiny is not appropriate.

### b.    Rigorous Rational Basis Review.

Alternatively, Plaintiffs argue that a more "active" form of rational basis review is required because the identity theft laws are motivated by animus or the desire to punish a politically unpopular group. *See* Doc. 83 at 31. Ordinarily, courts apply rational basis

review in a highly deferential manner, upholding the challenged law "'if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'"   *Heller v. Doe*, 509 U.S. 312, 320 (1993) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)).   This approach reflects "deference to legislative policy decisions" and a reluctance of courts "to judge the wisdom, fairness, logic or desirability of those choices."   *LeClerc v. Webb*, 419 F.3d 405, 421 (5th Cir. 2005).  But "even the standard of rationality . . . must find some footing in the realities of the subject addressed by the legislation."   *Heller*, 509 U.S. at 321 (1993).

Some cases, however, have applied a more rigorous form of rational basis review. *See, e.g.*, *United States v. Windsor*, 133 S. Ct. 2675 (2013); *Romer v. Evans*, 517 U.S. 620 (1996); *Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432 (1985); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973); *Diaz v. Brewer*, 656 F.3d 1008 (9th Cir. 2011). These cases involve laws motivated by "an improper animus" towards a politically unpopular group.  *See, e.g.*, *Windsor*, 133 S. Ct. at 2693.  When a law disadvantages an unpopular group, there arises an "inference that the disadvantage imposed is born of animosity toward the class of persons affected."  *Romer*, 517 U.S. at 634.  This inference cannot be overcome by any conceivable rational basis for the law.  *See Cleburne*, 473 U.S. at 447-50.  Rather, the state must demonstrate that the actual reason for the law was not a desire to discriminate.  *See Romer*, 517 U.S. at 634.  If a court finds that the only actual reason for the law is a desire to discriminate, the court will invalidate the law, relying on the maxim that "a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."  *Moreno*, 413 U.S. at 534; *see also Windsor*, 133 S. Ct. at 2693 (finding that laws may not exist to "impose a disadvantage, a separate status, and so a stigma upon" those of a particular class).

Plaintiffs allege that the identity theft laws are animated by an improper animus towards unauthorized aliens.  Plaintiffs cite numerous statements by legislators that allegedly show hostility towards this group.  *See, e.g.*, Doc. 23, ¶ 56 (state representative urging members not to stand back "while we wait the destruction of our country" and

1   "the destruction of neighborhoods" by illegal aliens); ¶ 64 (state senator saying he wanted
2   to make sure workers would be charged with a serious enough crime to guarantee they
3   "stay in jail" while the case is pending and then be immediately deported).  Plaintiffs
4   allege that unauthorized aliens are a politically unpopular group that has been subjected
5   to frequent discrimination in Arizona.

6        The Court is unsure whether rigorous rational basis review applies to this case.
7   The cases applying rigorous rational basis review involved the denial of government
8   benefits, not the imposition of criminal penalties for clearly criminal conduct.  *See, e.g.*,
9   *Windsor*, 133 S. Ct. at 2683 (surviving spouse of same-sex couple challenged a denial of
10  the spousal deduction tax benefit); *Cleburne*, 473 U.S. at 435-36 (challenge to a zoning
11  ordinance requiring a special use permit for houses for the mentally retarded); *Moreno*,
12  413 U.S. at 529-30 (challenge to a Food Stamp Act amendment that rendered ineligible
13  for certain benefits households containing unrelated persons).  In addition, those cases
14  involved laws that disadvantaged otherwise law-abiding citizens, not persons who are
15  unlawfully present in the country and engaged in fraudulent activity.  Because the case
16  law requires a more rigorous review when an improper animus is alleged, Plaintiffs have
17  alleged that the identity theft laws are the fruit of animus towards unauthorized aliens,
18  and this issue may be more fully illuminated at the summary judgment stage, the Court
19  will assume for purposes of the motion to dismiss that rigorous rational basis review
20  applies.[13]

21            **3.**    **Application.**

22       Plaintiffs claim that the only actual reason for the identity theft laws was to punish
23  or harm a politically unpopular group – unauthorized aliens.  *See* Doc. 83 at 31-34.  They

---

25  [13] The Court finds rigorous rational basis review to be problematic. The rational
    basis test has long been viewed as reflecting the deference courts should afford to the
26  policy-making branches of government. The Court also finds this more rigorous rational
    basis review, with its lack of guiding principles, to be dangerously susceptible to
27  invoking a judge's own policy preferences. These concerns notwithstanding, the Supreme
    Court and Ninth Circuit plainly have applied a more active rational basis review in some
    cases, and those cases constitute precedent binding on this Court.  *See Ariz. Dream Act*
28  *Coal. v. Brewer*, 945 F. Supp. 2d 1049, 1069 (D. Ariz. 2013), *rev'd on other grounds*,
    757 F.3d 1053 (9th Cir. 2014).

also argue that the identity theft laws "were not intended to address identifiable criminal harms separate from the immigration issue."  Doc. 83 at 34; *see* Doc. 23, ¶ 65.  Courts have been reluctant to find that facially neutral criminal laws violate the Equal Protection Clause.   For example, numerous cases have rejected the argument that the stark difference in punishment for crack cocaine offenses and simple powder cocaine offenses violates equal protection.  *See United States v. Singleterry*, 29 F.3d 733, 740-41 (1st Cir. 1994); *United States v. Thompson*, 27 F.3d 671, 678 (D.C. Cir. 1994) (collecting cases); *United States v. Haynes*, 985 F.2d 65, 70 (2d Cir. 1993).  Plaintiffs in those cases argued that the difference was irrational and had a disparate impact on African-Americans, who are more likely to use crack cocaine than Caucasians.  *See Singleterry*, 29 F.3d at 740-41.

Here also, Plaintiffs argue that criminalizing the act of identity theft done "with the intent to obtain or continue employment" will have a disparate impact on unauthorized aliens.  The difference, however, is that Plaintiffs have alleged that the Arizona Legislature *intended* the disparate impact on unauthorized aliens, an allegation that must be taken as true at this stage of the litigation.  And the Court assumes for purposes of this motion that a more rigorous rational basis review will apply – more rigorous than the crack cocaine cases.  *See, e.g.*, *United States v. Cyrus*, 890 F.2d 1245, 1248 (D.C. Cir. 1989).  Applying this standard of review, the Court cannot conclude that Plaintiffs' equal protection claim should be dismissed for failure to state a claim.  *See Moreno*, 413 U.S. at 534.

Defendant Montgomery argues that he does not apply the identity theft laws in a discriminatory manner and his actions therefore do not deny equal protection.  Doc. 55 at 21-22.  This argument misses the point.  Plaintiffs attack the laws he is applying, not his office's prosecutorial decisions.  If the identity theft laws are facially invalid because they deny equal protection, the Court may enjoin him from enforcing those laws.  The Court, therefore, denies Defendants' motions to dismiss Plaintiffs' equal protection claim.[14]

---

[14] Defendant Arpaio argues that Plaintiffs have failed to state a claim under 42 U.S.C. § 1983.  *See* Doc. 53 at 12-13.   To state a claim under § 1983, Plaintiffs must plausibly claim that Defendants (1) acted under the color of state law (2) to deprive

1

**B.     Maricopa County's Liability Under § 1983.**

2          Defendants argue that Maricopa County is not a proper defendant under § 1983

3    because (1) Sheriff Arpaio and County Attorney Montgomery are not final policymakers

4    for the County; (2) the County does not enforce the identity theft laws; and (3) Maricopa

5    County would be unable to legally comply with any injunctive relief the Court might

6    grant.   Doc. 55 at 13-18.   Plaintiffs counter that Maricopa County is liable because

7    Sheriff Arpaio is a final policymaker and the County finances the enforcement of the

8    identity theft laws through tax revenues.  Doc. 83 at 23-25.

9          Under *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 691-94 (1978),

10   municipal liability attaches when a plaintiff's alleged constitutional deprivation was the

11   product of a policy or custom of the local government.   *See also Fogel v. Collins*, 531

12   F.3d 824, 834 (9th Cir. 2008).   "For purposes of liability under *Monell*, a policy is a

13   deliberate choice to follow a course of action . . . made from among various alternatives

14   by the official or officials responsible for establishing final policy with respect to the

15   subject matter in question."   *Id.* (quoting *Fairley v. Luman*, 281 F.3d 913, 918 (9th Cir.

16   2002) (per curiam)) (internal quotations omitted).   A municipal policy may include the

17   decision to enforce a state law.   *Evers v. Custer Cnty.*, 745 F.2d 1196, 1203-04 (9th Cir.

18   1984).  Whether a state official is a final policy maker for purposes of municipal liability

19   is a question of state law.   *See Streit v. County of Los Angeles*, 236 F.3d 552, 560 (9th

20   Cir. 2001).   When determining whether an individual has final policymaking authority,

21   courts ask whether the individual at issue has authority "in a particular area, or on a

22   particular issue."  *McMillian v. Monroe County,* 520 U.S. 781, 785 (1997).

23         The Arizona Constitution creates the elected office of sheriff for each county and

24   provides that the sheriff's duties and powers "shall be as prescribed by law."  Ariz. Const.

25   art. XII, §§ 3-4.  Under A.R.S. § 11-441, the sheriff is empowered to "[a]rrest and take

26

27   Plaintiffs of a constitutional right.  *Ewing v. City of Stockton*, 588 F.3d 1218, 1223 (9th
     Cir. 2009).  Based on the foregoing analysis, Plaintiffs have stated a claim under § 1983.
28   Plaintiffs have plausibly alleged that Defendants are enforcing a law that violates the
     Equal Protection Clause.

before the nearest magistrate for examination all persons who attempt to commit or who have committed a public offense." *Id.* "The purpose of this duty is the prompt and orderly administration of criminal justice, including the Sheriff's discretionary investigatory determination of when enough evidence has been obtained to make an arrest." *Guillory v. Greenlee Cnty.*, No. CV05-352-TUC-DCB, 2006 WL 2816600, at *4 (D. Ariz. Sept. 28, 2006).   Under A.R.S. § 11-444, the local county is responsible for paying the "actual and necessary expenses incurred by the sheriff in pursuit of criminals" as well as additional expenses.

These provisions make Sheriff Arpaio a final policymaker for Maricopa County. Unlike in *McMillian*, where the court found that the sheriff was a state but not a county officer, Arizona law designates the sheriff as a county officer.  *See McMillian*, 520 U.S. at 788-89; *see also* A.R.S. § 11-401 (listing the sheriff as an officer of the county).  The Sheriff's responsibility for criminal law enforcement makes him a person "whose edicts or acts . . . may fairly be said to represent official policy[.]"  *Monell*, 436 U.S. at 694. Sheriff Arpaio's decision to enforce the identity theft laws, therefore, makes Maricopa County liable for that action.  *See Evers*, 745 F.2d at 1203-04.

Defendants argue that Maricopa County's lack of control over Sheriff Arpaio's law-enforcement decisions shows that he is not a final policymaker for the County.  *See* Doc. 118 at 16-19.  But the Arizona Court of Appeals has held that the Sheriff is the final policymaker for the County on matters of jail management, *Flanders v. Maricopa Cnty.*, 54 P.3d 837, 847 (Ariz. Ct. App. 2002), and the County has not explained, nor can the Court discern, how the County has more control over the Sheriff's jail-management decisions than over his law-enforcement decisions.  *Flanders* compels the conclusion that Sheriff Arpaio is the final policymaker for the County on law-enforcement matters. Furthermore, every district court to address this issue has held that Arizona counties are liable for law-enforcement decisions of local sheriffs.  *See United States v. Maricopa Cnty.*, 915 F. Supp. 2d 1073, 1083-84 (D. Ariz. 2012); *Ortega Melendres v. Arpaio*, 598 F. Supp. 2d 1025, 1038-39 (D. Ariz. 2009); *Guillory*, 2006 WL 2816600, at *3-5.

1   Maricopa County argues that its presence in this case could result in it being

2   "bound by an injunction that is not within its authority to comply with under Arizona

3   law." Doc. 55 at 17. The County emphasizes that Arizona law gives it no control over

4   criminal law enforcement. *Id.* at 14 (citing A.R.S. § 11-251). This fact might limit the

5   County's exposure to contempt or other remedies if an injunction is disregarded, but it

6   does not alter the fact that the County is a proper defendant under *Monell*. Due to this

7   finding, the Court need not decide whether County Attorney Montgomery is also an

8   official policymaker for the County.

9   **C.    Rule 8 and Motions to Strike.**

10   Defendants ask the Court to dismiss Plaintiffs' complaint for failing to comply

11   with Rule 8. Doc. 53 at 17; Doc. 55 at 6-7. The rule requires that a complaint contain "a

12   short and plain statement of the claim," and that each "allegation be simple, concise, and

13   direct." Fed.R.Civ.P. 8(a)(2) & 8(d)(1). Defendants argue that the complaint violates the

14   rule because it "contains paragraph after paragraph of vague, conclusory and

15   disconnected allegations, unduly prejudicing [Defendants] by foreclosing reasonable

16   notice and fair opportunity to respond and raising the specter of unnecessary discovery."

17   Doc. 55 at 7. The Court disagrees.

18   The Ninth Circuit has held that "verbosity or length is not by itself a basis for

19   dismissing a complaint based on Rule 8(a)." *Hearns v. San Bernardino Police Dept.*, 530

20   F.3d 1124, 1131 (9th Cir. 2008) (citations omitted); *but see Cafasso, U.S. ex rel. v. Gen.*

21   *Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1059 (9th Cir. 2011) (affirming dismissal of a

22   733-page complaint as prejudicial and showing bad faith). To qualify for dismissal, the

23   complaint must be so complex or confusing that a defendant could not readily discern the

24   allegations being made against him. *See, e.g.*, *McHenry v. Renne*, 84 F.3d 1172, 1178

25   (9th Cir. 1996); *Nevijel v. North Coast Life Ins. Co.*, 651 F.2d 671, 674 (9th Cir. 1981).

26   Plaintiffs' complaint contains 34 pages and 192 paragraphs. The complaint may

27   be long, but it is not so complex or confusing that Defendants are unable to discern the

28   allegations made against them. From its beginning, the complaint makes clear that this

case is about the constitutionality of the identity theft laws under the Supremacy and Equal Protection Clauses.  Doc. 23, ¶ 5.  The complaint delineates the parties and their interests in the case.  *Id.*, ¶¶ 9-16.  It contains factual allegations that, although more extensive than necessary, give substance to Plaintiffs' claims.  *Id.*, ¶¶ 17-168.  The complaint also clearly states the requested forms of relief.  *Id.*, ¶¶ 180-92.  This is not a case where "one cannot determine from the complaint who is being sued, for what relief, and on what theory, with enough detail to guide discovery."  *McHenry*, 84 F.3d at 1178.

Defendants have also move to strike numerous portions of the complaint.  Doc. 53 at 18-25; Doc. 55 at 7-13.  Under Rule 12(f), the "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  Motions to strike are generally disfavored, as they involve a drastic remedy and may be used as a "dilatory or harassing tactic."  5C C. Wright, A. Miller, et al., *Federal Practice & Procedure* § 1380 (3d ed.1998); *see also Torres v. Goddard,* No. CV–06–2482–PHX–SMM, 2008 WL 1817994, at *1 (D. Ariz. Apr. 22, 2008).  Defendants argue that dozens of paragraphs from the complaint are infirm for a variety of reasons.  They argue that specified paragraphs contain argumentative and inflammatory allegations, immaterial and impertinent legislative history, vague and confusing statements, as well as other problems.  Defendants essentially invite the Court to place the complaint under a microscope and assess whether each statement is pertinent to this case.  The Court declines the invitation.  A party's "assertions in its pleadings are not evidence."  *United States v. Zermeno*, 66 F.3d 1058, 1062 (9th Cir. 1995).  The Court will deny Defendants' motions to strike.[15]

**V.    Motions to Supplement.**

Plaintiffs and Defendants have filed motions for leave to file supplemental declarations, evidentiary records, responses, and surreplies.  Docs. 84, 98, 103, 123.

---

[15] As a separate argument, Defendant Arpaio asks the Court to strike paragraphs in the complaint that contain allegations regarding the MCSO because the MCSO is a "nonjural" entity.  Doc. 53 at 16.  The MCSO, however, is not named as a defendant in the complaint.  *See* Doc. 23.  The allegations regarding the MCSO are relevant to Plaintiffs' claims against Defendant Arpaio.

Given the accelerated nature of the proceedings in this case, the importance of the issues, and the lack of opposition to the motions, the Court will grant the motions.  The Court has read and considered the supplemental documents in rendering its decision.

**IT IS ORDERED:**

1.  Plaintiffs' motion for a preliminary injunction (Doc. 30) is **granted**.  Until further order of the Court, Defendants are enjoined from enforcing A.R.S. § 2009(A)(3) and the portion of A.R.S. § 13-2008(A) that addresses actions committed "with the intent to obtain or continue employment."

2.  Defendants' motions to dismiss and strike (Docs. 53, 55, 127) are **denied**.

3.  Parties' motions to supplement (Docs. 84, 98, 103, 123) are **granted**.

Dated this 5th day of January, 2015.


_____
David G. Campbell
United States District Judge