Anne Lai (admitted *pro hac vice*)
*alai@law.uci.edu*
Sameer Ashar (admitted *pro hac vice*)
*sashar@law.uci.edu*
University of California, Irvine School
   of Law – Immigrant Rights Clinic
401 E. Peltason Dr., Ste. 3500
Irvine, CA 92616-5479
Telephone: (949) 824-9894
Facsimile: (949) 824-2747

Daniel J. Pochoda (SBA No. 021979)
*dpochoda@acluaz.org*
Joshua D. Bendor (SBA No. 031908)
*jbendor@acluaz.org*
ACLU Foundation of Arizona
3707 N. 7th St., Ste. 235
Phoenix, AZ 85014
Telephone: (602) 650-1854

Ray A. Ybarra Maldonado
   (SBA No. 027076)
*rybarra@stanfordalumni.org*
Law Office of Ray A. Ybarra
   Maldonado, PLC
2637 North 16th St., Unit 1
Phoenix, AZ 85006
Telephone: (602) 910-4040

Jessica Karp Bansal (admitted *pro hac
   vice*)
*jbansal@ndlon.org*
National Day Laborer Organizing
   Network
675 S. Park View St., Ste. B
Los Angeles, CA 90057
Telephone: (213) 380-2214

Jessica Myers Vosburgh (admitted *pro
   hac vice*)
*jvosburgh@ndlon.org*
National Day Laborer Organizing
   Network
2104 Chapel Hill Road
Hoover, AL 35216
Telephone: (205) 317-1481

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

Puente Arizona, Susan E. Frederick-Gray, Russell Andrew Burnette and Erin Tamayo, on behalf of themselves and all others similarly situated; Sara Cervantes Arreola; and Elia Estrada Fernandez,

Plaintiffs,

v.

Joseph M. Arpaio, Sheriff of Maricopa County, Arizona, in his official capacity; Bill Montgomery, Maricopa County Attorney, in his official capacity; Maricopa County, Arizona; and the State of Arizona,

Defendants.

No. 2:14-cv-01356-DGC

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

CLASS ACTION

# INTRODUCTION

1.      This action challenges two state laws, Arizona House Bill 2779 ("H.B. 2779"), passed in 2007, and Arizona House Bill 2745 ("H.B. 2745"), passed in 2008, which sought, in relevant part, to criminally punish individuals who do not have federal authorization to work in the United States for the act of securing employment. Both measures were promulgated as part of a broader platform favored by Arizona nativists to make life so difficult for immigrants coming from Mexico and Latin America that they would "self-deport."

2.      Arizona entered uncharted territory as a state when it revised its identity theft laws to achieve this aim. Specifically, H.B. 2779, also called the "Legal Arizona Workers Act," created a new offense of aggravated identity theft to use the information of "another person, including a real or fictitious person, with the intent to obtain employment." A.R.S. § 13-2009(A)(3). H.B. 2745 supplemented the Legal Arizona Workers Act by defining the offense of identity theft to include use of another's information, real or fictitious, "with the intent to obtain or continue employment." § 13-2008(A).

3.      The action also challenges the Maricopa County Sheriff's Office (the "MCSO") and the Maricopa County Attorney's Office (the "MCAO") effort, funded by Maricopa County, to use the above-described provisions in A.R.S. §§ 13-2008(A) and 13-2009(A)(3) (collectively referred to as the "worker identity provisions"), together with Arizona's forgery statute, A.R.S. § 13-2002, to carry out a campaign to target undocumented immigrants in the workplace for arrest and prosecution.[1]

4.      The effect of these measures has been to turn individuals such as Plaintiff Sara Cervantes Arreola—who worked for years at a grocery store on Phoenix's west

---

[1] Plaintiffs use the terms "undocumented immigrant" and "undocumented worker" in this Complaint to refer to individuals who do not have federal authorization to work in the United States. The only exception is that where materials quoted by Plaintiffs use a different term—such as "illegal immigrants," "illegal aliens," "aliens" and "illegals"— then Plaintiffs will use that terminology for purposes of faithfully reproducing the quote.

side to support her young son—into convicted felons. Ms. Cervantes Arreola was arrested at work in January 2013 for using identifying information of a fictitious person, something she needed to do in order to get the job.

5.    MCSO's and MCAO's enforcement campaign has separated breadwinners from their families, suppressed workers' rights, eroded the social fabric of the community, and ultimately harmed many U.S. citizens as well as immigrants. Taxpayer funds have been improperly diverted from essential public services to jail and prosecute workers. And organizations such as Plaintiff Puente Arizona have had to respond to the fallout of enforcement operations by providing humanitarian and advocacy assistance to affected families.

6.    Defendants' effort to single out employment by undocumented workers intrudes upon an area of exclusive federal control. It interferes and conflicts with federal laws established by Congress and implemented by the executive branch regulating immigration and employment, and thus violate the Supremacy Clause. The worker identity provisions also discriminate on the basis of alienage in violation of the Fourteenth Amendment of the U.S. Constitution.

7.    Plaintiffs bring this action seeking declaratory and injunctive relief to prevent further unconstitutional arrests and prosecutions and an expungement of records for the two Plaintiffs who have been improperly convicted.

## JURISDICTION AND VENUE

8.    This action arises under 42 U.S.C. § 1983 and the laws and Constitution of the United States.  This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.  The Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

9.    Venue is proper under 28 U.S.C. § 1391(b). All Defendants are sued in their official capacity and their official places of business are located within this District.

A substantial part of the events or omissions giving rise to the claims occurred in this District.

**PARTIES**

**Plaintiffs**

10.    Plaintiff Puente Arizona ("Puente") is a grassroots membership organization based in Phoenix. Its mission is to promote justice, human dignity, non-violence and interdependence. It aims to develop, educate, and empower immigrant communities, and to enhance the quality of life of immigrants. Puente provides free English classes, media trainings, know-your-rights workshops, health and wellness training, educational programs for children, and other services to the community. The arrests and prosecutions of workers under A.R.S. §§ 13-2002, 13-2008(A) and 13-2009(A)(3) have frustrated Puente's mission by creating a climate of fear and separating parents, community leaders, and students from those who depend on them. Puente has been forced to cut back on its services and divert scarce resources in order to assist affected workers and their families. In addition, some members of Puente are currently at risk of being investigated, arrested, detained and/or prosecuted under the worker identity provisions and forgery statute.

11.    Plaintiff Sara Cervantes Arreola is a resident of Glendale, Arizona and mother of a 6-year-old son and a 5-month old baby. From 2007 to 2013, Ms. Cervantes worked up to 14 hours a day, five days a week in the produce department at Lam's Supermarket to provide for her family. On January 17, 2013, she was arrested at work by the MSCO during a workplace raid for using the identity of a fictitious person to obtain employment. On March 18, 2013, she pled guilty to aggravated identity theft, a Class 3 felony, under A.R.S. § 13-2009.

12.    Plaintiff Elia Estrada Fernandez is a resident of Mesa, Arizona and the mother of three young children. From 2013 to 2014, Ms. Estrada worked at Arby's in Chandler Arizona to provide for her family. On September 22, 2014, she was arrested by

4

the Gilbert Police Department and charged with using a false identity to work. On October 28, 2014, she pled guilty to one count of aggravated taking the identity of another with intent to obtain employment under A.R.S. § 13-2009, a Class 3 felony.

13.     Plaintiff Reverend Susan E. Frederick-Gray is the Lead Minister of the Unitarian Universalist Congregation of Phoenix, Arizona.  She works in, resides in, owns property in and pays taxes to Defendant Maricopa County.  Upon information and belief, Maricopa County has been using taxes paid by Plaintiff Frederick-Gray to enforce A.R.S. §§ 13-2002, 13-2008(A) and 13-2009(A)(3) against undocumented workers. Plaintiff Frederick-Gray is challenging the enforcement of these statutes as an illegal expenditure of county taxpayer funds.

14.     Plaintiff Reverend Russell Andrew Burnette is the Senior Minister at Valley Unitarian Universalist Congregation in Chandler, Arizona.  He works in, resides in, owns property in and pays taxes to Defendant Maricopa County.  Upon information and belief, Maricopa County has been using taxes paid by Plaintiff Burnette to enforce A.R.S. §§ 13-2002, 13-2008(A), and 13-2009(A)(3) against undocumented workers. Plaintiff Burnette is challenging the enforcement of these statutes as an illegal expenditure of county taxpayer funds.

15.     Plaintiff Reverend Erin Tamayo is a pastor of the Presbyterian Church USA. She works in, resides in, owns property in and pays taxes to Defendant Maricopa County.  Upon information and belief, Maricopa County has been using taxes paid by Reverend Tamayo to enforce A.R.S. §§ 13-2002, 13-2008(A), and 13-2009(A)(3) against undocumented workers. Reverend Tamayo is challenging the enforcement of these statutes as an illegal expenditure of county taxpayer funds.

**Defendants**

16.     Defendant Joseph M. Arpaio ("Arpaio") is the elected Sheriff of Maricopa County, Arizona. He is the final policymaker for Maricopa County in the area of law enforcement, and is responsible for setting the policies, practices and customs of the

MCSO, including those pertaining to the agency's enforcement of A.R.S. §§ 13-2002, 13-2008(A) and 13-2009(A)(3). Defendant Arpaio is sued in his official capacity.

17.     Defendant Bill Montgomery ("Montgomery") is the elected County Attorney for Maricopa County, Arizona. Defendant Montgomery is the chief official responsible for the enforcement and prosecution of felonies within Maricopa County, including A.R.S. §§ 13-2002, 13-2008(A) and 13-2009(A)(3), as well as misdemeanors that occur in unincorporated areas. Defendant Montgomery is the final policymaker for Maricopa County on matters of prosecution. He is sued in his official capacity.

18.     Defendant Maricopa County, Arizona, is a political subdivision formed and designated as such pursuant to Title 11 of the Arizona Revised Statutes.  Maricopa County is liable for the practices and policies of Defendants Arpaio. The County has also acquiesced in and, through local tax revenues, financed the enforcement of A.R.S. §§ 13-2002, 13-2008(A) and 13-2009(A)(3) by MCSO and MCAO as described in this Complaint.

19.     Defendant State of Arizona is a state in the United States. It includes the Arizona Department of Public Safety ("DPS"), which is responsible for collecting, storing and disseminating criminal history records and related criminal justice information for the state of Arizona.

## FACTUAL ALLEGATIONS

### Exclusive Federal Control over Immigration and Employment Verification

20.     More than 20 years before Arizona sought to regulate the employment of undocumented immigrants through H.B. 2779 and H.B. 2745, Congress enacted the Immigration Reform and Control Act of 1986 ("IRCA"), Pub. L. 99-603, "a comprehensive framework for combatting the employment of illegal aliens." *Arizona v. United* States, 132 S. Ct. 2492, 2504 (2012) (internal quotation omitted).

21.     IRCA added to an already extensive system of federal laws addressing the entry, expulsion and treatment of immigrants in the Immigration and Nationality Act ("INA"). *See* 8 U.S.C. § 1101 *et seq*.

22.     The Constitution grants the federal government exclusive, plenary power over immigration matters, stating that the federal government may "establish a uniform Rule of Naturalization," U.S. Const. art. 1, § 8, cl. 4, and "regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, cl. 3.

23.     Congress's comprehensive system of federal laws governing immigration generally leaves no room for supplemental or parallel state laws.

24.     In passing IRCA, Congress balanced numerous factors in settling on a scheme for the regulation of immigration and employment that imposed a graduated series of civil and criminal sanctions on employers for the knowing employment of undocumented workers. Congress located this new scheme in the immigration statutes. *See* 8 U.S.C. § 1324a *et seq*.

25.     The comprehensive framework created by Congress does not impose criminal sanctions on the employee side for unauthorized work. Proposals to make seeking or engaging in unauthorized work a criminal offense were introduced and debated. However, Congress decided not to adopt them.

26.     As the Supreme Court recently recognized, "IRCA's framework reflects a considered judgment that making criminals out of aliens engaged in unauthorized work—aliens who already face the possibility of employer exploitation because of their removable status—would be inconsistent with federal policy and objectives." *Arizona*, 132 S. Ct. 2492 at 2504.

27.     Committee reports accompanying IRCA confirmed Congress's view that undocumented workers should not be treated as severely as the employers that hire them. They recognized that there are "severe economic 'push factors' that lead aliens to enter the country illegally" and that "many who enter illegally do so for the best of

motives—to seek a better life for themselves and their families." H.R. Rep. 99-682, part 1, at 46, 63; *see also* S. Rep. No. 99-132, at 3.

28.     Further, in IRCA, Congress established a detailed procedure by which employers would have to verify prospective employees' eligibility for employment. 8 U.S.C. § 1324a(a)(1)(B). This procedure involves the inspection of certain documents to confirm identity and employment eligibility and completion of a Form I-9, Employment Eligibility Verification Form. *Id.*; *see also* 8 C.F.R. § 274a.2.

29.     Anticipating that some might respond to the new verification system by relying on false documents or making false statements, Congress also endowed federal authorities with certain tools to combat document fraud.

30.     Section 103 of IRCA amended 18 U.S.C. § 1546 pertaining to "Fraud and misuse of visas, permits, and other documents" to impose a criminal penalty for the use of a false identification document or making of a false attestation for purposes of satisfying the employment verification requirement. 18 U.S.C. § 1546(b). Section 103 also expanded the prohibition on selling, making or using fraudulent immigration documents to include those documents used "as evidence of authorized . . . employment in the United States." 18 U.S.C. § 1546(a).

31.     In addition to 18 U.S.C. § 1546, Congress specifically designated several existing federal criminal statutes that could be applied to fraud in the employment verification process. *See* 8 U.S.C. § 1324a(b)(5) (listing applicable statutes, consisting of Title 18, Sections 1001 [false statements], 1028 [fraud in connection with identity documents], 1546 and 1621 [perjury]).

32.     Congress has also created certain civil penalties for document fraud. 8 U.S.C. §1324c allows an administrative law judge to impose a fine, after a hearing, of $250-$2,000 on any person or entity who knowingly "forge[s]," "use[s]" or "attempt[s] to use" a document not belonging to the possessor to satisfy the requirements of the INA, including for purposes of obtaining employment. 8 U.S.C. §§1324c(a)(1)-(4), 1324c(d).

33.     Finally, immigration consequences can attach to document fraud in the employment verification process. *See, e.g.*, 8 U.S.C. § 1227(a)(3)(C)(i) (making "an alien who is the subject of a final order for violation of section 1324c of this title [] deportable"); 8 U.S.C. § 1182(a)(6)(C) (making those who make false claims to citizenship, including for purposes of 8 U.S.C. § 1324a, inadmissible and thus ineligible for adjustment of status to that of a lawful permanent resident). Conversely, federal authorities may decide to forego sanctions, for example, in cases where a worker is the victim of labor trafficking, other labor violations or could otherwise be helpful to a law enforcement investigation. *See, e.g.*, 8 U.S.C. §§ 1101(a)(15)(T), 1101(a)(15)(U).

34.     Congress made a point to circumscribe punishment of fraud in the employment verification process to enforcement of the immigration statutes and the several criminal statutes listed in 8 U.S.C. § 1324a. *See* 8 U.S.C. §§ 1324a(b)(5) (limiting use of the "[Form I-9] attestation form . . . and any information contained in or appended to such forms" to "enforcement of this chapter and sections 1001, 1028, 1546, and 1621 of Title 18") and 1324a(d)(2)(F) (requiring that any changes to the employment verification system continue to meet the requirement that it "not be used for law enforcement purposes, other than for enforcement of this chapter or sections 1001, 1028, 1546, and 1621 of Title 18). The limitation on the use of the attestation form extends to "copies or electronic images of documents . . . used to verify an individual's identity or employment eligibility." 8 C.F.R. § 274a.2(b)(4).

35.     Congress also included other language reinforcing the limitations on the use of the employment verification system. It included sections titled "Limited use of system," 8 U.S.C. § 1324a(d)(2)(C), "Restrictions on use of new documents," 8 U.S.C. § 1324a(d)(2)(G), and limited the "Copying of documentation permitted." 8 U.S.C. § 1324a(b)(4).

36.     In sum, in establishing the new employer sanctions regime in IRCA, Congress "made clear" that the verification process created by the legislation and the

"information employees submit to show their work status" was to be used to enforce federal law and not for any other purpose. *Arizona*, 132 S. Ct. 2492 at 2504.

37. The federal government's creation of a pervasive, complex array of civil, criminal and immigration tools to address fraud in the employment verification process further manifests its purpose to preclude any state or local regulation on the same subject. Congress has expressed much more than a "peripheral concern" with the issue, *De Canas v. Bica*, 424 U.S. 351, 360 (1976); indeed, it has fully occupied the field.

**Arizona Legislature Adopts Anti-Immigrant Agenda, Amends Identity Theft Laws**

38. Beginning in 2004, citizen groups in Arizona began to converge around a platform of protecting against the perceived threats posed by the state's immigrant population.

39. These nativist groups, such as the Minuteman Civil Defense Corps, found a sympathetic ear in then-Arizona House Representative Russell Pearce, among other elected officials.

40. In 2004, Pearce authored and championed for the passage of Proposition 200, a ballot initiative that would require proof of citizenship in voter registration and limit immigrant families' access to public benefits. He would go on to author many more measures dealing with immigration over the following six years, first as a representative and then later as a state senator, as part of a comprehensive strategy he called "attrition through enforcement."

41. The goal of "attrition through enforcement" was to make life so difficult for undocumented immigrants and their families that they would "deport themselves." For example, "attrition through enforcement" was the explicit aim of Pearce's Senate Bill 1070, an omnibus immigration measure passed in 2010, much of which has since been found to be unconstitutional.

42. According to an April 2006 Center for Immigration Studies article that Pearce circulated to supporters, the "attrition through enforcement" strategy had different components, such as the enactment of local regulation to discourage

immigrants from settling in a location and the aggressive expansion of the role of state and local law enforcement agencies in the apprehension and detention of immigrants. Another element focused on "*ending misuse of Social Security and IRS identification numbers, which illegal immigrants use to secure jobs . . . .*" (emphasis added). A copy of the email from Pearce is attached as Exhibit 1 to this Complaint.

43.     The Arizona Legislature incorporated this latter aspect of the attrition through enforcement strategy in a Pearce-sponsored bill in 2006, House Bill 2577 ("H.B. 2577").

44.     H.B. 2577, in relevant part, added a provision to the Arizona criminal code that defined the offense of forgery to include the making or alteration of a written instrument "that is used to obtain employment in this state by a person who is not authorized to work in the United States." The bill specifically made this type of forgery, targeted at undocumented workers, a Class 3 felony, punishable by up to 7 years, A.R.S. §13-702(D), while all other types of forgery would remain Class 4 felonies under the statute.

45.     To mobilize support for measures like H.B. 2577 in the Legislature, Pearce encouraged and played on the fear and resentment his constituents felt towards immigrants.

46.     For example, he forwarded a message from two residents of his home district in Mesa advocating for passage of H.B. 2577 that included grievances about "a mass invasion of historic proportions" by "an Hispanic 'migrant army,'" members of whom were "corrupt[ing] our unifying national language while actively disrespecting our culture, society and country." A copy of the email from Pearce is attached as Exhibit 2 to this Complaint.

47.     Pearce has himself discussed the "threat" he believes is posed by immigration from Mexico.

48.     During a February 6, 2006 House Federal Mandates and Property Rights Committee hearing, in which he was advocating for H.B. 2577, Pearce proclaimed,

incorrectly, that "[Arizona is] number one in the nation in crime, number one!" He explained, "[T]here's a clear reason for that, and that's that connection we have to open borders and our failure to secure that border." Arizona Legislature recording of February 6, 2006 House Federal Mandates and Property Rights Committee hearing, at approximately 8:07 of discussion on H.B. 2577.

49.     During a Senate Appropriations Committee hearing on April 19, 2006, Pearce remarked that "We have an illegal alien crisis and we all recognize that." Arizona Legislature recording of April 19, 2006 Senate Appropriations Committee hearing, at approximately 11:15 of discussion on H.B. 2577. He further discussed "the Mexican government in their 12th edition of 'How to Break into America and Get Free Stuff.'" *Id.* at approximately 14:55.

50.     Pearce specifically alerted supporters to the phenomenon of individuals using false Social Security numbers to work.

51.     In 2006, he forwarded an article that presented the issue as one about, among other things, "illegals" who "smuggle [themselves] across the border and take a job that lawfully belongs to an American." A copy of the email from Pearce is attached as Exhibit 3 to this Complaint.

52.     In a 2007 email to a constituent who had advocated for classification of certain "illegals" as "domestic terrorists," Pearce discussed the "rapidly growing crime" of "illegal aliens stealing identities to get American jobs." A copy of the email from Pearce is attached as Exhibit 4 to this Complaint.

53.      Although H.B. 2577 passed the Legislature in 2006, it was vetoed by the Governor.

54.     Pearce made another attempt the next year. In 2007, he introduced H.B. 2779, a bill that would eventually come to be known the Legal Arizona Workers Act.

55.     Section 1 of H.B. 2779 amended Arizona's aggravated identity theft statute to punish individuals for using the information of "another person, including a real or fictitious person, with the intent to obtain employment." A.R.S. §13-2009(A)(3).

Previously, an individual was only punishable under this statute if he or she had bought, manufactured or used the identity of five or more persons, or caused the loss of $3,000 or more. H.B. 2779 expanded the grounds of this Class 3 felony to also include the use of false information to work, whether or not the employee used the information of additional persons or caused economic loss to any person or entity.

56.     By contrast, an individual under 21 years of age who uses false identification to illegally obtain liquor was exempt under the statute and guilty only of a Class 1 misdemeanor, punishable by up to 6 months. A.R.S. §§ 13-2009(C); 4-241(L), 13-707(A).

57.     Other aspects of H.B. 2779 required employers to use the basic pilot E-Verify program and imposed sanctions in the form of license suspension on employers found to have knowingly employed undocumented immigrants.[2] The full text of the law, as enacted, is attached as Exhibit 5 to this Complaint and is incorporated by reference.

58.     Legislators plainly understood that the purpose of H.B. 2779, including the amendments to A.R.S. § 13-2009, was to address the employment of undocumented immigrants. Their contemporary statements and legislative fact sheets for the bill reflected this purpose. They wanted to do so specifically because they were dissatisfied with the federal government's handling of the issue.

59.     During a House Government Committee hearing on February 20, 2007 at which he appeared to discuss H.B. 2779, Pearce urged members to not wait "while we watch the destruction of our country" and "the destruction of neighborhoods" by illegal aliens. Arizona Legislature recording of February 20, 2007 House Government Committee hearing, at approximately 2:55:55. He declared that "the feds have not done their job" to quell what he described as a "national epidemic," and insisted that

---

[2] The sanctions on employers later were found permissible under an express savings clause in 8 U.S.C. § 1324. *See Chamber of Commerce of U.S. v. Whiting*, 131 S. Ct. 1968 (2011) (discussing 8 U.S.C. § 1324(h)(2)). There is no savings clause allowing states to impose penalties on employees.

"[Arizona] need[s] to step up to the plate . . . ." *Id.* at approximately 02:56:47 and 02:57:54.

60.     At a June 20, 2007 Conference Committee hearing, Pearce responded to a proposal that the Legislature delay passage of the bill to resolve some outstanding concerns by stating "It's about time we do something. The public's tired of waiting . . . The [corresponding ballot] initiative is out there because of the failure of both the federal government and the state government to do their job . . . and it's sad that [Congress is] working on [amnesty] . . . . This law's needed whether they do something or not … and . . . securing the borders is needed." Arizona Legislature recording of June 20, 2007 Conference Committee hearing at approximately 00:36:38, 00:38:35 and 00:38:55 of.

61.     Just two days before the Conference Committee hearing, Pearce had forwarded the April 2006 Center for Immigration Studies article identifying undocumented workers' use of false Social Security numbers as a target for the "attrition through enforcement" immigration strategy to supporters and, upon information and belief, colleagues in the Legislature. A copy of the email from Pearce is attached as Exhibit 1 to this Complaint.

62.     Other legislators also voiced their frustration with the perceived failures on immigration at the federal level and the need to take the issue into their own hands.

63.     During a Senate Committee of the Whole hearing on May 23, 2007 Senator Chuck Gray explained that he was supporting H.B. 2779 because it "advances the cause of protecting our citizens against something that the federal government won't do." Arizona Legislature recording of May 23, 2007 Senate Committee of the Whole hearing, at approximately 01:14:46.

64.     Proponents of the bill were committed to ensuring that workers under would receive a harsh penalty under the measure, *because of* their undocumented status and *because* the provision had to do with immigration.

65.     Though being unlawfully present is a civil offense under the immigration laws, some legislators seemed to operate under the assumption that it is a crime. For

14

instance, while addressing a proposed amendment to H.B. 2779 during a House Committee of the Whole hearing on March 15, 2007, Representative Bob Robson emphasized, erroneously, that "being in the country illegally is a criminal violation!" Arizona Legislature recording of March 15, 2007 House Committee of the Whole hearing, at approximately 00:32:05.

66.     When one Representative, Jorge Luis Garcia, proposed that the bill be amended to make the offense a Class 6 rather than a Class 3 felony during the May 23, 2007 Senate Committee of the Whole hearing, noting that "there's a lot of issues out there that certainly are much more serious crimes than working here illegally," co-sponsor Senator Robert Burns, stated "I guess the issue of the penalty, and whether the penalty fits the crime is certainly a worthwhile debate; however, I think the timing on this particular issue is really critical. At this point, we're all aware of the turmoil that has come out of the [immigration reform] proposal at the federal level. I believe this would be viewed as a weakening of our opposition to illegal immigration and so for that reason I would oppose the amendment." Arizona Legislature recording of May 23, 2007 Senate Committee of the Whole hearing, at approximately 00:30:30 and 00:33:08.

67.     During the same hearing on May 23, 2007, Senator Tom O'Halloran stated his intent to make sure workers would be charged with a serious enough crime to guarantee they "stay in jail" while the case is pending and then be immediately deported. Arizona Legislature recording of May 23, 2007 Senate Committee of the Whole hearing, at approximately 00:57:50. He erroneously believed they could "be deported by the State of Arizona." *Id.* at 00:57:20.

68.     The Legislature did not make any findings or conduct any studies regarding the specific financial or other harm to individuals' whose identities were used as a result of this activity.

69.     Unlike other situations commonly understood as "identify theft," undocumented workers do not take money or make purchases in the name of the person whose information they use. In many cases undocumented workers do not know if the

information they are using belongs to a real person, and often, the information *does not* belong to a real person.

70.     The legislative proceedings demonstrate that the motivation for Section 1 in H.B. 2779 was related to legislators' views regarding illegal immigration and not to address identifiable criminal harms of identity theft.

71.     In signing H.B. 2779 into law, Governor Napolitano also identified the measure as reflecting state frustration with the federal handling of immigration. She stated, "Immigration is a federal responsibility, but I signed House Bill 2779 because it is abundantly clear that Congress finds itself incapable of coping with the comprehensive immigration reforms our country needs." Letter from Janet Napolitano to Jim Weiers (July 2, 2007), available at http://www.azsos.gov/public_services/Chapter_Laws/2007/48th_Legislature_1st_Regular_Session/CH_279.pdf.

72.     Napolitano was quoted in news sources as saying, about the bill, "We're dealing somewhat in uncharted territory right now . . . . The states will take the lead, and Arizona will take the lead among the states." Matthew Benson, *Governor OKs toughest migrant-hire law in U.S.*, ARIZ. REPUBLIC, July 3, 2007.

73.     With the adoption of H.B. 2779, Arizona had appeased constituents who had expressed hostility and bias against undocumented workers. Champions of the bill included members of the Minuteman Civil Defense Corps, United for a Sovereign America and Protect Arizona NOW.

74.     In 2008, backers of H.B. 2779 faced a ballot initiative that they believed would make Arizona's employer sanctions regime more lenient. In a message opposing the initiative, then-Representative Pearce opened with "#1 LURE IS JOBS AND ILLEGAL EMPLOYERS; VIOLENT CRIME FOLLOWS ILLEGAL ALIEN CROWD." He continued, "IMMIGRANT GANG MEMBERS RARELY MAKE A LIVING AS GANGSTERS, THEY ARE WORK[sic] CONSTRUCTION, AUTO REPAIR, FARMING, LANDSCAPING, AND LOS[sic] SKILLED JOBS, DRUGS,

HOME INVASIONS, FALSE DOCUMENTS." A copy of the email is attached as Exhibit 6 to this Complaint.

75.     Pearce also returned to the Legislature that year with another bill to amend and supplement the Legal Arizona Workers Act, H.B. 2745. Section 1 of H.B. 2745 expanded the Class 4 identity theft statute to punish individuals for using the information of another person, real or fictitious, "with the intent to obtain or continue employment." A.R.S. §13-2008. A Class 4 felony is punishable by up to 3 years. A.R.S. §13-702(D). An individual under 21 years of age who uses false identification to illegally obtain liquor was exempt under the statute. A.R.S. §§ 13-2008(E), 4-241(L), 13-707(A).

76.     H.B. 2745 was passed by the Legislature and signed into law on May 1, 2008. The full text of the law, as enacted, is attached as Exhibit 7 to this Complaint and is incorporated by reference.

**Arizona's Worker Identity Provisions Intrude upon Federal Law**

77.     Arizona's passage of laws to penalize undocumented workers' use of false or fictitious identities to "obtain or continue employment" directly intrudes upon the federal government's exclusive authority in the (federally-created) employment verification process.

78.     The scheme Congress created provides a "full set of standards designed to work as a harmonious whole." *Valle del Sol v. Whiting*, 732 F.3d 1006, 1024-25 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 1876 (2014) (internal quotation omitted).

79.     Congress's consolidation of authority over fraud in the employment verification process at the federal level allows authorities to select among available enforcement tools to carry out (and balance) federal objectives. This flexibility is an important feature of the federal scheme.

80.     If Arizona's worker identity provisions are allowed to stand, every state could "create an independent scheme of prosecution and judicial enforcement outside the control of the federal government . . . ." *United States v. S. Carolina*, 840 F. Supp. 2d 898, 926-27 (D.S.C. 2011) (invalidating provision making it a state offense to use a

fraudulent identification document for the purpose of establishing lawful presence in the United States), *aff'd*, 720 F.3d 518 (4th Cir. 2013). This would "detract[] from the integrated scheme of regulation created by Congress." *Arizona*, 132 S. Ct. at 2502 (internal quotation omitted).

81. Even complementary state regulation is impermissible. In this case, Arizona's sanctions actually conflict with federal law.

82. A.R.S. §§ 13-2008(A) and 13-2009(A)(3) impose different penalties than federal law and, unlike federal law, fail to distinguish between different types of fraudulent conduct in the employment verification process.

83. Arizona's statutes therefore further stand as an obstacle to success of Congress's chosen "calibration of force" in accomplishing its purposes and objectives. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 380 (2000).

84. In addition to federal immigration law, A.R.S. §§ 13-2008(A) and 13-2009(A)(3) frustrate the goals of federal labor and employment law, which Congress recognized was critical to the success of the employer sanctions regime.

85. During congressional deliberations over IRCA, Congress was acutely aware of the importance of vigorous enforcement of labor protections for workers. Congress explicitly authorized funds for the U.S. Department of Labor's ("DOL's") Wage and Hour Division to strengthen enforcement of employment standards laws for undocumented workers in IRCA, recognizing that doing so would "remove the economic incentive for employers to exploit and use such aliens." IRCA § 111(d).

86. Federal labor and employment law protections apply regardless of immigration status.

87. The U.S. Department of Homeland Security ("DHS") and the DOL have entered into a Memorandum of Understanding whereby DHS has agreed to refrain from worksite enforcement in cases where employers may be manipulating enforcement activities to gain leverage in a labor dispute. DHS/DOL Revised MOU Between DHS and Labor Concerning Enforcement Activities at Worksites (Mar. 31, 2011).

88.     In Arizona, however, the threat of a felony arrest under the worker identity provisions gives unscrupulous employers a hammer to hold over the head of workers who would otherwise seek to enforce their labor rights.

89.     Arizona's worker identity provisions also contravene federal anti-discrimination law.

90.     For example, the 1870 Civil Rights Act specifically sought to protect foreign nationals from sub-federal discrimination.

91.     Codified today at 28 U.S.C. § 1981, Section 16 of the 1870 Civil Rights Act emphasized that "all *persons* . . . shall be subject to like punishment, pains, penalties . . . ." 28 U.S.C. § 1981 (emphasis added). Codified today at 18 U.S.C. § 242, Section 17 of the Act prohibited any person "under the color of [] law" from subjecting any person within a state to "different punishments, pains or penalties, *on account of such person being an alien* . . . ." 18 U.S.C. § 242 (emphasis added).

92.     The Fourteenth Amendment to the U.S. Constitution also guarantees that all persons receive equal protection of the laws.

93.     In recasting Arizona's identity theft statutes to target undocumented workers, the Legislature acted in a discriminatory fashion.

94.     The language and history of Section 1 of H.B. 2779 and Section 1 of H.B. 2745 demonstrate the Legislature's intent to punish on the basis of alienage.

95.     As candidly acknowledged by their author and primary sponsor, the purpose of these measures was to make conditions so unbearable for undocumented workers that they would voluntarily "self-deport."

96.     In passing these measures, the Arizona Legislature acted on a desire to harm a politically unpopular group.

97.     The Legislature played on and gave effect to private fears and prejudice against undocumented immigrants.

98.     Further, legislators refused to consider any lighter penalty for undocumented workers because such a move would be "viewed as a weakening of our

opposition to illegal immigration." Perception of Arizona's position on the federal issue of illegal immigration is not a legitimate state interest that could justify differential treatment on the basis of alienage.

99.    Arizona's worker identity provisions violate federal anti-discrimination protections.

**Maricopa County Defendants' Campaign to Criminally Punish Undocumented Workers**

100.    Since 2008 or earlier, Defendants Arpaio, Montgomery and Maricopa County (the "Maricopa County Defendants") have had a policy, practice or custom of enforcing the worker identity provisions and Arizona's forgery statute against undocumented immigrants.

101.    The purpose and effect of the Maricopa County Defendants' policy, practice or custom has been to regulate—independent of federal policies and priorities—the use of false information or documents by undocumented immigrants to circumvent the federal employment verification system.

102.    For example, in 2008, the MCSO began conducting worksite enforcement operations based on the newly enacted worker identity provisions and Arizona's forgery statute.

103.    MCSO conducted these worksite enforcement operations through a specialized unit focused on illegal immigration, called the Human Smuggling Unit ("HSU").

104.    The HSU was created in or around 2006. In 2008, after the Legal Arizona Workers Act was passed, MCSO tasked one of three HSU squads with enforcement of illegal immigration laws in the workplace. The squad was originally called the Employer Sanctions Unit.  Its name was later changed to the Criminal Employment Squad and then to the Criminal Employment Unit.

105.   The work of the Criminal Employment Unit and its predecessor units involved investigating undocumented immigrants who used false information or documents to show federal authorization to work.

106.   The MCSO's worksite operations were part of a larger campaign by the Sheriff's Office to "crack down" on illegal immigration. In a March 15, 2008 news brief from the MCSO announcing the arrest of an employee for identity theft and forgery, the Sheriff stated, "My Office will continue cracking down on illegal immigration[.] Sheriff's deputies will continue to investigate crimes in the work place related to illegal immigration . . . ."

107.   In a December 10, 2011 news release announcing a raid on a Chandler restaurant, Sheriff Arpaio stated that "100% of all suspects [of] identity theft to gain employment" in worksite operations to date had been "illegal aliens." In a September 20, 2012 news release, he stated that he viewed "arrests of illegal aliens using fake names and false social security numbers" as "open[ing] up employment opportunities for those who are in this country legally."

108.   Sheriff Arpaio had significant personal involvement in the work of the Criminal Employment Unit and its predecessor units.  He was briefed on and attended most major operations, as well as some smaller operations.

109.   The operations were also publicized by the Sheriff's Office. Arpaio's head of media relations, Lisa Allen, has stated that for the MCSO, "immigration enforcement" was "an awful lot of, you know, identity theft and so forth." Allen Dep. 28:17-20, Mar. 31, 2014, in *United States v. Maricopa County*, No. 2:12-cv-00981-ROS (D. Ariz.).

110.   Sheriff Arpaio focused his agency's illegal immigration program on immigrants from Mexico and Latin America. Anti-Hispanic sentiment had fueled his constituents' call to channel the agency's law enforcement resources towards the immigration issue.

111.   Sheriff Arpaio set up an "illegal immigration hotline" for members of the public to call and provide "tips" about suspected undocumented immigrants who were

working. He also applied for a 287(g) agreement with DHS to cross-certify 160 officers to arrest individuals based on a suspected violation of the federal immigration laws.

112.    The MCAO, for its part, designated a specialized unit to prosecute cases of employees using false information and documents to work—the Special Crimes Bureau.

113.    The Special Crimes Bureau worked closely with the MCSO's Criminal Employment Unit and its predecessor units in a concerted effort to pursue cases against undocumented workers. Members of the two units would meet regularly about MCSO's worksite operations.

114.    The Special Crimes Bureau also prosecuted cases of undocumented workers using false information and documents to work referred by other law enforcement agencies.

115.    The MCAO has a separate unit called the Fraud and Identity Theft Enforcement ("FITE") Bureau, which was created to prosecute fraud, identity theft and forgery. However, since approximately 2008, MCAO has handled identity theft and forgery cases involving employment through the Special Crimes Bureau rather than the FITE Bureau.

116.    The Special Crimes Bureau carries out the office's immigration-related enforcement mission. The MCAO webpage for the Special Crimes Bureau states, in relevant part, that it prosecutes, "[i]llegal immigrant crimes," which "involve illegal immigrants accused of . . . the use of a stolen Social Security account or other identification in order to get a job in the United States (Employment Identity Theft)." Maricopa County Attorney's Office, Special Crimes, available at http://www.maricopacountyattorney.org/prosecuting-criminals/organized-crime/special-crimes/.

117.    According to the longtime former chief of MCAO's Special Crimes Bureau, Vicki Kratovil, prosecution of employees was part of the focus of the office's enforcement of the Legal Arizona Workers Act because "every unauthorized worker who

is working is committing state criminal offenses." Kratovil Dep. 51:15-24, Sept. 21, 2010, in *Mora v. Arpaio*, No. CV09-01719-PHX-DGC (D. Ariz.).

118.    When MCSO began prosecuting cases of undocumented immigrants using false information and documents in employment, the office was headed by former County Attorney Andrew Thomas.

119.    While campaigning for his re-election in 2008, speaking about immigration, Thomas assured voters that he would "work tirelessly to protect our neighborhoods from *those who threaten us and violate our laws*." Andrew Thomas, *County Attorney stands up for you*, ARIZ. REPUBLIC, Sept. 26, 2008 (emphasis added). He declared, "I will not treat illegal immigrants as a protected class . . . ." *Id.*

120.    In 2010, there was a change in leadership at the MCAO. The interim County Attorney Rick Romley decided to stop sharing state funds that Arizona had allocated to Maricopa County for enforcement of the Legal Arizona Workers Act with the MCSO.

121.    In response to Romley's decision, Sheriff Arpaio shifted funds from other parts of his agency's budget in order to continue conducting worksite operations. He was adamant that there be no change. That is when the MCSO changed the name of the unit to the Criminal Employment Squad to focus explicitly on employees.

122.    While he was campaigning for office in 2010, now County Attorney Bill Montgomery also signaled a commitment to making Maricopa County inhospitable to undocumented immigrants and vowed to resume working with the MCSO on worksite operations. Upon taking office in 2010, he restored the policy of systematically enforcing the worker identity provisions and forgery statute against undocumented workers.

123.    In a 2013 interview, Montgomery stated that he would continue to enforce the state identity theft and forgery laws as long as Arizona's border with Mexico remains insecure. He continued, "The federal government could take away all of my concerns tomorrow, by simply securing the border and doing what they have a responsibility to do.

. . . I would be more than happy to deal with other offenses, and violations of other statutes. But unless and until they do their job, I have to do mine." Jude Joffe-Block, *Police in Arizona crack down on identity theft by immigrants*, KPCC, Jan. 7, 2013.

*Details of Worker Identity and Forgery Investigations*

124.    MCSO's worksite operations would typically begin with a citizen tip to the Office's "illegal immigration hotline" that undocumented workers were employed at a particular business. MCSO detectives would conduct an investigation, often obtaining copies of wage reports that an employer files with the Arizona Department of Economic Security ("DES") containing names and Social Security numbers reported for employees and comparing that information against information found in other databases.

125.    With the information from the DES reports and database checks, MCSO would then contact the Social Security Administration ("SSA") and ask that agency to identify which employees' names and Social Security numbers matched information SSA had on file and which did not. With the information it received back from the SSA, MCSO would obtain a search warrant for a business, alleging violations of A.R.S. §§ 13-2002, 13-2008(A) and 13-2009(A)(3).

126.    MCSO executed search warrants with a show of force and regularly sent hundreds of deputies and posse members, including tactical and K-9 units, to descend upon a business. Workers were usually held incommunicado for hours while deputies sorted through employee records and questioned them about their identity and immigration status.

127.    Until October 2009, those workers who could not be charged criminally were arrested by MCSO on administrative immigration charges and processed for deportation.[3]

---

[3] DHS terminated the MCSO's street-level 287(g) authority on October 16, 2009 after the DOJ found that the agency was engaged in a pattern and practice of discriminatory policing and other civil rights violations.

128.   Many workers, however, were arrested on state felony charges of identity theft and forgery and prosecuted.

129.   Workers were given forgery charges for using false personal identifying information on forms such as the Form I-9, as well as other employment documents. Workers usually use a Social Security number on the Form I-9 to show eligibility for employment and that same number will then be used on other forms for consistency. Forgery charges were also brought against undocumented workers for presenting a false driver's license or immigration documents during the employment verification process.

130.   MCSO would regularly arrest undocumented workers under the worker identity provisions and forgery statute together. The Criminal Employment Unit kept a single tally of the number of employees arrested under both charges and the Unit generally did not have forgery cases other than those involving the use of false information or documents in order to obtain employment. The MCAO would regularly prosecute undocumented workers under both provisions as well.

131.   By charging undocumented workers under these statutes, MCSO and MCAO could ensure that they would be categorically disqualified from pretrial bail pursuant to another harsh Pearce immigration measure, Proposition 100.[4]

132.   Though there have been some changes to how MCSO and MCAO have conducted these investigations in the intervening years, such as the source of tips and how many workers are arrested at once, the basic goal of the operations remained the same—to arrest and punish undocumented workers using false information or documents for employment.

133.   Since 2008, the MCSO has conducted over 80 worksite operations, arresting nearly 790 workers. The vast majority of these were arrested for identity theft and forgery.

---

[4] Proposition 100 and its implementing statutes prohibited Arizona courts from setting pretrial bail for persons charged with a Class 1-4 felony who "ha[ve] entered and remained in the United States illegally." The measure was overturned as unconstitutional on October 15, 2014. *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772 (9th Cir.) (en banc).

134.    In the same period, Maricopa County has brought only five actions against employers. Three of those actions were civil, resulting in business license suspensions of 10 days or less, and two were criminal.

135.    MCSO and MCAO's method of enforcing A.R.S. §§ 13-2002, 13-2008(A) and 13-2009(A)(3) against undocumented workers has instilled great fear in the immigrant community.

136.    Rather than being secondary to employer sanctions, Maricopa County's worksite enforcement strategy has been to almost exclusively target workers, detain them without possibility of bail and pressure them into signing felony pleas.

137.    Maricopa County's practices have given employers unchecked power over workers.

138.    Sometimes, an employer is aware that a worker is undocumented and has used false or fictitious information to obtain work; an employer may even provide the information or fill it in for workers. Yet employers know it will likely be the worker who is arrested if the discrepancy were to be discovered (or be reported by the employer).

139.    Volunteers and staff with Puente have observed what seems to be an increase in labor abuse and greater hesitation on the part of workers to report labor violations in Maricopa County.

*Enforcement Practices Since Filing of This Lawsuit*

140.    As recently as 2014, Sheriff Arpaio publicly announced his continuing commitment to vigorous enforcement of the worker identity provisions and forgery statute against undocumented workers.

141.    In March 2014, Arpaio stressed to a group of supporters, "Now, they're clamping down, all these rulings from judges . . . But I still enforce the illegal immigration laws by virtue of going into businesses and locking up the employees with fake ID." He continued, confirming his understanding of the identity theft laws as an immigration enforcement tool, "[W]e do know that 99.9 percent are here illegally, we know that, but they are not charged with that, they are stealing your ID." Statement of

Sheriff Joe Arpaio, MN Tea Party Special Event, March 6, 2014, available at https://www.youtube.com/watch?v=LFd-Xxrl5qw, at minute 51:04.

142.    When this lawsuit was filed, Sheriff Arpaio reiterated his commitment to continuing enforcement so long as he was the Sheriff, stating, "[T]here is no sanctuary in Maricopa County."  Megan Cassidy, *Lawsuit challenges Arpaio's workplace raids*, ARIZ. REPUBLIC, June 18, 2014.

143.    After the preliminary injunction hearing in this lawsuit, and before the Court issued a decision, the MCSO announced its apparent intention to disband the Criminal Employment Unit in early 2015. Defendant Arpaio filed a notice with the Court arguing that because the MCSO had "voluntarily enjoined themselves" from enforcing the worker identity provisions, no preliminary injunction was necessary.

144.    Defendant Arpaio's notice did not address the MCSO's use of the forgery statute against undocumented workers and it did not explain whether deputies outside of the Criminal Employment Unit would continue to enforce the worker identity provisions. Defendant Arpaio provided no indication of how long MCSO's voluntary change in policy would last or whether it might be rescinded in the future.

145.    In an official written statement issued by the MCSO on December 18, 2014, Sheriff Arpaio warned that notwithstanding disbandment of the Criminal Employment Unit, "ID theft and ID fraud remain[] . . . offenses under Arizona Revised Statutes" and that his deputies would "continue to investigate these crimes."

146.    After this lawsuit was filed, and before the Court issued a decision on Plaintiffs' motion for a preliminary injunction, the MCAO issued a policy prohibiting prosecutors from further using the Form I-9 as the basis for identity theft and forgery charges. The new policy did not address any other information or documents submitted by workers to circumvent the federal employment verification system.

147.    Since the Court issued its preliminary injunction barring Defendants from enforcing the worker identity provisions, MCAO has begun withdrawing charges under

the worker identity provisions but, in many cases, has continued to prosecute the same underlying conduct under Arizona's forgery statute.

148.    Montgomery and the MCAO have indicated an intention to vigorously pursue forgery prosecutions against employees. For example, after a Maricopa County Superior Court, relying on the reasoning of this Court's preliminary injunction, dismissed forgery and identity theft charges against an employee who was alleged to have submitted a fraudulent Arizona driver's license for employment, MCAO filed a motion to reconsider arguing that it could constitutionally prosecute employees under the forgery statute for the same conduct so long as it did not rely on the Form I-9. A driver's license is one of the documents employees show to prove identity in the federal employment verification system.

149.    MCAO's policy does not consider a person's immigration status or his or her status as a victim of labor violations in determining whether or not to decline to prosecute a case.

150.    The Maricopa County Defendants' policies, practices and customs deprive federal authorities of the exclusive power to prosecute (or decide not to criminally prosecute) undocumented workers.

151.    Upon information and belief, the MCSO is continuing to detain undocumented workers on forgery charges in the Maricopa County Jail. The Maricopa County Defendants continue to expend local tax revenues on investigating, prosecuting and incarcerating undocumented immigrants for using false information or documents to work.

**Impact on the Immigrant Community and Puente's Response**

*Plaintiff Puente Arizona*

152.    Puente is a grassroots organization based in Phoenix, Arizona, with hundreds of members, the vast majority of whom are immigrants.

153.    Migrants, particularly undocumented immigrants and immigrants in mixed status families, face significant stigma and barriers to social and economic integration.

To fulfill its mission of developing, educating and empowering immigrants to enhance their quality of life, Puente provides a variety of services to the community, including English classes, media trainings, know-your-rights workshops, health and wellness training, and educational programs for children. Puente also offers cultural events, including concerts, film screenings, and an annual Day of the Dead celebration.

154.    Puente's members play a central role in setting the organization's direction, priorities, and activities. Primary decision-making happens at Puente's weekly meetings, which are open to all members and program participants. In addition, Puente holds membership retreats twice a year. As an organization, Puente represents its members' collective interests and expresses their collective views.

155.    The Maricopa County Defendants' enforcement of Arizona's worker identity provisions and forgery statute has heavily impacted Puente's work and frustrated its mission.

156.    The climate of fear caused by enforcement directly interferes with Puente's efforts to develop and empower the immigrant community. For example, many workers who participate in Puente's know-your-rights trainings are reluctant to exercise labor rights for fear of arrest and prosecution under Arizona's laws.

157.    The climate of fear created by the enforcement operations has also led immigrants to retreat from public life. Some are even reluctant to leave their homes, including to participate in Puente events and activities.

158.    The jailing of heads of families—many of whom play important roles in local churches, schools, and community organizations—has also frayed the social fabric and made it difficult for Puente to build a strong community. Families of arrested individuals struggle to get by without their primary breadwinners, which lowers not just their own capacity, but that of other community members to whom they are forced to turn for support. The enforcement operations have affected community members of all ages, from all walks of life.

159.   For example, in June 2009, then-9-year-old Katherine Figueroa was playing at home when she overheard a TV news anchor announce that the carwash where her parents worked had just been raided. She rushed to the TV and watched in horror as MCSO deputies arrested her mother, Sandra Figueroa, and her father, Carlos Figueroa. The MCSO charged her parents with using false documents to work and incarcerated both of them in the County Jail for the next several months. Without her parents, Katherine was forced to rely on extended family and friends for support.

160.   More recently, in January 2013, 22-year-old Noemi Romero was arrested by MCSO deputies while working as a cashier at Lam's Supermarket. Noemi, who grew up in the United States, was working in order to raise money to pay the application fee for the federal government's Deferred Action for Childhood Arrivals ("DACA") program, which provides certain undocumented young people with work authorization and a reprieve from deportation. Noemi dreamed of one day working in nursing or cosmetology. Her dreams were shattered when MCSO raided Lam's Supermarket just days after she'd finally managed to save enough money for the application, arrested her and charged her with using a false identity to work. The identity information Noemi used belonged to her mother. Noemi's felony conviction now disqualifies her from the DACA program. Unable to work or go to college, Noemi lives at home with her parents.

161.   63-year-old Marta Espinoza Lopez was arrested by MCSO deputies in February 2013 while she was working as a seamstress at Sportex Apparel. Marta had worked at Sportex for 12 years. She had used her earnings to support herself and to put her children through college in Mexico. She was arrested during an MCSO raid on Sportex for using a fictitious identity to work. She spent four months in County Jail and was subsequently transferred to immigration detention. Upon her release, Marta found she had nothing. When she hadn't returned home after the raid, her landlord sold all her possessions and rented the apartment to someone else. Marta was forced to rely on friends and community organizations, including Puente, for support.

162.   One of Puente's core organizers also had an uncle arrested in the MCSO raid of Sportex.

163.   Seeing the impact that the Maricopa County Defendants' practices were having on the community with which Puente works, Puente was compelled to respond.

164.   Puente has provided affected workers and families with childcare, temporary housing, emergency financial assistance, essential information about the criminal process, access to legal services, and critical social and moral support. Additionally, Puente brings family members to visit their loved ones in detention and purchased a van for this purpose. Finally, Puente advocates on behalf of arrested workers in order to try to secure their release and reunite them with their families.

165.   Because of the resources Puente diverted toward providing this assistance, the organization had to cut back on its free English classes, health and wellness projects, and other core services. Future enforcement actions will again require Puente to divert scarce resources towards assisting affected workers and families.

166.   Puente's membership continues to include a significant number of immigrants who are at risk of being investigated, arrested, detained and/or prosecuted by the Maricopa County Defendants under A.R.S. §§ 13-2002, 13-2008(A) and 13-2009(A)(3). Some undocumented Puente members are working to provide for themselves and their families and have used false identity information and documents in order to obtain or continue employment.

167.   Puente members who have used false identity information and documents in order to obtain or continue employment live in constant fear that they may be arrested and prosecuted under A.R.S. §§ 13-2002, 13-2008(A) and 13-2009(A)(3) at any time. Many worry every morning when they leave for work that they may not come home that night.

168.   Puente brings this suit on behalf of itself and on behalf of its members who face a likelihood of future injury due to the Maricopa County Defendants' practices. Because Plaintiffs seek injunctive relief and their claims are not dependent on detailed

facts unique to each individual, individual participation by Puente members is not necessary. Given the climate of fear surrounding enforcement of A.R.S. §§ 13-2001, 13-2008(A) and 13-2009(A)(3), it is unlikely any would come forward to assert their rights if their individual participation were required.

169.    Puente has no relevant conflicts of interest with its individual members. Puente's pursuit of this litigation is pertinent to the organization's mission of developing, educating and empowering the local immigrant community.

*Plaintiff Sara Cervantes Arreola*

170.    Sara Cervantes is a 27-year-old resident of Glendale, Arizona. She is the mother of two young children, ages six and five months. Until January 2013, she worked in the produce department at Lam's Supermarket to support herself and her young son and had never been charged with or convicted of any crime.

171.    On January 17, 2013, MCSO deputies conducted a worksite raid on Lam's Supermarket while Ms. Cervantes and others were working. Deputies cleared the store of customers and then blocked the store exits, gathered all the workers together, and demanded they produce identification. Deputies ultimately arrested Ms. Cervantes along with approximately eight other Latino employees.

172.    Ms. Cervantes was charged with using a false identity to work. She was detained at the County Jail and denied the opportunity for bail pursuant to Proposition 100.

173.    On March 18, 2013, after approximately two months in jail, Ms. Cervantes pled guilty to one count of aggravated taking the identity of another with intent to obtain employment under A.R.S. § 13-2009, a Class 3 felony.

174.    Ms. Cervantes was sentenced on May 6, 2013. As the Superior Court found, "there [was] no victim in this case" because Ms. Cervantes had used information belonging to a fictitious person. The court sentenced her to 109 days in jail, with credit for time served, and twelve months probation.

175.   On November 5, 2013, Ms. Cervantes was granted an early termination of probation upon the recommendation of her Probation Officer and released from probation. In total, following her guilty plea on March 18, 2013, Ms. Cervantes spent 59 days in jail and six months on probation.

176.   Ms. Cervantes' length of incarceration and probation rendered federal habeas relief unavailable to her.

177.   Upon information and belief, it takes the Arizona Court of Appeals, Division One, approximately one year or longer from the date of filing to decide a criminal appeal. It takes the Arizona Supreme Court approximately four to six months to decide whether or not to hear a case following a Court of Appeals decision, and an additional three to six months to decide the appeal.

178.   Given the length of the Arizona appellate process and the length of her sentence, it was impossible for Plaintiff Cervantes to exhaust state remedies, much less file and prevail on a federal habeas petition while she was in custody.

179.   Ms. Cervantes feels as if her felony conviction has marked her life forever. She believes that people in her community now look at her differently. She worries that the conviction will negatively impact her in the event she is ever stopped or detained by police in the future, and may impact her chances for future immigration relief.

*Plaintiff Elia Estrada Fernandez*

180.   Plaintiff Elia Estrada is a resident of Mesa, Arizona. She has three young children, ages 12, 4, and 8 months.

181.   From 2013 to 2014, Ms. Estrada worked at Arby's located in Chandler, Arizona to support her family. She worked most of the time as a cook.

182.   On September 22, 2014, Ms. Estrada was arrested by the Gilbert Police Department and charged with using a false identity to work.

183.   After her arrest, Ms. Estrada was detained at the Maricopa County Jail for 63 days, having been denied the opportunity for bail pursuant to Proposition 100.

184.    Ms. Estrada's case was prosecuted by the Maricopa County Attorney's Office. On October 28, 2014, Ms. Estrada pled guilty to one count of aggravated taking the identity of another with intent to obtain employment under A.R.S. § 13-2009, a Class 3 felony.

185.    Ms. Estrada had never previously been charged with or convicted of any crime.

186.    Ms. Estrada was sentenced on November 26, 2014. The court sentenced her to six months of probation.

187.    In total, following her arrest on September 22, 2014, Ms. Estrada spent approximately two months in jail and six months on probation. After her sentencing, she did not serve any additional time in jail.

188.    Ms. Estrada's length of incarceration and probation made federal habeas relief unavailable to her.

189.    Upon information and belief, it takes the Arizona Court of Appeals, Division One, approximately one year or longer from the date of filing to decide a criminal appeal. It takes the Arizona Supreme Court approximately four to six months to decide whether or not to hear a case following a Court of Appeals decision, and an additional three to six months to decide the appeal.

190.    Given the length of the Arizona appellate process and the length of her sentence, it was impossible for Plaintiff Estrada to exhaust state remedies, much less file and prevail on a federal habeas petition while she was in custody.

191.    Ms. Estrada worries that her family and community will think of her as a bad person because of her felony conviction for working to provide for her family. She feels stigma and shame from the conviction. In addition, she believes that the conviction will negatively impact her in the event she ever comes in contact with police in the future, and may impact her chances for future immigration relief.

*Plaintiff Reverend Susan Frederick-Gray*

192.    Reverend Susan E. Frederick-Gray is a Maricopa County taxpayer.

34

193.    Rev. Frederick-Gray objects to the use of county taxpayer funds to enforce A.R.S. §§ 13-2002, 13-2008(A) and 13-2009(A)(3) against undocumented workers.

194.    She believes that the expenditure of taxpayer funds to punish individuals who are working to provide for their families and not intending to harm other persons does not serve the public good. Those funds could instead be spent on essential public services.

195.    Rev. Frederick-Gray is challenging the enforcement of A.R.S. §§ 13-2002, 13-2008(A) and 13-2009(A)(3) by Maricopa County Defendants as an illegal expenditure of county taxpayer funds.

*Plaintiff Reverend Russell Andrew Burnette*

196.    Reverend Russell Andrew Burnette is a resident of Phoenix, Arizona and a Maricopa County taxpayer.

197.    Rev. Burnette objects to the use of county taxpayer funds to enforce A.R.S. §§ 13-2002, 13-2008(A), and 13-2009(A)(3) against undocumented workers.  Among other taxes, he pays property taxes to the County, as well as excise taxes and sales taxes that help fund the operation of County jails.

198.    He believes that the expenditure of taxpayer funds to punish individuals who are working to provide for their families and not intending to harm other persons does not serve the public good.

199.    Rev. Burnette is challenging the Maricopa County Defendants' enforcement of A.R.S. §§ 13-2002, 13-2008(A), and 13-2009(A)(3) as an illegal expenditure of county taxpayer funds.

*Plaintiff Reverend Erin Tamayo*

200.    Reverend Erin Tamayo is a resident of Mesa, Arizona and a Maricopa County taxpayer.

201.    Rev. Tamayo objects to the use of county taxpayer funds to enforce A.R.S. §§ 13-2002, 13-2008(A), and 13-2009(A)(3) against undocumented workers.  Among

35

other taxes, she pays property taxes to the County, as well as excise taxes and sales taxes that help fund the operation of County jails.

202.    Rev. Tamayo believes that the expenditure of taxpayer funds to punish individuals who are working to provide for their families and not intending to harm other persons does not serve the public good.

203.    Rev. Tamayo is challenging the Maricopa County Defendants' enforcement of A.R.S. §§ 13-2002, 13-2008(A), and 13-2009(A)(3) as an illegal expenditure of county taxpayer funds.

## CLASS ACTION ALLEGATIONS

204.    Plaintiffs Puente, Frederick-Gray, Tamayo, and Burnette bring this action as a class action seeking declaratory and injunctive relief under Federal Rule of Civil Procedure 23(b)(2) on behalf of themselves and all others similarly situated.

      a.    Plaintiff Puente seeks to represent a class of undocumented workers who will be subject to arrest, detention or prosecution by the Maricopa County Defendants under Arizona's worker identity provisions and forgery statute (the "worker class").

      b.    Plaintiffs Frederick-Gray, Tamayo, and Burnette seek to represent a class of all persons who pay taxes to Maricopa County and object to the use of county tax funds to investigate, arrest, detain or prosecute individuals under Arizona's worker identity provisions and forgery statute (the "taxpayer class").

205.    The proposed classes are so numerous that joinder of all members is impracticable.

206.    There are questions of law and fact common to the proposed classes, including (1) whether Arizona's worker identity provisions are preempted by federal law; (2) whether Arizona's worker identity provisions deprive members of the worker class of the equal protection of the laws within the meaning of the Fourteenth

36

Amendment to the U.S. Constitution; and (3) whether the Maricopa County Defendants' policy, practice or custom of using the worker identity provisions and forgery statute to regulate fraud by undocumented immigrants in employment is preempted by federal law.

207.    The claims and defenses of the representative Plaintiffs are typical of the claims and defenses of their respective classes.

208.    The representative Plaintiffs will fairly and adequately protect the interests of the respective classes.

209.    Defendants in this case have acted and will continue to act in violation of proposed class members' rights, which are grounds generally applicable to the classes, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the classes as a whole.

210.    Plaintiffs' counsel are competent and experienced in class action litigation of the type brought here. Plaintiffs are represented *pro bono* by the University of California, Irvine School of Law Immigrant Rights Clinic, the ACLU Foundation of Arizona, the National Day Laborer Organizing Network and the Law Office of Ray A. Ybarra Maldonado PLC, who collectively have extensive experience with litigation, including class action litigation, regarding the rights of immigrants and constitutional law.

## REQUISITES FOR RELIEF

211.    As a result of the conduct of Defendants described above, Plaintiffs have been denied their constitutional rights.

212.    In violating Plaintiffs' constitutional rights, Defendants have and will continue to act under color of law.

213.    An actual and substantial controversy exists between Plaintiffs and Defendants as to their respective legal rights and duties. Defendants' policies, practices, conduct and acts alleged herein have resulted and will continue to result in irreparable

injury to Plaintiffs, including but not limited to further violations of their constitutional rights.

214.   Plaintiffs have no plain, speedy or adequate remedy at law to address the wrongs described herein. Plaintiffs therefore seek injunctive relief restraining Defendants from continuing to enforce and engage in the policies, practices and customs described herein.

## CLAIMS FOR RELIEF

### First Claim For Relief

Supremacy Clause; 42 U.S.C. §1983
(Against All Defendants)

215.   The above paragraphs are hereby incorporated by reference as though fully set forth here.

216.   The Supremacy Clause, Article VI, Section 2, of the U.S. Constitution provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution of Laws of any State to the Contrary notwithstanding.

217.   The Supremacy Clause mandates that federal law preempts state law in any area over which Congress expressly or impliedly has reserved exclusive authority or which is constitutionally reserved to the federal government, or where state law conflicts or interferes with federal law.

218.   In enacting Section 1 of H.B. 2779 and Section 1 of H.B. 2745, amending A.R.S. §§ 13-2008(A) and 13-2009(A), Arizona impermissibly intruded on the federal government's exclusive authority to regulate immigration, legislating in a field occupied by the federal government and imposing burdens and penalties on noncitizens not authorized by and contrary to federal law and policy, all in violation of the Supremacy Clause.

219.   Arizona's worker identity provisions are therefore facially preempted and Defendants may not enforce them.

220.   The Maricopa County Defendants have a policy, practice and custom of using Arizona's worker identity and forgery provisions to arrest and prosecute undocumented workers for using false information to show federal authorization to work. Such arrests and prosecutions intrude on the federal government's exclusive authority to regulate immigration and disrupt a carefully aligned federal scheme of regulation of immigration and employment, thus violating the Supremacy Clause in application.

Second Claim For Relief

Equal Protection, U.S. Const., Fourteenth Amendment; 42 U.S.C. §1983
(Against All Defendants)

221.   The above paragraphs are hereby incorporated by reference as though fully set forth here.

222.   The Fourteenth Amendment to the U.S. Constitution provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

223.   Section 1 of H.B. 2779 and Section 1 of H.B. 2745, amending A.R.S. §§ 13-2008(A) and 13-2009(A), constitute impermissible discrimination against noncitizens on the basis of alienage.

224.   Defendants cannot establish that Sections 1 of H.B. 2779 and H.B. 2745 had any valid justification, including a rational basis.

225.   Arizona's worker identity provisions therefore violate the equal protection clause of the Fourteenth Amendment to the U.S. Constitution and Defendants may not enforce them.

**PRAYER FOR RELIEF**

226.   Plaintiffs respectfully request that the Court grant the following relief:

a.   Enter a judgment declaring that the portion of A.R.S. §§ 13-2008(A)

39

that addresses actions committed "with the intent to obtain or continue employment" and 13-2009(A)(3) violate the Supremacy Clause and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution;

b.    Enter a judgment declaring that the Maricopa County Defendants' policy, practice or custom of using state statutes, including A.R.S. §§ 13-2002, 13-2008(A) and 13-2009(A)(3), to independently regulate fraud committed by undocumented immigrants to circumvent the federal employment verification process violates the Supremacy Clause of the United States Constitution;

c.    Enter a permanent injunction prohibiting the Maricopa County Defendants from further enforcing the portion of A.R.S. §§ 13-2008(A) that addresses actions committed "with the intent to obtain or continue employment" and 13-2009(A)(3);

d.    Enter a permanent injunction prohibiting the Maricopa County Defendants from further using state statutes, including A.R.S. §§ 13-2002, 13-2008(A) and 13-2009(A)(3), to criminally punish undocumented workers who submit false information or documents for the purpose of showing federal authorization to work;

e.    Issue an injunction ordering Defendants to expunge from their records the arrests and convictions of Plaintiffs Cervantes and Estrada under A.R.S. § 13-2009(A)(3), and to forward a copy of this order to any person or agency that was notified of said arrests or convictions;

f.    Award attorneys' fees and costs of suit, plus interest, pursuant to 42 U.S.C. § 1988; and

g.    Grant such other relief as the Court deems just and proper.

DATED this 18th day of June, 2015.

40

1

2                                       By _____/s/  Anne Lai_____

3                                          Anne Lai (admitted *pro hac vice*)
                                           Sameer Ashar (admitted *pro hac vice*)
                                           University of California, Irvine School of
4                                             Law – Immigrant Rights Clinic
                                           401 E. Peltason Dr., Ste. 3500
5                                          Irvine, CA 92616-5479

6                                          Daniel J. Pochoda
                                           Joshua D. Bendor
7                                          ACLU Foundation of Arizona
                                           3707 N. 7th St., Ste. 205
8                                          Phoenix, AZ 85012

9                                          Jessica Karp Bansal (admitted *pro hac vice*)
                                           National Day Labor Organizing Network
10                                         675 S. Park View St., Ste. B
                                           Los Angeles, CA 90057

11
                                           Jessica Myers Vosburgh (admitted *pro hac
12                                            vice*)
                                           National Day Laborer Organizing Network
13                                         2104 Chapel Hill Road
                                           Hoover, AL 35216
14                                         Telephone: (205) 317-1481

15                                         Ray A. Ybarra Maldonado
                                           Law Office of Ray A. Ybarra Maldonado, PLC
16                                         2637 North 16th St., Unit 1
                                           Phoenix, AZ 85006

17
                                           *Attorneys for Plaintiffs*
18

19

20

21

22

23

24

25

26

27

28