**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Puente Arizona, et al., | No. CV-14-01356-PHX-DGC |
| Plaintiffs, | **ORDER** |
| v. | |
| Joseph M. Arpaio, et al., | |
| Defendants. | |

In October 2015, Plaintiffs served subpoenas duces tecum on the Arizona Legislature and former State Senator Russell Pearce, seeking documents and communications related to the identity theft statutes at issue in this case. Each recipient produced some of the requested documents, but withheld others on legislative privilege grounds. Pearce also withheld one document on First Amendment grounds. Plaintiffs have moved to compel production of some of these documents. Doc. 442. Pearce and the State filed separate responses in opposition, Docs. 466, 467, and Plaintiffs replied, Doc. 472. Oral argument has not been requested. For the reasons set forth below, the Court will deny the motion to compel.

**I.    Background.**

This case concerns two Arizona statutes, H.B. 2779 and H.B. 2745, which criminalize the use of another person's personal identification information for the purpose of obtaining employment. Plaintiffs claim that these statutes are preempted by the Immigration Reform and Control Act, Pub. L. No. 99-603, 100 Stat. 3359 (1986), and

that they violate the Equal Protection Clause by discriminating against non-citizens. The parties have recently completed discovery.

On October 5, 2015, Plaintiffs served a subpoena duces tecum on Pearce, a co-sponsor of the statutes who is not a party to this case. The subpoena sought documents and communications in Pearce's possession related to the statutes or predecessor legislation, as well as documents and communications created between 2003 and 2008 that discuss certain relevant issues (e.g., the actual or perceived consequences of employment of undocumented immigrants in Arizona), or that contain relevant keywords (e.g., "E-verify"). Doc. 442-2 at 20-28.[1] A corrected version of the subpoena was served on October 8. *Id.* at 30-39. The same day, Plaintiffs served subpoenas seeking similar information on the Chief Clerk of the Arizona House of Representatives (*id.* at 40-49) and the Secretary of the Arizona State Senate (*id.* at 51-60).

Both Pearce and the State of Arizona produced some responsive documents. On February 12, 2016, Pearce informed Plaintiffs through his amended privilege log that he would be withholding 42 documents on legislative privilege or First Amendment grounds. *Id.* at 190-94. The same day, the State of Arizona informed Plaintiffs, through its second amended privilege log, that it would be withholding 67 documents on legislative privilege grounds. *Id.* at 196-203. On February 18, Plaintiffs wrote a letter jointly addressed to Pearce and the State, accepting most of their assertions of privilege, but contesting the assertions with respect to ten documents on Pearce's log and 12 on the State's log. *Id.* at 208-12. The contested documents are listed in Plaintiffs' motion. Doc. 442 at 10-12 (listing contested documents on Pearce's amended privilege log) (hereinafter "Pearce Log"), 12-13 (listing contested documents on State's second amended privilege log) (hereinafter "State Log"). On February 19, the Court granted Plaintiffs leave to file the motion to compel. Doc. 438 at 2.

/ / /

---

[1] Citations are to page numbers attached to the top of each page by the Court's CM/ECF system, not to the original page number at the bottom of each page.

## II. Legal Standard.

Where the recipient of a subpoena duces tecum refuses to produce requested documents, the proponent of the subpoena may move for an order compelling production. Fed. R. Civ. P. 45(d)(2)(B)(i). Such an order may issue against a non-party. Fed. R. Civ. P. 34(c). To obtain such an order, the proponent must first show that, but for the assertion of privilege, the requested material would be discoverable. *See Miller v. York Risk Servs. Grp.*, No. 2:13-CV-1419 JWS, 2015 WL 3490031, at *2 (D. Ariz. June 3, 2015). In other words, the proponent must show that the requested material is "relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1); *see* Fed. R. Civ. P. 45 (1970 Advisory Committee Note) ("[T]he scope of discovery through a subpoena is the same as that applicable to Rule 34 and the other discovery rules."). If the proponent makes this showing, the burden shifts to the recipient to establish that the requested discovery should be denied. "The party asserting an evidentiary privilege has the burden to demonstrate that the privilege applies to the information in question." *Tornay v. United States*, 840 F.2d 1424, 1426 (9th Cir. 1988); *see also Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975). Whether material is privileged is generally determined as a matter of federal common law, with exceptions not applicable here. Fed. R. Evid. 501.

## III. Analysis.

Plaintiffs seek to compel the production of 22 documents in total. Neither Pearce nor the State argues that this request is disproportionate to the needs of the case. Instead, they argue that the requested material is not relevant and is protected by the legislative privilege or the First Amendment.

### A. Relevance.

Plaintiffs argue that the contested documents are relevant to their preemption and equal protection claims because they shed light on why the Arizona Legislature enacted H.B. 2779 and H.B. 2745. A state law that has a discriminatory purpose violates the Equal Protection Clause. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429

1    U.S. 252, 265-66 (1977). Determining whether a statute embodies such a purpose
2    requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may
3    be available." *Id.* at 266. Evidence that the legislature has undertaken "a series of
4    official actions . . . for invidious purposes" may be relevant to this inquiry. *Id.* at 267.
5    "[C]ontemporary statements by members of the decisionmaking body, minutes of its
6    meetings, or reports" may also be relevant. *Id.* at 268.

7    Similarly, a state law that has the purpose and effect of regulating a preempted
8    subject matter violates the Supremacy Clause. *See Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct.
9    1591, 1599 (2015) (courts should consider "the target at which the state law aims in
10   determining whether that law is pre-empted") (emphasis omitted); *N.Y. State Conf. of
11   Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 658 (1995)
12   (considering the purpose and effect of challenged state law). In determining whether a
13   state law is addressed to a preempted subject matter, courts consider "any specific
14   expressions of legislative intent in the statute itself as well as the legislative history."
15   *Cal. Tow Truck Ass'n v. City & Cty. of S.F.*, 693 F.3d 847, 859 (9th Cir. 2012) (citation
16   omitted).[2]

17   The contested documents may shed light on whether the Arizona Legislature acted
18   with a constitutionally impermissible purpose in adopting H.B. 2779 and H.B. 2745. The
19   documents consist of emails between Pearce and various third party attorneys, lobbyists,
20   and constituents regarding anti-illegal immigration legislation Pearce was sponsoring.
21   Some of the emails relate directly to the legislation at issue in this case. Pearce Log, Nos.
22   27, 33, and 42; State Log, Nos. 16, 19, 20. Other emails discuss an early version of the
23   bill that became H.B. 2745 (State Log 9); a bill that would have made it a crime for an

---

[2] This analysis is unchanged by the Ninth Circuit's recent decision in this case. The appellate court held that the Arizona Legislature's purpose in enacting the H.B. 2779 and H.B. 2745 should not be "dispositive" of the preemption inquiry. *Puente Arizona v. Arpaio*, --- F.3d --- (9th Cir., May 2, 2016) (slip op. at 16, n.8). But the court recognized that the legislature's purpose is "relevant" to the preemption inquiry, and indicated that Plaintiffs should be allowed to "produce evidence of the Arizona legislature's intent to regulate immigration when asking the district court to enjoin certain immigration-related applications of the identity theft laws." *Id.*, slip op. at 17, n.9.

undocumented immigrant to enter or remain in Arizona (State Log Nos. 60, 62); a ballot initiative that would have prohibited undocumented adults from receiving certain state benefits (State Log Nos. 3, 4, 5); unnamed legislation that would prohibit undocumented immigrants from receiving workers compensation, occupational licenses, and social security benefits (Pearce Log Nos. 3, 4, 21; State Log. No. 39); unnamed legislation to promote enforcement of immigration laws (Pearce Log Nos. 16, 29); unnamed legislation "concerning deduction of business expenses and illegal aliens" (Pearce Log. No. 2); unnamed legislation "concerning illegal aliens and commercial transactions" (Pearce Log. No. 6); and unnamed legislation "to stop anchor babies" (State Log No. 41). Several of these bills were included in Pearce's "Comprehensive Immigration Enforcement Bill," a 2006 omnibus bill designed to "mak[e] Arizona 'illegal alien unfriendly.'" Doc. 472-2 at 11-12. The Court concludes that these emails may be relevant to Plaintiffs' equal protection and preemption claims, insofar as they provide historical context for H.B. 2779 and H.B. 2745 and bear on whether Pearce and the Legislature undertook "a series of official actions . . . for invidious purposes" around the time these statutes were adopted. *Arlington Heights*, 429 U.S. at 267.

The State concedes that the three emails on its privilege log that relate to H.B. 2279 and H.B. 2745 are relevant. Doc. 466 at 11. But it argues that the remaining emails are not relevant, either because they relate to bills considered during a prior legislative session or because they relate to legislation that did not include a criminal identity theft provision. *Id.* at 10-11.

Judge Bolton rejected similar arguments in *Valle Del Sol v. Whiting*, No. CV-10-01061-PHX-SRB (D. Ariz.). In her December 11, 2013 order, Judge Bolton allowed plaintiffs to conduct discovery into bills considered by the Arizona Legislature up to five years before the enactment of S.B. 1070, the statute challenged in that case. *See* Doc. 927 in CV-10-01061-PHX-SRB. She explained:

> S.B. 1070 was one of a series of bills that certain Arizona state legislators sought to enact to address immigration in Arizona. It is reasonable to conclude that the intentions behind those bills were similar, if not identical, to the intentions behind S.B. 1070. Stated differently, they are part of the

> 'historical background' of the enactment of S.B. 1070 and are therefore relevant to establishing whether S.B. 1070 violates the Equal Protection Clause.

*Id.* at 7-8 (internal citations omitted).

The Court reaches the same conclusion here.  Like S.B. 1070, H.B. 2779 and H.B. 2745 were enacted during a period when Pearce and other Arizona state legislators were pursuing a legislative agenda designed to "mak[e] Arizona 'illegal alien unfriendly.'" Doc. 472-2 at 11.  It is reasonable to conclude that the immigration-related bills sponsored by Pearce during this period were intended to serve a similar purpose.

### B.     Legislative Privilege.

Because Plaintiffs have shown that the contested documents are relevant to their claims, the burden now shifts to Pearce and the State to show that the documents are privileged.  *See Tornay*, 840 F.2d at 1426.  Pearce asserts that nine of the ten documents on his privilege log are protected by the state legislative privilege; the State asserts that all 12 of the documents on its log are so protected.

Applying the doctrine of state legislative privilege requires some familiarity with the related doctrine of federal legislative privilege, as well as the corollary doctrines of state and federal legislative immunity.  These complex, nebulous doctrines orbit a simple constitutional provision.  The Speech and Debate Clause provides that "for any Speech or Debate in either House[, members of Congress] shall not be questioned in any other Place."  U.S. Const., art. I, § 6, cl. 1.  By its terms, the Clause establishes a privilege that protects members of Congress from being compelled to testify or produce evidence regarding their legislative activities.  *See Gravel v. United States*, 408 U.S. 606, 616 (1972); *United States v. Rayburn House Office Bldg., Room 2113, Washington, D.C. 20515*, 497 F.3d 654, 660 (D.C. Cir. 2007).  From this privilege, courts have derived the doctrine of federal legislative immunity, which shields members of Congress from civil or criminal liability for their legislative acts.  *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 507 (1975).  In turn, courts have recognized analogous protections for state legislators under federal common law.  *See Tenney v. Brandhove*, 341 U.S. 367, 372

(1951) (recognizing state legislative immunity); *EEOC v. Wash. Suburban Sanitary Comm'n*, 631 F.3d 174, 181 (4th Cir. 2011) (recognizing state legislative privilege against "compulsory evidentiary process"). Under these doctrines, state legislators, like members of Congress, enjoy protection from criminal, civil, or evidentiary process that interferes with their "legitimate legislative activity." *See Tenney*, 341 U.S. at 376 (state legislative immunity applies to "legitimate legislative activity"); *Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 529 (9th Cir. 1983) (federal privilege protects "activity that is within the 'legitimate legislative sphere'") (citing *Eastland*, 421 U.S. at 503).[3]

Plaintiffs argue that the state legislative privilege is not applicable here because Pearce's emails were sent to and received from third-party attorneys, lobbyists, and constituents. Docs. 442 at 17-18; 472 at 8-11. Alternatively, Plaintiffs argue that Pearce and the State have waived the privilege, or that the privilege must give way to Plaintiffs' interest in vindicating federal constitutional rights. Docs. 442 at 18-19; 472 at 11-12.

### 1. Applicability.

The Ninth Circuit has held that because "[o]btaining information pertinent to potential legislation or investigation" is a legitimate legislative activity, the federal legislative privilege applies to communications in which constituents urge their congressperson to initiate or support some legislative action and provide data to document their views. *Miller*, 709 F.2d at 530. Other courts have held that the federal legislative privilege applies more broadly to a congressperson's communications with third parties about legislation or legislative strategy. *See Jewish War Veterans of the U.S. of Am., Inc. v. Gates*, 506 F. Supp. 2d 30, 57 (D.D.C. 2007) (communications with executive branch, constituents, interested organizations, and members of the public are protected by federal legislative privilege if these communications "constitute information

---

[3] The use of the term "legitimate" in this context connotes only that the legislator was engaged in a bona fide attempt to enact legislation, and does not suggest that the legislation was constitutional or otherwise proper. *See Tenney*, 341 U.S. at 377 ("The claim of an unworthy purpose does not destroy the privilege."); *cf. Arlington Heights,* 429 U.S. at 268 (recognizing that legislators may invoke the privilege in defending against an equal protection challenge) (citing *Tenney*).

1 gathering in connection with or in aid of . . . legislative acts"). Courts have held that
2 communications of this type are also protected by the state legislative privilege and
3 immunity doctrines. *See Jeff D. v. Kempthorne*, No. CV-80-4091-E-BLW, 2006 WL
4 2540090, at *3 (D. Idaho Sept. 1, 2006) (legislator's communications with third party
5 were protected by state legislative privilege where the purpose of these communications
6 was to gather information for legislative purposes), *aff'd in part sub nom. Jeff D. v. Otter*,
7 643 F.3d 278 (9th Cir. 2011); *Almonte v. City of Long Beach*, 478 F.3d 100, 107 (2d Cir.
8 2007) ("Meeting[s] with persons outside the legislature – such as executive officers,
9 partisans, political interest groups, or constituents – to discuss issues that bear on
10 potential legislation . . . assist legislators in the discharge of their legislative duty" and are
11 therefore protected by state legislative immunity); *Bruce v. Riddle*, 631 F.2d 272, 280
12 (4th Cir. 1980) ("Meeting with 'interest' groups, professional or amateur, regardless of
13 their motivation, is a part and parcel of the modern legislative procedures" and is
14 protected by state legislative immunity).

15 There is no dispute that the emails at issue in this case were created in connection
16 with bona fide legislative activity – all but two of them refer to specific legislation in
17 their subject line,[4] and many of them include draft legislation.  It is precisely because
18 these emails address legislative activity that Plaintiffs claim they are relevant.  The Court
19 concludes that these emails are protected by the legislative privilege.

20 Plaintiffs cite four cases to support their argument that the emails are not
21 privileged.  None is helpful.  *Almonte v. City of Long Beach*, No. CV 04 4192 JS JO,
22 2007 WL 951863 (E.D.N.Y. Mar. 27, 2007), was overturned by the Second Circuit on
23 appeal.  *Almonte*, 478 F.3d at 107.  The Second Circuit's decision also abrogated
24 *Rodriguez v. Pataki*, 280 F. Supp. 2d 89 (S.D.N.Y.), *aff'd* 293 F. Supp. 2d 302 (S.D.N.Y.
25 2003).  *Compare Rodriguez*, 280 F. Supp. 2d at 1013 (suggesting that "a conversation

---

[4] The only exceptions are Pearce Log No. 15, an email from an attorney entitled "comments on RP's proposed legislative agenda," and State Log No. 2, an email from a lobbyist entitled "On Life issues and On immigration."  The first email plainly addresses legislative activity, and it is reasonable to infer that the second does as well.

- 8 -

1  between legislators and knowledgeable outsiders, such as lobbyists, to mark up
2  legislation" would not be privileged), *with Almonte*, 478 F.3d at 107 (state legislative
3  immunity protects a legislator's conversations with "executive officers, partisans,
4  political interest groups, or constituents . . . to discuss issues that bear on potential
5  legislation"). *Page v. Virginia State Board of Elections*, 15 F. Supp. 3d 657 (E.D. Va.
6  2014), held that a third party legislative consultant could not invoke the legislative
7  privilege; it is a decision about who can invoke the privilege, not what type of
8  communications are covered. Finally, the dicta in *Bastien v. Office of Sen. Ben
9  Nighthorse Campbell*, 390 F.3d 1301 (10th Cir. 2004), casting doubt on whether federal
10 legislative immunity applies to informal information (*id.* at 1316), is contrary to the Ninth
11 Circuit's holding in *Miller*, 709 F.2d at 530.

12 Plaintiffs also argue that cases like *Miller* and *Jewish War Veterans* are
13 distinguishable because "they address a legislature's gathering of information, not
14 solicitation of policy advice." Doc. 472 at 9. But they cite no cases recognizing such a
15 distinction. Rather, the cases instruct that all of a legislator's communications "that bear
16 on potential legislation" are privileged, *Almonte*, 478 F.3d at 107, "regardless of their
17 motivation," *Bruce*, 631 F.2d at 280.

### 2. Waiver.

19 Plaintiffs argue that Pearce and the State have waived the privilege because they
20 have produced some emails between Pearce and third-party attorneys, lobbyists, and
21 constituents, and because Pearce has testified about some of these emails at his deposition
22 in this case. Doc. 442 at 18-19. Pearce responds that he did not produce any of these
23 emails and that his conduct at his deposition did not constitute a waiver of the privilege.
24 Doc. 467 at 9. The State argues that disclosure of some emails pursuant to a subpoena or
25 public records request cannot constitute waiver of the privilege with respect to emails not
26 disclosed. Doc. 466 at 8.

27 The legislative privilege "is a personal one and may be waived or asserted by each
28 individual legislator." *Marylanders for Fair Representation, Inc. v. Schaefer*, 144 F.R.D.

292, 298 (D. Md. 1992); *see Gravel*, 408 U.S. at 622 n.13 (1972). Waiver of the privilege need not be explicit, but "may occur either in the course of the litigation when a party testifies as to otherwise privileged matters, or when purportedly privileged communications are shared with outsiders." *Favors v. Cuomo*, 285 F.R.D. 187, 211-12 (E.D.N.Y. 2012) (citations omitted).

The Court cannot conclude that Pearce waived the privilege. Plaintiffs do not identify the documents produced by Pearce in this case that allegedly constituted the waiver, nor do they explain why disclosure of the documents constituted a waiver. Pearce asserts that he has produced no documents in this case like those challenged in this motion. Doc. 467 at 10. Plaintiffs make a contrary assertion, but without citation to the record or any specific documents. *See* Doc. 442 at 9. What is more, Plaintiffs do not specifically identify who, from among the many parties subpoenaed, produced the documents that allegedly resulted in waiver. *Id.* As noted above, the legislative privilege is personal and must be waived by the individual legislator. *Schaefer*, 144 F.R.D. at 298.

Nor does Pearce's conduct at his deposition constitute waiver. Pearce answered several questions about his email exchanges with third-party attorneys, lobbyists, and constituents, but Pearce's answers were quite limited in scope and did not address the content of the emails. Doc. 467-2 at 6-10. Moreover, Pearce's counsel clarified that these answers should not be construed as a waiver of the privilege. *See id.* at 8-9.

Nor can the Court conclude that the State has waived the privilege. Plaintiffs assert only that the State produced similar communications, but they provide no description of the specific documents that constituted the alleged waiver, no explanation as to why the documents were privileged, and no discussion of the circumstances under which they were disclosed. Docs. 442 at 18-19; 472 at 11.[5]

---

[5] Plaintiffs also fail to provide persuasive authority that waiver of the legislative privilege with respect to some documents waives the privilege with respect to any other documents Plaintiffs choose to request. Docs. 442 at 19; 472 at 11. The Court notes that Congress recently tightened the test for attorney-client privilege waivers arising from documents disclosed in federal or state proceedings, *see* Fed. R. Evid. 502, and the parties do not discuss this Congressionally-enacted rule or its effect on the law of privilege waivers generally.

### 3. Qualification.

"[T]he state legislative privilege is a qualified one . . . when a plaintiff proceeds against the State and seeks evidence to vindicate important public rights guaranteed by federal law." *Bethune-Hill v. Va. State Bd. of Elections*, 114 F. Supp. 3d 323, 336 (E.D. Va. 2015) (citing *Schaefer*, 144 F.R.D. at 304); *see also In re Grand Jury*, 821 F.2d 946, 957 (3d Cir. 1987); *Kay v. City of Rancho Palos Verdes*, No. CV 02-03922 MMM RZ, 2003 WL 25294710, at *14 (C.D. Cal. Oct. 10, 2003) ("cases applying a qualified privilege represent the better, and controlling, legal rule"). Whether privileged material must be disclosed is determined by balancing the legislator's interest in non-disclosure with the movant's interest in obtaining the material. *See In re Grand Jury*, 821 F.2d at 957 (whether privilege is sustained "depend[s] on a balancing of the legitimate interests on both sides"). Both Plaintiffs and the State discuss the five-factor balancing test employed in *Bethune-Hill*, 114 F. Supp. 3d at 336, which looks to "(i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the seriousness of the litigation and the issues involved; (iv) the role of government in the litigation; and (v) the purposes of the privilege." *Id.* (citation omitted).

Applying these factors, the Court concludes that the privilege applies. The first and third factors favor Plaintiffs. The Court has found that the emails at issue may be relevant, particularly those that relate to the legislation at issue in this case, and Plaintiffs seek to protect serious constitutional rights. The fourth and fifth factors favor the State and Pearce. The State is a defendant in this case and seeks to uphold the validity of the challenged legislation, as well as protecting the Arizona legislative process from unwarranted intrusion. The purpose of the legislative privilege, as discussed above, is to protect legislators from unwarranted interference with their legislative activity. The Court finds that the second factor – the availability of other evidence – tips the balance. Plaintiffs have access to the traditional sources of legislative history in this case. Indeed, they cited enough of it in their motion for preliminary injunction to persuade this Court and the Ninth Circuit that the statutes in question were directed at unauthorized aliens.

- 11 -

*See Puente*, --- F.3d ---, slip op. at 17 ("We agree with Puente and the district court that the legislative history of both H.B. 2779 and H.B. 2745 show an intent on the part of Arizona legislators to prevent unauthorized aliens from remaining in the state."). In addition, Plaintiffs have deposed Pearce, and have obtained documents from the Arizona Legislature, Pearce, Senator Kavanagh, FAIR, IRLI, Kris Kobach, and other former legislators who were subpoenaed. Doc. 442 at 9. The State asserts without contradiction that it has "disclosed literally thousands of emails in response to Plaintiffs' subpoenas and public records act requests." Doc. 466 at 7. The Court concludes that the substantial availability of other evidence in this case tips the balance in favor of the State and Pearce. Plaintiffs have not made the showing necessary to overcome the legislative privilege.

### C. First Amendment Privilege.

A person "who objects to a discovery request as an infringement of [his] First Amendment rights is in essence asserting a First Amendment privilege." *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010) (emphasis deleted). This privilege protects against "compelled disclosure of political associations" where such disclosure would have a "deterrent effect on the exercise of First Amendment rights." *Id.* To claim the privilege, a person must show that "enforcement of the discovery requests will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or chilling of, the members' associational rights." *Id.* (internal quotation marks omitted and alterations incorporated).

Pearce asserts the First Amendment privilege with respect to an email from NumbersUSA to Pearce and other NumbersUSA members concerning federal legislation to prevent undocumented immigrants from obtaining social security benefits. *See* Pearce Log No. 21. Pearce submits an affidavit from Roy H. Beck, President and founder of NumbersUSA, which states that the email at issue was "a confidential communication from NumbersUSA to its private and confidential network of interested members and activists," that "[t]he communication requested that it remain private and not be

forwarded to individuals outside the group," and that "[i]f NumbersUSA is compelled to disclose these communications and information about its participants . . . [t]his will undoubtedly induce members and organizations to withdraw their participation in our current strategy sessions." Doc. 467-3, ¶¶ 13, 15. As Plaintiffs acknowledge, this affidavit constitutes evidence that disclosure of the contested email might chill NumberUSA's exercise of its First Amendment rights. Doc. 472 at 1 2. Because Senator Pearce has shown that compelled disclosure of this email might have such a chilling effect, and because the email appears at most marginally relevant to this case, Pearce's claim of First Amendment privilege will be sustained.

**IT IS ORDERED** that Plaintiffs' motion to compel (Doc. 442) is **denied**.

Dated this 5th day of May, 2016.

_____
David G. Campbell
United States District Judge