**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Puente Arizona, et al., | No. CV-14-01356-PHX-DGC |
| Plaintiffs, | **ORDER** |
| v. | |
| Joseph M Arpaio, et al., | |
| Defendants. | |

This case involves the constitutionality of two Arizona statutes that criminalize the act of identity theft when done with the intent to obtain or continue employment, and a general Arizona statute that makes it a crime to commit forgery.  Plaintiffs argue that these three statutes are preempted when applied to unauthorized aliens who commit fraud in the federal employment verification process or to show authorization to work under federal immigration law.  Plaintiffs also claim that the two identity theft statutes were enacted with the purpose of discriminating against unauthorized aliens and are facially invalid under the Equal Protection Clause of the Fourteenth Amendment.  Plaintiffs seek declaratory and injunctive relief.

The Parties have filed motions for summary judgment, and the Court heard oral arguments on October 13, 2016.  For the reasons set forth below, the Court will grant in part Plaintiffs' motion for summary judgment on the preemption claim, grant in part Defendants' motion for summary judgment on the preemption claim, and grant Defendants' motion for summary judgment on the equal protection claim.

## I.     Background.

For purposes of this order, the Court will refer to those who are in the United States without legal authorization as "unauthorized aliens."   Plaintiffs consist of two unauthorized aliens who have been convicted of identity theft felonies in Arizona for using false names to obtain employment; Puente, an organization formed to protect and promote the interests of unauthorized aliens and their families; and several residents of Maricopa County who object to the use of their tax dollars to prosecute unauthorized aliens for identity theft or forgery in the employment context.  Defendants are the State of Arizona, Maricopa County, Maricopa County Sheriff Joseph Arpaio, and Maricopa County Attorney Bill Montgomery.

The Court will begin by describing relevant federal laws and regulations on the employment of unauthorized aliens, and then will describe the Arizona laws challenged by Plaintiffs and the prior proceedings in this case.

### A.     Federal Regulation of Unauthorized Alien Employment.

In 1986, Congress passed the Immigration Reform and Control Act ("IRCA"). Pub. L. No. 99-603 (S. 1200).   Among other provisions, the IRCA prohibited the employment of unauthorized aliens and created a national system for verifying whether prospective employees were authorized to work in this Country.  *Id.* § 101.  The new system required employers to verify the identity and work authorization of persons they intend to hire.  *Id.*  Congress instructed the Attorney General to create a form on which an employer would attest, under penalty of perjury, that it had verified that an employee was authorized to work.  *Id.*  The prospective employee was also required to swear that he or she is a United States citizen or an alien lawfully authorized to obtain employment in the United States.  *Id.*

Following the passage of the IRCA, the Attorney General enacted regulations to implement the employment verification system.  8 C.F.R. § 274a.2.  These regulations create the Form I-9 to be used in the verification process.  Section 1 of the Form I-9 requires the employee to provide his or her name, address, date of birth, and social

security number, and to swear under penalty of perjury that he or she is a citizen or national of the United States, a lawful permanent resident alien, or an alien authorized to work in the United States.  In section 2, the employer identifies documents reviewed by the employer to verify the employee's identity and work authorization.  The regulations identify specific documents, referred to as "List A" documents, that can be used to show both identity and authorization to work, such as U.S. passports, permanent resident alien cards, or federal employment authorization documents.  "List B" documents can be used to show identity, and include items such as driver's licenses or state, federal, or school ID cards.  "List C" documents can be used to show employment authorization, and include social security cards and other specific federally- or tribally-issued documents.  8 C.F.R. § 274a.2(b)(1)(v).  A prospective employee must show the employer either a List A document or a combination of List B and List C documents.

After the employer verifies the employee's identity and authorization to work and the Form I-9 is completed, the employer is required to maintain the form and any copies it made of documents provided by the employee.  The Form I-9 is not submitted to the government.  The intent is for employees to prove their identity and authorization to work, and for employers to confirm these facts and then retain a copy of the Form I-9 as proof the process was completed.[1]

The IRCA established criminal penalties for employers who fail to follow the Form I-9 process.  Pub. L. No. 99–603 (S 1200) § 101 (codified at 8 U.S.C. § 1324a(f)).  It also imposed criminal penalties on persons who knowingly forge, counterfeit, or alter any of the documents prescribed for proof of identity or employment authorization.  *Id.*

---

[1] The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 required the Attorney General to provide for the operation of three pilot programs related to the federal employment verification system.  Pub. L. No. 104–208 (HR 3610), §§ 401–405.  One of these programs, originally titled the Basic Pilot Program but now referred to as the E-Verify System, is still in operation today.  The E-Verify System is an alternative to the Form I-9 process and is an internet-based program through which an employer can verify the work authorization of a prospective employee.  Use of the system is voluntary.  Pub. L. No. 104–208 (HR 3610), § 402.  The E-Verify system is not at issue in this case.

§ 103 (codified at 18 U.S.C. § 1546).   The IRCA also imposed criminal penalties on persons who knowingly use a false identification document to satisfy any requirement of the I-9 process.  *Id.*

Four years after the enactment of the IRCA, Congress passed the Immigration Act of 1990.   Pub. L. 101-649.   This statute added a range of civil penalties for fraud committed by employees in the Form I-9 process.   *Id* (codified at 8 U.S.C. § 1324c).  Congress has also enacted various immigration penalties for fraud committed to satisfy the federal employment verification system.  *See* 8 U.S.C. §§ 1182(a)(6)(c), 1227(a)(3), 1255(c).   These criminal, civil, and immigration provisions will be discussed in greater detail below.

**B.   Arizona Laws.**

This case concerns three Arizona laws:  two identity theft statutes passed in 1996 and 2005, and then amended in 2007 and 2008 to apply specifically to the use of false identities to obtain employment, and a general forgery statute passed in 1977.   As the nature, history, and application of these laws are important to the issues addressed below, the Court will describe them in some detail.

In July 1996, Arizona became the first state in the country to pass legislation making identity theft a felony.   S. Rep. No. 105-274, at 6 (1998).   This statute, now codified at A.R.S. § 13-2008, made it a crime to "knowingly take[] the name, birth date or social security number of another person, without the consent of that person, with the intent to obtain or use the other person's identity for any unlawful purpose or to cause financial loss to the other person."  1996 Ariz. Legis. Serv. Ch. 205 (H.B. 2090) (West).  The statute has been amended several times to expand the definition of identity theft.  *See*, *e.g.*, 2000 Ariz. Legis. Serv. Ch. 189 (H.B. 2428) (West) (broadening the statute to cover "any personal identifying information" of another person).

In 2005, Arizona passed legislation creating a new crime of aggravated identity theft.   2005 Ariz. Legis. Serv. Ch. 190 (S.B. 1058) (West).   This statute, codified at A.R.S. § 13-2009, designated identity theft as aggravated if it causes another to suffer an

economic loss of $1,000 or more, or if it involves stealing the identities of three or more persons.

Plaintiffs' claims focus on later amendments to § 13-2008 and § 13-2009 that added specific language covering identity theft committed to obtain or continue employment.  The first amendment was passed in 2007 as part of H.B. 2779, known as the "Legal Arizona Workers Act."  2007 Ariz. Legis. Serv. Ch. 279 (H.B. 2779) (West). H.B. 2779 created a new statute – A.R.S. § 13-212 – which prohibits employers from hiring unauthorized aliens and threatens the suspension of their business licenses if they fail to comply.[2]  H.B. 2779 also amended the aggravated identity theft statute that had been passed in 2005.  Under the amended statute, a person commits aggravated identity theft by knowingly taking the identity of "[a]nother person, including a real or fictitious person, with the intent to obtain employment."  A.R.S. § 13-2009(a)(3).

In 2008, Arizona passed H.B. 2745, titled "Employment of Unauthorized Aliens." 2008 Ariz. Legis. Serv. Ch. 152 (H.B. 2745) (West). The bill amended and created several statutes relating to the employment of unauthorized aliens.  The bill also amended § 13-2008(A) – originally passed in 1996 – to make clear that identity theft is a crime when committed "with the intent to obtain or continue employment."  *Id.*

Throughout the remainder of this order, the Court will refer to the 2007 and 2008 amendments – which are the legislative acts specifically challenged by Plaintiffs – simply as "the identity theft statutes."

This Court and the Ninth Circuit have recognized in previous rulings in this case that the 2007-2008 legislative history of the identity theft statutes reflects "an intent on the part of Arizona legislators to prevent unauthorized aliens from coming to and remaining in the state."  *Puente Arizona v. Arpaio*, 821 F.3d 1098, 1102 (9th Cir. 2016); *Puente Arizona v. Arpaio*, 76 F. Supp. 3d 833, 855 (D. Ariz. 2015).  Plaintiffs identify numerous statements by Arizona lawmakers expressing an intent to target unauthorized aliens and affect immigration with both bills.  Doc. 621 at 4-8; Doc. 538 at 17-18; Doc.

---

[2] The Supreme Court found this statute to be constitutional in *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582 (2011).

575 at 16-21.  For example, one of H.B. 2779's sponsors, Representative Barnes, stated that the bill was "meant to address the illegal immigration problem."  Doc. 575 at 16. Senator Pearce, another sponsor of both bills, stated during a hearing on H.B. 2779 that Arizona needed to do more to stop illegal immigration and that "attrition starts through enforcement."  Doc. 621 at 5.  Representatives Burns and O'Halloran expressed support for the bills because they would take a tough stance on immigration and ensure that unauthorized aliens would not become citizens.  Doc. 575 at 18.  When signing H.B. 2779 into law, Governor Napolitano noted that a "state like Arizona [has] no choice but to take strong action to discourage the further flow of illegal immigration through our borders."  2007 Ariz. Legis. Serv. Ch. 279 (H.B. 2779) (West).  In addition, H.B. 2779 and H.B. 2745 were among dozens of Arizona bills introduced during the same time period which focused on unauthorized aliens.  Doc. 575 at 19-20.

Defendants do not offer any contrary legislative history, but instead argue that the statements cited by Plaintiffs are immaterial to their claims (Doc. 573 at 6-9), and that "state legislative intent is irrelevant to the issue of preemption."  Doc. 510 at 16. Defendants also argue that because H.B. 2779 and H.B. 2745 contain multiple provisions, the legislative history cited by Plaintiffs cannot be linked specifically to the identity theft statutes.  Doc. 604 at 11.  The Court has already rejected this argument, finding that the 2007 and 2008 amendments were intended – at least in part – to target unauthorized aliens and influence illegal immigration.  *Puente*, 76 F. Supp. 3d at 856-57.

In addition to challenging the identity theft statutes, Plaintiffs' amended complaint includes a preemption challenge to the general forgery statute, A.R.S. § 13-2002, as applied to unauthorized aliens seeking employment.  Doc. 191.  This statute was originally enacted in 1977, and provides that a person "commits forgery if, with intent to defraud," the person "[o]ffers or presents, whether accepted or not, a forged instrument or one that contains false information."  A.R.S. § 13-2002(A)(3).  This statute does not specifically mention employment, but Defendants do not dispute that it has been applied to unauthorized aliens who commit forgery in the employment context. Doc. 534 at 19.

**C.     History of This Case.**

On January 5, 2015, this Court preliminarily enjoined enforcement of the identity theft statutes – § 13-2009(A)(3) and the portion of § 13-2008(A) that addresses actions committed with the intent to obtain or continue employment – finding that Plaintiffs were likely to prevail on their claim that these provisions are facially preempted under the Supremacy Clause.   *Puente*, 76 F. Supp. 3d at 842.   The Court relied heavily on the legislative history of these provisions, finding "a primary purpose and effect . . . to impose criminal penalties on unauthorized aliens" and "regulate unauthorized aliens who seek employment." *Id.* at 855.   Because Congress has comprehensively regulated the field of unauthorized alien employment, the Court concluded that the statutes were likely invalid under both field and conflict preemption. *Id.* at 856-58.

On appeal, the Ninth Circuit agreed with the Court's characterization of the purpose of the identity theft statutes, but concluded that Plaintiffs' facial preemption challenge would fail on the merits because the statutes could also be applied to citizens or lawful resident aliens and therefore could be enforced "in ways that do not implicate federal immigration priorities." *Puente*, 821 F.3d at 1108.   The Court of Appeals explained:

> [T]he identity theft laws are textually neutral – that is, they apply to unauthorized aliens, authorized aliens, and U.S. citizens alike. . . . The key point is this: one could not tell that the identity theft laws undermine federal immigration policy by looking at the text itself.   Only when studying certain applications of the laws do immigration conflicts arise.

*Id.* at 1105.   The court vacated the preliminary injunction and remanded for consideration of Plaintiffs' as-applied challenge. *Id.* at 1110.

The Ninth Circuit also held that a presumption against preemption applies in this case because the challenged identity theft laws "regulate for the health and safety of the people of Arizona." *Id.* at 1104.   "Therefore, only if Congress's intent to preempt the challenged state statute is 'clear and manifest' may we deem the statute preempted." *Id.* More will be said about this presumption below.

### D.    Current Procedural Setting.

The parties have completed discovery and filed cross motions for summary judgment on Plaintiffs' as-applied preemption claim.  Defendants have also moved for summary judgment on Plaintiffs' equal protection claim, and Defendant Maricopa County seeks summary judgment on its liability for the conduct of Sheriff Joseph Arpaio and County Attorney Bill Montgomery.  Docs. 510, 511, 525, 534.  After setting forth the relevant legal standard for summary judgment, the Court will address preemption, equal protection, and the County's liability.

## II.    Legal Standard.

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III.    Preemption.

### A.    Basic Preemption Principles.

"The Supremacy Clause provides a clear rule that federal law 'shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, anything in the Constitution or Laws of any State to the Contrary notwithstanding.'" *Arizona United States,* 132 S.Ct. 2492, 2500 (2012) (quoting U.S. Const. art. VI, cl. 2).  Under this clause, "Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372, (2000).  In determining whether Congress has in fact preempted a state law, "'the purpose of Congress is the ultimate touchstone.'" *Wyeth v.*

*Levine,* 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, (1996)).

The preemption doctrine consists of three well-recognized classes: express, field, and conflict preemption. *Arizona,* 132 S.Ct. at 2500-01. Express preemption occurs when Congress "withdraw[s] specified powers from the States by enacting a statute containing an express preemption provision." *Id.* (citing *Whiting,* 131 S.Ct. at 1974-75). Field preemption precludes states "from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Id.* at 2501 (citing *Gade v. Nat'l Solid Wastes Mgmt. Ass'n,* 505 U.S. 88, 115 (1992)). Conflict preemption occurs "where 'compliance with both federal and state regulations is a physical impossibility,' *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142-43 (1963), and in those instances where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' *Hines* [*v. Davidowitz* ], 312 U.S. [52,] 67, (1941)." *Id.*

As noted by the Ninth Circuit in this case, the Court begins with a presumption that application of the identity theft and forgery statutes to unauthorized aliens is not preempted. *Puente*, 821 F.3d at 1104. The Supreme Court has long held that "courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Arizona v. United States*, 132 S.Ct. at 2501 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947)); *see also Wyeth*, 555 U.S. at 565.

This case clearly implicates historic police powers. As already noted, § 13-2008 was the first identity theft statute passed by a state in the United States. More than a decade later, "[b]etween 2006 and 2008, Arizona had the highest per-capita identity theft rates in the nation, and one third of all identity theft complaints in the state involved employment-related fraud." *Puente*, 821 F.3d at 1002. Defendants assert, without contradiction from Plaintiffs, that some 860,000 identity thefts and 270,000 cases of personal information theft occur annually in Arizona. Doc. 584, ¶ 6. Defendants' expert,

Dr. Cohen, found that Arizona residents are 2.5 times more likely to be victims of identity theft than average Americans, and that Arizona residents incur between $2.8 and $5.1 billion in annual costs from identity theft.  *Id.*, ¶ 13.

Protecting residents against fraud, including fraud committed in the employment context, plainly falls within the historic police powers of the State.  To overcome the resulting presumption against preemption, therefore, Plaintiffs must show that "Congress's intent to preempt the challenged state statutes is 'clear and manifest.'" *Puente*, 821 F.3d at 1104.  In addition, as the Supreme Court has said, laws within the historic police powers of the states "must do 'major damage' to 'clear and substantial' federal interests before the Supremacy Clause will demand that [they] be overridden[.]" *Hillman v. Maretta*, 133 S. Ct. 1943, 1950 (2013) (quoting *Hisquierdo v. Hisquierdo,* 439 U.S. 572, 58 (1979)).

### B.     As-Applied Preemption.

Plaintiffs assert that Congress intended to preempt Arizona from applying its identity theft and forgery statutes to unauthorized aliens who commit fraud in obtaining employment.  Plaintiffs do not claim that the laws have been applied unjustly to innocent unauthorized aliens.  Rather, they argue that aliens who actually steal the identity of another to obtain employment cannot be prosecuted under the Arizona laws.

As the Ninth Circuit has emphasized, factual findings are very important in as-applied preemption analysis.  *Puente*, 821 F.3d at 1105.  If the as-applied challenge succeeds, the Arizona identity theft statutes will not be found invalid in their entirety, but only as applied to employment-related fraud committed by unauthorized aliens.

The Supreme Court has explained that in "assessing the impact of a state law on the federal scheme, we have refused to rely solely on the legislature's professed purpose and have looked as well to the effects of the law."  *Gade*, 505 U.S. at 105.  The Ninth Circuit also noted that Arizona's purpose behind the challenged statutes is relevant but not sufficient to establish preemption.  *Puente*, 821 F.3d at 1106 n.8.  Citing *Gade* and similar cases, Defendants suggest that the Court's as-applied analysis must focus on the

*practical effect* of the statutes' application.  Plaintiffs disagree, arguing that the court must instead "determine whether a state or local policy poses an obstacle to the accomplishment and execution of the full purposes and objectives of Congress . . . [by] evaluat[ing] not only its formal terms, but *practical result*."  Doc. 606 at 16 (emphasis added).  The Court sees no meaningful distinction between the "practical effect" and "practical result" of the statutes' application.  By either name, the Court must determine whether the challenged application conflicts with a federal scheme enacted by Congress or intrudes on a field fully occupied by Congress.  The touchstone remains the intent of Congress, but with the presumption against preemption firmly in mind.

## C.   Relevant Facts.

### 1.   Maricopa County Attorney's Office.

Between 2005 and 2015, a high majority of those prosecuted by the Maricopa County Attorney's Office ("MCAO") under the Arizona identity theft and forgery laws were unauthorized aliens.  Doc. 621-21 at 11; Doc. 538 at 27.  During this period, MCAO filed employment-related identity theft or forgery charges against 1,390 persons.  Of these, 90% were designated as unauthorized aliens, 3% were designated as not unauthorized aliens, and 7% had unknown alien status.  Doc. 584-1, ¶ 122.  Both sides agree, however, that the evidence does not show that this rate of prosecution is out of proportion to the rate at which unauthorized aliens commit identity theft or forgery in the employment context.  Doc. 589 at 54.  Rather, because federal law prohibits their employment, both sides find it obvious that unauthorized aliens working in the United States use false identifications to obtain employment.  Doc. 538 at 20; Doc. 573 at 17; Doc. 606 at 17 n.12.

Between 2005 and 2015, approximately 23 different law enforcement agencies in Maricopa County submitted identity theft cases to MCAO for prosecution.  Doc. 534 at 18.  Of the 1,353 cases for which charging documents were available, approximately 90 percent relied on documents *other than* the Form I-9.  *Id.* at 24.  Thus, it appears that about 10 percent of MCAO prosecutions for identity theft or forgery involved charges

based at least in part on the Form I-9.  Doc. 589 at 48.  Apparently because he realized that the IRCA includes a ban on state use of such documents (as discussed below), Defendant Montgomery formally revised the MCAO's written policy on September 17, 2014, to prohibit reliance on the Form I-9 as evidence in trial or for charging purposes. *Id.*, ¶ 74; Doc. 538 at 29.  Other documents relied on by MCAO in identity theft and forgery cases include false federal tax withholding forms (W-4), state tax withholding forms (A-4), job applications, social security cards, state identification cards, driver's licenses, and federal tax reporting forms (W-2).  Doc. 584, ¶ 60; Doc. 589 at 40.

## 2.      Maricopa County Sheriff's Office.

Defendant Arpaio acknowledges that a majority of those referred by law enforcement agencies for identity theft prosecutions are unauthorized aliens.  Doc. 525 at 9; Doc. 584-1, ¶ 120.  A full 93% of MCSO's referrals of identity theft and forgery cases were derived from Defendant Arpaio's workplace investigations.  Doc. 525 at 9.  These investigations generally would begin with a tip from the community regarding a specific place of business and its employees, usually made to telephone and email hotlines set up by MCSO.  Doc. 538 at 19; Doc. 525 at 12.  MCSO would then investigate the tip and, if evidence suggested employees of the business were engaged in identity theft or forgery, apply for a warrant to search the worksite.  *Id.*  While executing the warrant, MCSO would review and seize employment files and arrest individual workers believed to have committed identity theft or forgery.  *Id.*  Among other records, MCSO would seize Form I-9 documents.  Doc. 538 at 28; Doc. 573, ¶ 80.  Through 2014, MCSO conducted over 80 workplace investigations, resulting in the arrest of at least 806 employees who were almost exclusively unauthorized aliens.  Doc. 538 at 19; Doc. 573, ¶ 59.  According to Defendant Arpaio, MCSO was "enforce[ing] the illegal immigration laws by virtue of going into businesses and locking up the employees with fake IDs."  Doc. 621, ¶ 77; Doc. 573, ¶ 77.

## D.      Field Preemption.

"[F]ield preemption can be inferred either where there is a regulatory framework

- 12 -

so pervasive . . . that Congress left no room for the States to supplement it or where the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1023 (9th Cir. 2013) (internal quotations and brackets omitted). "[W]here a multiplicity of federal statutes or regulations govern and densely criss-cross a given field, the pervasiveness of such federal laws will help to sustain a conclusion that Congress intended to exercise exclusive control over the subject matter." Laurence H. Tribe, *American Constitutional Law,* § 6-31, at 1206-07. "The nature of the power exerted by Congress, the object sought to be attained, and the character of the obligations imposed by the law, are all important in considering the question of whether supreme federal enactments preclude enforcement of state laws on the same subject." *Hines*, 312 U.S. at 70.

Citing the Court's previous preliminary injunction order, Plaintiffs argue that Congress has preempted a field of "unauthorized-alien fraud in obtaining employment," as related to the federal employment verification process. Doc. 538 at 23; Doc. 606 at 11. According to Plaintiffs, this definition of the preempted field was not disturbed by the Ninth Circuit and remains law of the case. *Id.*

The Court's previous ruling, while certainly relevant, was made at the preliminary injunction phase and thus was based only on likelihoods – whether Plaintiffs were *likely* to prevail on the merits of their claim. *Puente*, 76 F.Supp.3d. at 853. The Court's decision was also made on a smaller factual record and less briefing than this ruling. The Court is not bound by its previous decision, and, on the more complete presentations now available, has taken a closer look at both Congress' actions and Defendants' applications of the challenged laws. As discussed below, the Court finds a narrower congressional intent than it found in the preliminary injunction ruling.

Plaintiffs themselves depart from the field identified in the Court's preliminary injunction ruling. They argue that the preempted field is unauthorized alien fraud committed in the federal employment verification process, and that this preemption must

be expanded to include any false documents provided by an unauthorized alien to an employer in order to maintain consistency with false information provided in the verification process.  Doc. 606 at 11 n.6.  Thus, Plaintiffs would include in the preempted field not only the use of false documents submitted in the I-9 process or to show authorization to work under federal law, but also the use of any false communication made in the employment context in order to be consistent with the I-9 false identity, such as false tax forms, payroll forms, or applications for employment benefits.

Plaintiffs argue that this broad field has been preempted by IRCA's process for verifying eligibility of prospective employees, the variety of civil and criminal sanctions for employers who knowingly employ unauthorized aliens, and extensive civil, criminal, and immigration penalties for unauthorized aliens who engage in employment verification fraud.  Doc. 538 at 14-15.  As the intent of Congress is the touchstone, the Court will look closely at each of the laws and regulations cited by Plaintiffs.[3]

### 1.    The Use Limitation.

Section 1324a(b)(5) provides that the Form I-9, and "any information contained in or appended to such form, may not be used for purposes other than for enforcement of this chapter and sections 1001, 1028, 1546, and 1621 of Title 18."  8 U.S.C. § 1324a(b)(5).  This prohibition, which the Court will refer to in this order as the "use limitation," prohibits the use of the Form I-9 and any attached documents for any purpose other than enforcement of specific federal criminal statutes.  They cannot be used for other purposes, including state prosecutions.  The use limitation certainly is relevant in assessing Congress's intent for preemption purposes, but the focus of the provision is quite narrow.  It applies only to Form I-9 and documents appended to the form.  *Id.*

---

[3] The United States filed an *amicus curie* brief with the Ninth Circuit on the appeal of the Court's preliminary injunction ruling.  *Puente Arizona et al., Plaintiffs-Appellees, v. Sheriff Joseph Arpaio et al., Defendants-Appellants*, 2016 WL 1181917 (C.A.9) ("Amicus Brief").  The Court has considered the arguments and citations in that brief.

### 2.   Criminal, Civil, and Immigration Statutes.

As Plaintiffs note, "Congress anticipated that some individuals might respond to the new employment verification system by relying on false information or documents." Doc. 538 at 14.  As a result, Congress established several provisions relating to fraud committed by unauthorized aliens.  Plaintiffs rely heavily on these statutes for their preemption argument, but a close examination shows that they too have a narrow focus: Congress limited the statutes either to fraud committed in the I-9 process or fraud in satisfying a requirement or seeking a benefit under federal immigration law generally.

### a.   Criminal Penalties.

The federal criminal statute cited by Plaintiffs is 18 U.S.C. § 1546.  Under part (a) of this section, which was amended by the IRCA to apply to employment, an individual is subject to fines and imprisonment if he or she:

> knowingly forges, counterfeits, alters, or falsely makes any immigrant or nonimmigrant visa . . . or *other document prescribed by statute or regulation* for entry into or *as evidence of authorized* stay or . . . *employment in the United States*, or utters, uses, attempts to use, possesses, obtains, accepts, or receives any such visa . . . or *other document prescribed by statute or regulation* for entry into or *as evidence of authorized* stay or *employment in the United States*, knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained[.]

18 U.S.C. § 1546(a) (emphasis added).

As relevant here, this statute prohibits a very specific kind of employment-related fraud:  use of false documents "prescribed by statute or regulation . . . as evidence of authorized . . . employment in the United States." *Id.*  Thus, the only employment fraud prohibited by part (a) is fraud in specific documents – those prescribed by federal law to show work authorization in the United States.  As explained above, federal regulations establish three categories of documents to be used in the I-9 process:  List A documents that can be used to show both identity and work authorization, List B documents that can be used only to show identity, and List C documents that can be used only to show work

authorization.  *See* 8 C.F.R. § 274a.2(b)(1)(v).  Section 1546(a)'s prohibition on false employment-related documents applies only to List A and List C documents – those used to show work authorization.  The Ninth Circuit has confirmed this reading of the statute. *See United States v. Wei Lin*, 738 F.3d 1082, 1084 (9th Cir. 2013).

Section 1546(b) provides criminal penalties for the use of false identification documents or false attestations, and it too is limited to the I-9 process:

Whoever uses –

(1)   an identification document, knowing (or having reason to know) that the document was not issued lawfully for the use of the possessor,
(2)   an identification document knowing (or having reason to know) that the document is false, or
(3)   a false attestation,

for the purpose of satisfying a requirement of section 274A(b) of the Immigration and Nationality Act, shall be fined under this title, imprisoned not more than 5 years, or both.

18 U.S.C. § 1546(b).  The reference to section 274A(b) of the Immigration and Nationality Act is to 8 U.S.C. § 1324a(b), the statute that establishes the I-9 process.  Thus, part (b) of this statute, like part (a), is limited to fraud in the I-9 process.

Turning then to congressional intent, the precise language of § 1546(a) and (b) shows that Congress had a narrow target: fraud in the I-9 process.  Congress did not prohibit employment fraud generally.  Thus, the Court cannot conclude from the relevant criminal statute that Congress intended to occupy the entire field of unauthorized alien fraud in the employment context.

### b.   Civil Penalties.

The civil penalties cited by Plaintiffs are similarly focused.  Congress set out a range of unlawful conduct for which civil penalties can be imposed in 8 U.S.C. § 1324c.  The penalties can range from $250 to $5,000.  8 U.S.C. § 1324c(d)(3).  The unlawful conduct includes making false documents, using false documents, using a document issued to another person, and receiving a document issued to another person.

§ 1324c(a)(1)-(5).   This unlawful conduct, however, is limited to actions taken for specific purposes:  "satisfying a requirement of this chapter or to obtain a benefit under this chapter," "to satisfy any requirement of this chapter or to obtain a benefit under this chapter," or "for the purpose of complying with section 1324a(b)."   8 U.S.C. § 1324c(a)(1)-(4).  The unlawful conduct may also include fraud in "any application for benefits under this chapter, or any document required under this chapter, or any document submitted in connection with such application or document."   8 U.S.C. § 1324c(a)(5).

The references in these civil penalty provisions to "this chapter" is to Chapter 12 of Title 8, which addresses a broad range of immigration matters such as immigration qualifications and procedures, alien registration, naturalization, refugee resettlement, removal of aliens, and criminal penalties for immigration crimes.  *See* 8 U.S.C. §§ 1101-1537.  The civil penalties for fraud related to these broad-ranging immigration laws do not, in the Court's view, reveal any intent of Congress to preempt state prosecution of identity theft in the employment context.  The penalties instead reflect a broad intent to penalize those who defraud the nation's immigration system.  They do not support Plaintiffs' employment-specific preemption argument.  Plaintiffs do not challenge the identity theft statutes on the ground that Defendants are using them to prosecute broad-ranging immigration fraud.

The civil penalty provisions do make specific reference to one statute: 8 U.S.C. § 1324a(b).  Again, this is the statute that establishes the I-9 process.  Thus, to the extent that one can discern any preemptive intent from the civil penalty provisions, it is narrowly focused on the I-9 process.  As with the criminal provision discussed above, the Court cannot conclude that Congress intended to occupy the entire field of unauthorized alien fraud in employment.

### c.    Immigration Consequences.

Plaintiffs also rely on immigration consequences imposed on aliens who commit fraud – that is, adverse consequences that can occur in the immigration process to persons

who commit fraud.  But these statutes are also narrowly focused.

8 U.S.C. § 1227 provides that an alien may be removed from the United States if he or she has been convicted of "a violation of, or an attempt or a conspiracy to violate, section 1546 of Title 18."  8 U.S.C. § 1227(a)(3)(B)(iii).  As we have already seen, § 1546 is limited to the I-9 process.

Section 1227 also provides that "[a]ny alien who falsely represents, or has falsely represented, himself to be a citizen of the United States for any purpose or benefit under this chapter (including section 1324a of this title) or any Federal or State law is deportable."  8 U.S.C. § 1227(a)(3)(D)(i).  This provision focuses on fraud under the immigration laws of Chapter 12, as discussed above, and § 1324a, which is the I-9 process.  It has the same narrow focus as the civil penalty provisions.

This section – as well as § 1182 discussed below – also refers to fraud committed for any purpose, or to obtain any benefit, under "Federal or State law," but the Court cannot find in this phrase a congressional intent to preempt state regulation of all fraud in employment.  Because these statutes are identifying situations under which aliens are inadmissible or deportable, they necessarily have a broader focus than fraud in the I-9 process.  Congress intended to sweep in many kinds of fraudulent conduct that could affect a person's suitability for citizenship or legal residency.  But nothing in the language, and nothing cited by Plaintiffs, suggests that this general mention of federal and state law has anything to do with employment, or represents a specific intent to preempt prosecution of employment fraud outside the I-9 process.  The Court cannot conclude that a broad description of events that might affect the right to citizenship or residency shows a "clear and manifest" intent to prevent states from regulating all unauthorized alien fraud in the employment context.  *Puente*, 821 F.3d at 1104.

Section 1182 provides that "[a]ny alien who falsely represents, or has falsely represented, himself or herself to be a citizen of the United States for any purpose or benefit under this chapter (including section 1324a of this title) or any other Federal or State law is inadmissible."  8 U.S.C.A. § 1182(a)(6)(C)(ii)(1).  Again, the focus is on

obtaining benefits under the immigration chapter and, specifically, the I-9 process.  Like § 1227, the statute has the same narrow focus as the civil penalty provisions.

One provision is a bit broader.  It states that an alien is not eligible for adjustment of status if he or she "continues in or accepts unauthorized employment prior to filing an application for adjustment of status."  8 U.S.C. § 1255(c).  This provision does refer to unauthorized employment generally, but it does not focus on fraud.  The penalty arises from being employed when unauthorized.  Thus, although it has a somewhat broader focus than the other provisions Plaintiffs cite, it does not show a clear and manifest congressional intent to focus on employment-related fraud outside the I-9 process. [4]

### d.      Conclusion from Plaintiffs' Statutes.

After carefully reviewing these statutes, the Court cannot conclude that Congress has expressed a clear and manifest intent to occupy the field of unauthorized alien fraud in seeking employment.  The focus of the criminal statute, 18 U.S.C. § 1546, is the I-9 process.  The focus of the civil penalty statutes is the I-9 process and fraud committed to comply with or obtain benefits from immigration laws found in Chapter 12 of Title 8.  The immigration consequences also focus primarily on obtaining benefits under the immigration chapter and, specifically, the I-9 process.  The Court cannot find in these statutes the broad preemptive intent Plaintiffs espouse.

### 3.      Plaintiffs' Other Arguments.

Plaintiffs argue that Congress has manifested a clear intent to focus penalties on employers rather than employees in the regulation of unauthorized alien employment.  Doc. 538 at 16.  According to this argument, Congress's failure to provide harsher criminal and civil penalties for fraud committed by unauthorized aliens was a deliberate decision.  But the specific area in which Congress chose to impose less harsh penalties

---

[4]  Section 1182(a)(6)(C)(i) provides that "[a]ny alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter is inadmissible."  This provision is primarily focused on fraudulent admission to the United States or obtaining other benefits under the immigration chapter.  It is not employment-specific and does not show a congressional intent to preempt regulation of employment-related fraud.

was narrow – the I-9 process or efforts to obtain benefits from or comply with federal immigration law.  The statutes reviewed above impose no penalties for employment-related fraud outside the I-9 process, and the Court therefore cannot conclude that Plaintiffs' lighter-penalties argument proves a clear and manifest preemptive intent.

Plaintiffs also argue that "undocumented immigrants who submit false identity information in the I-9 process have to complete other employment-related paperwork to get or maintain a job – and their use of the same false information on those other documents to maintain the same identity is still being done for an immigration-related reason, to prove that they are authorized to work in the United States."  Doc. 606 at 8 (internal quotations and citations omitted).  Thus, Plaintiffs argue, any fraud committed in the employment context simply to maintain consistency with the false identity used in the I-9 process falls within the federally preempted field of unauthorized alien fraud in the federal employment verification system.  Doc. 538 at 26.

The Court is not persuaded.  While it may be true that unauthorized aliens must maintain a consistent false identity in all of their employment-related communications, such an obvious fact would not have been lost on Congress.  And yet Congress clearly directed its statutes at the I-9 process, not other aspects of the employment relationship.

What is more, Plaintiffs' consistency argument proves too much.  If Congress has preempted the prosecution of any identify fraud undertaken to be consistent with fraud committed in the I-9 process, such preemption would extend well beyond fraud committed to obtain employment.  It would encompass fraud on tax forms, payroll benefits forms, insurance forms, and even direct deposit forms submitted to an employer.  Although these forms are not intended to demonstrate work authorization, state prosecutions based on them would, under Plaintiffs' theory, be preempted so long as the individual used the same identity as he used in the I-9 process.

Nor would the preemptive effect stop at the employer.  For example, the individual who submitted a false direct deposit form to his employer, using the same false name already used on his Form I-9, would inevitably need to open a bank account to

receive the direct deposits, and the account would also need to be in the same false name. Would prosecution based on use of the false name at the bank be preempted simply because it was done to maintain consistency with fraud already committed on the Form I-9?  What if the employee sought a car loan, and used the same false name as he did on the Form I-9 because he knew the lender would contact his employer to verify his employment?  Would his intent to be consistent with the I-9 fraud bar prosecution for defrauding the lender?  The Court sees no boundary to Plaintiffs' position that Congress preempted not only fraud in the I-9 process, but also fraud done to be consistent with the I-9 process.  Certainly the Court can find no intent of Congress to preempt so broadly, let alone a clear and manifest intent.

Plaintiffs' expansive preemption argument also includes inconsistencies. Plaintiffs concede that "there may be a rare case where an undocumented immigrant commits fraud in employment for reasons other than to demonstrate authorization to work," and that state prosecution of such fraud would not be preempted.  Doc. 606 at 11-12 n.6.  Plaintiffs offer the example of an unauthorized alien who presents a false commercial or passenger driver's license to prove his ability to drive for the employer, but they do not explain why this act would be outside the scope of their proposed field preemption.  *Id.*  After all, use of the same false name on the commercial driver's license presumably is done to be consistent with the I-9 fraud.

### 4.    Field Preemption Conclusion.

In summary, the Court finds a clear and manifest congressional intent to preempt a relatively narrow field:  state prosecution of fraud in the I-9 process.  This intent is reflected in the use limitation of § 1324a(b)(5) and also in the fact that the criminal, civil, and immigration penalties discussed above all focus primarily on the I-9 process.  They represent comprehensive federal regulation of this narrow field.

But the Court finds no clear and manifest congressional intent to preempt state regulation of anything beyond fraud committed directly in the Form I-9 process.  The criminal, civil, and immigration statutes do not attempt to regulate employment-related

fraud beyond the Form I-9 and its attachments.

When Congress did address other law enforcement actions directly – in the use limitation – it chose to foreclose nothing beyond the Form I-9 and attached documents.  8 U.S.C. § 1324a(b)(5).  Granted, an "express preemption provision . . . does not bar the ordinary working of conflict pre-emption principles or impose a special burden making it more difficult to establish the preemption of laws falling outside the clause."  *Arizona*, 132 S. Ct. at 2496 (internal quotation marks omitted).  But as the Ninth Circuit has explained:

> express provisions for preemption of some state laws imply that Congress intentionally did not preempt state law generally, or in respects other than those it addressed.  When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a reliable indicium of congressional intent with respect to state authority, there is no need to infer congressional intent to preempt state laws from the substantive provisions of the legislation.  This applies the familiar principle of statutory construction, *expressio unius est exclusio alterius.*  This is not a rule of law, but one of interpretation, based on how language is ordinarily used.  Nevertheless, the congressional narrowness and precision in preempting some state laws cuts against an inference of a congressional intention to preempt laws with a broad brush, and without express reference.

*Keams v. Tempe Tech. Inst., Inc.,* 39 F.3d 222, 225 (9th Cir. 1994) (internal quotation marks and citations omitted).

The Court notes that it does not read the use limitation as narrowly as Defendants. They argue that the limitation applies only to use of the Form I-9 to *prove* the elements of a crime.  Docs. 510 at 16; 534 at 24-27.  This interpretation is not supported by the plain meaning of the text.  The limitation encompasses not only the Form I-9, but any document "appended to such form," and the provision prohibits "use" of Form I-9 generally, not just use as evidence.  The word "use" would appear to include use in investigations.  This interpretation is supported by the legislative history of the IRCA, which suggests that the use limitation was included to address "[c]oncern . . . that verification information could create a 'paper trail' resulting in the utilization of this

information for the purpose of apprehending undocumented aliens." H.R. Rep. 99-682(I-II) (1986) at 8-9. The Court agrees with the position of the federal government expressed in its Amicus Brief before the Ninth Circuit:

> In stating that information within or accompanying the Form I-9 "may not be used" other than for enumerated federal purposes, § 1324a(b)(5) does not distinguish between reliance on such information for investigation or prosecution. In practical terms, § 1324a(b)(5) therefore constrains state and local law enforcement's ability to rely on the Form I-9 as an investigative lead, or as the basis for obtaining a warrant to raid a workplace thought to be employing unauthorized aliens.

Amicus Brief, at *14.

The Court concludes that Defendants are field preempted from using the Form I-9 and accompanying documents for investigations or prosecutions of violations of the Arizona identity theft and forgery statutes. As noted above, this includes approximately 10 percent of the employment-related identity theft and forgery cases prosecuted between 2005 and 2015. The Court will seek additional briefing on the appropriate relief.

###### E.    Conflict Preemption.

"There are two types of conflict preemption. Conflict preemption occurs where (1) it is impossible to comply with both federal and state law, or (2) where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Puente*, 821 F.3d at 1104. Conflict preemption can occur where "inconsistency of sanctions . . . undermines the congressional calibration of force." *Crosby*, 530 U.S. at 380. Additionally, even where state and federal laws have similar aims, a "[c]onflict in technique can be fully as disruptive to the system Congress enacted as conflict in overt policy." *Arizona*, 132 S. Ct. at 2505 (internal quotations omitted). The Ninth Circuit has also found conflict preemption where state laws "divest[ed] federal authorities of the exclusive power to prosecute [certain] crimes." *Valle del Sol*, 732 F.3d at 1027. As the Supreme Court has explained, however, "when the claim is that federal law impliedly pre-empts state law, we require a strong showing of a conflict to overcome the presumption that state and local regulation . . . can constitutionally coexist with

federal regulation." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 641-42 (2011) (internal quotation marks omitted).

"To determine whether a state law conflicts with Congress' purposes and objectives, we must first ascertain the nature of the federal interest." *Hillman*, 133 S. Ct. at 1949–50.  Here, Plaintiffs' conflict preemption arguments focus solely on obstacle preemption.  Plaintiffs argue that application of the Arizona identity theft and forgery statutes to unauthorized-alien employment fraud is conflict preempted because it layers additional and different penalties on top of federal penalties for the same conduct, undermines federal discretion in addressing alien fraud in obtaining employment, and interferes with Congress's careful balancing of priorities within the broader immigration regulatory scheme.  Doc. 538 at 15-16, 24, 29-30.

The Court is not persuaded.  As already noted, federal statutes cited by Plaintiffs provide criminal and civil penalties only for fraud committed directly in the I-9 process, or to satisfy other immigration requirements or receive other immigration benefits.  To the extent evidence shows that the identity theft and forgery statutes have been applied to I-9 conduct, they clearly are layered on top of federal penalties and the application is conflict preempted – in addition to being field preempted, as shown above.  But state penalties imposed on fraud committed outside the I-9 process do not layer additional consequences on top of federal penalties because the federal penalties do not address non-I-9 conduct, as also shown above.

Plaintiffs argue that "use of a false identity on non-I-9 documents to be consistent with information workers provide in the employment verification status is the same activity for these purposes as use of a false identity on an I-9."  Doc. 606 at 16.  The Court does not agree.  Use of a false name in the I-9 process is done to establish federal authorization to work.  Use of the same false name on an employer's direct-deposit payroll form, for example, is done for a different purpose – to obtain the convenience of direct payroll deposits.  True, the employee logically will use the same false name on the payroll form that he used on the I-9 form, but the act is different and the purpose is

different.  The two acts constitute separate crimes in separate spheres – one extensively regulated by Congress and one not.  The Court concludes that state regulation of fraud outside the I-9 process does not conflict with statutes that focus directly on that process and say nothing about the broader employment context.

Plaintiffs cite various non-statutory sources to argue that the federal government has a variety of interests related to immigration and alien employment (Doc. 538 at 24), and that application of the Arizona identity theft and forgery statutes will "interfere with the careful balance struck by Congress with respect to unauthorized employment of aliens."  *Arizona*, 132 S. Ct. at 2505.  Plaintiffs stress congressional concern about the possibility of undermining labor standards and protections.  They cite to the legislative history of the IRCA:

> [T]he committee does not intend that any provision of this Act would limit the powers of State or Federal labor standards . . . , in conformity with existing law, to remedy unfair practices committed against undocumented employees for exercising their rights before such agencies or for engaging in activities protected by these agencies.  To do otherwise would be counter-productive of our intent to limit the hiring of undocumented employees and the depressing effect on working conditions caused by their employment.

H.R. Rep. 99-682, 8-9 (1986).

Additionally, Plaintiffs refer to a variety of policy statements and agreements made by federal agencies that express an intention to ensure that immigration law does not undermine labor and employment protections or contribute to the vulnerability of unauthorized aliens to abusive employment conditions.  *See* Doc. 538 at 16; Amicus Brief, at *18-20.  The Amicus Brief cites a 2015 Action Plan from the Interagency Work Group for the Consistent Enforcement of Federal Labor, Employment and Immigration Laws, which seeks to coordinate efforts to enforce labor, employment, and immigration laws.  *Id.*  The government further notes that "[f]ederal law enforcement officials routinely rely on foreign nationals, including unauthorized aliens, to build cases, particularly against human traffickers. . . .  The ability to [do so] advances important

federal interests that would be thwarted by parallel state prosecutions of the same individuals for offenses already regulated by federal law."   Amicus Brief, at *18-19. Plaintiffs also assert that the United States has entered into a number of treaties relating to labor rights, suggesting that state interference in the regulation of alien employment will likely interfere with foreign relations.   Doc. 538 at 17; Amicus Brief, at *20. According to Plaintiffs, application of the identity theft and forgery statutes to fraud committed to maintain consistency with the From I-9 will interfere with federal discretion and priorities and undermine the federal government's ability to balance important interests.[5]

Although these citations do show a federal intent to balance important interests, Plaintiffs' argument again proves too much.  If prosecution of an unauthorized alien for using a false identity on a state tax form submitted to his employer would interfere with the federal government's discretion not to prosecute that alien (and thereby retain him, say, as a witness for an unfair labor case), prosecution of the alien for submitting the same false identity to a bank or a car lender would have the same effect.  Indeed, virtually any prosecution of the alien by the State would likely eliminate him as a potential witness for the federal government.  And yet Plaintiffs do not argue, and could not credibly argue, that all prosecutions of unauthorized aliens for fraud or identity theft are conflict preempted.  Plaintiffs attempt to draw a line around the employment context, limiting conflict preemption to fraud committed by unauthorized aliens in their employment, but the Court can find no legal basis on which to so limit Plaintiffs' conflict preemption theory, and, more importantly, no evidence that Congress intended to draw such a line. As noted above, the criminal, civil, and immigration statutes relied on by Plaintiffs draw

---

[5] Plaintiffs note that Congress has recognized that unauthorized aliens can be victims of human trafficking, and has provided that "[v]ictims of severe forms of trafficking should not be inappropriately incarcerated, fined, or otherwise penalized solely for unlawful acts committed as a direct result of being trafficked, such as using false documents, entering the country without documentation, or working without documentation." 22 U.S.C. § 7101(b)(19).  But Plaintiffs have provided no evidence that victims of human trafficking who have used false documents "as a direct result of being trafficked" have been prosecuted by Defendants under the Arizona identity theft and forgery laws.

a narrower line, limiting their application to fraud in the I-9 process.

Moreover, Plaintiffs have not presented any evidence to show that Defendants' application of the Arizona laws has had a practical effect on the federal government's ability to maintain labor standards and protect against employer abuse.  As already noted, factual findings are crucial to establish conflict in an as-applied preemption analysis. *Puente*, 821 F.3d at 1105

The Court does not doubt that federal officials seek to preserve their ability to enforce labor laws and to use unauthorized aliens as witnesses when needed.  And it is true that state prosecution of unauthorized aliens outside of the I-9 process might at times be in tension with that federal desire.  But the question to be answered by the Court is not what preemption holding will produce the smoothest path for government.  The Court is not a general ombudsman, at liberty to fashion a preemption ruling that accommodates priorities that appear to be important.  The key question – the "touchstone" – is the intent of Congress.  *Wyeth,* 555 U.S. at 565; *Medtronic,* 518 U.S. at 485.  And as discussed in detail above, the Court can find no basis on which to conclude that Congress intended to preclude states from prosecuting the use of false identities outside the I-9 process.[6]

In addition, as the Ninth Circuit observed on a related point, "[a]lthough there is tension between the federal scheme and some applications of the identity theft laws, we hold that this tension is not enough to rise to the level of a 'clear and manifest purpose' to preempt the identity theft laws in their entirety."  *Puente*, 821 F.3d at 1105.  Similarly,

---

[6] The Court acknowledges that "[f]ederal regulations have no less pre-emptive effect than federal statutes."  *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982); *see also Brannan v. United Student Aid Funds, Inc.*, 94 F.3d 1260, 1263 (9th Cir. 1996).  "Where Congress has delegated the authority to regulate a particular field to an administrative agency, the agency's regulations issued pursuant to that authority have no less preemptive effect than federal statutes, assuming those regulations are a valid exercise of the agency's delegated authority."  *Fellner v. Tri-Union Seafoods, L.L.C.*, 539 F.3d 237, 243 (3d Cir. 2008).  But the policy statements, action plans, and agency agreements cited by Plaintiffs are not regulations and thus are not "federal *law* which preempts contrary state law."  *Id.* at 244 (emphasis in original).  "[N]othing short of federal law can have that effect."  *Id.*

this Court finds that the policy tensions identified by Plaintiffs are not enough to show a clear and manifest intent by Congress to preclude application of state identity theft and forgery laws outside the I-9 process.  Nor have Plaintiffs shown that Arizona's exercise of its historic police powers to protect its citizens from identity theft has done "major damage" to "clear and substantial" federal interests.  *Hillman*, 133 S. Ct. at 1950.  As already noted, "when the claim is that federal law impliedly pre-empts state law, we require a strong showing of a conflict to overcome the presumption that state and local regulation . . . can constitutionally coexist with federal regulation."  *PLIVA*, 564 U.S. at 641-42.  The Court sees no strong showing of conflict between application of the identity theft and forgery statutes outside the I-9 process and federal statutes that are limited to that process.

The Court accordingly finds that the only conflict Congress clearly and manifestly intended to preempt is that caused by application of the Arizona identity theft and forgery statutes to unauthorized alien fraud committed in the I-9 process.  As noted, the Court will seek additional briefing on the proper remedy for this preemption finding.

## IV.    Equal Protection Claim.

Plaintiffs claim that the Arizona identity theft laws (again, the portions added by amendments in 2007 and 2008) violate their Fourteenth Amendment right to equal protection.  "The first step in determining whether a law violates the Equal Protection Clause is to identify the classification that it draws."  *Coal. for Econ. Equity v. Wilson*, 122 F.3d 692, 702 (9th Cir. 1997).  The classification helps the court determine whether "members of a certain group [are] being treated differently from other persons based on membership in the group."  *United States v. Lopez-Flores*, 63 F.3d 1468, 1472 (9th Cir. 1995).  "[I]f it is demonstrated that a cognizable class is treated differently, the court must analyze under the appropriate level of scrutiny whether the distinction made between the groups is justified."  *Id.*

### A.    Classification.

A law's classification can be determined in one of three ways.  First, the law may

classify on its face, by its explicit terms.  *See*, *e.g.*, *Loving v. Virginia*, 388 U.S. 1 (1967). Second, the law, although neutral on its face, may be applied in a discriminatory way. *See*, *e.g.*, *Yick Wo v. Hopkins*, 118 U.S. 356 (1886).  Third, the law, although neutral on its face and applied according to its terms, may have been enacted with a purpose of discriminating.  *See e.g.*, *Hunter v. Underwood*, 471 U.S. 222 (1985).

Only the third method is relevant here.  Plaintiffs acknowledge that the Arizona identify theft laws are neutral on their face – they apply to all Arizona residents, authorized or unauthorized, who use false identities in obtaining employment.  And Plaintiffs do not argue that the application of the laws creates an improper classification; Plaintiffs have dismissed their as-applied equal protection claim.  Doc. 139.  Thus, if the Court is to find that the identity theft laws classify in a way that raises equal protection concerns, it must do so on the basis of legislative purpose.

To establish a discriminatory purpose, Plaintiffs must show that the legislature "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."  *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979).  The Supreme Court has identified several factors to be considered when determining whether a legislative action was undertaken for a discriminatory purpose.  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, (1977).  These include the historical background of the statute, the sequence of events that led to its enactment, whether the legislature departed from normal legislative procedures, the legislative history of the statute, and, "[i]n some extraordinary instances," actual testimony from legislators.  *Id.* at 267-68.

The Supreme Court has instructed that courts should be cautious when deciding whether a statute was enacted for a discriminatory purpose.  "Proving the motivation behind official action is often a problematic undertaking."  *Hunter v. Underwood*, 471 U.S. 222, 228 (1985).  The task "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  *Arlington Heights*, 429 U.S. at 266.  As the Supreme Court has explained:

"Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the possibility of misreading Congress' purpose.  It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork."

*Hunter*, 471 U.S. at 228 (quoting *United States v. O'Brien*, 391 U.S. 367, 383-384 (1968)).

Even with these cautions in mind, the Court concludes that the Arizona identity theft statutes were amended to apply to employment, at least in part, for their effect on unauthorized aliens.  As recounted above, the laws were passed as part of a larger package of legislation focused on illegal immigration.  Doc. 575 at 15.  The titles of the legislation – the "Legal Arizona Workers Act" and "Employment of Unauthorized Aliens" – were consistent with this focus, and Plaintiffs cite several statements by Arizona lawmakers expressing an intent to target unauthorized aliens and discourage illegal immigration.  Doc. 621 at 4-8; Doc. 538 at 17-18; Doc. 575 at 16-21; Doc. 588 at 14-17.  Plaintiffs also provide evidence regarding the immigration-focused context in which the laws were enacted.  Doc. 588 at 17-19.  Thus, as the Ninth Circuit and this Court previously found, the legislative history surrounding the enactment of these bills indicates "an intent on the part of Arizona legislators to prevent unauthorized aliens from coming to and remaining in the state." *Puente*, 821 F.3d at 1102; *see also Puente*, 76 F. Supp. 3d at 855.[7]

---

[7] A law's effect on a particular group can also be probative of the legislature's purpose. *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 487 (1997).  The parties present much evidence on the actual effect of the identity theft laws, but the Court does not find it helpful on the question of purpose.  Although the statistics show that the vast majority of persons prosecuted for identity theft in the employment context are unauthorized aliens, Plaintiffs do not contend that the number of those prosecutions has been disproportionate to the rate at which unauthorized aliens actually commit identity theft in the employment

But the focus on illegal immigration was not the only legislative purpose. As noted above, the Arizona identity theft statutes were enacted to combat a very real and growing problem. After its enactment in 1996, § 13-2008 was amended in 1997 to drop the requirement of "financial loss," 1997 Ariz. Legis. Serv. Ch. 136, § 14 (H.B. 2408), and in 2000 to encompass "any personal identifying information," 2000 Ariz. Legis. Serv. Ch. 189, § 8 (H.B. 2428). Plaintiffs make no argument that these enactments had a discriminatory purpose. Nor do they claim that passage of § 13-2009 in 2005 was for a discriminatory purpose. Thus, there is no doubt that the identity theft statutes were created to address a genuine state problem.

When the statutes were amended in 2007 and 2008, that problem had grown worse. "Between 2006 and 2008, Arizona had the highest per-capita identity theft rates in the nation, and one third of all identity theft complaints in the state involved employment-related fraud." *Puente*, 821 F.3d at 1002. Thus, as the Ninth Circuit noted, the 2007 and 2008 amendments "were also aimed at curbing the growing and well-documented problem of identity theft in Arizona." *Id*. The Ninth Circuit also made this relevant observation:

> Since the laws were amended, Arizona has been aggressively enforcing employment-related identity theft. Although most of these enforcement actions have been brought against unauthorized aliens, some authorized aliens and U.S. citizens have also been prosecuted. And while many of the people prosecuted under the identity theft laws used a false identity to prove that they are authorized to work in the United States, other defendants used false documents for non-immigration related reasons. For example, Arizona has prosecuted U.S. citizens who used another individual's identity to hide a negative criminal history from a potential employer.

context. Doc. 589 at 46. Indeed, Plaintiffs concede that they cannot make this showing. Doc. 588 at 22. As a result, the Court cannot find from their effects that the identity theft laws discriminate – that the laws punish unauthorized aliens offenders at a higher proportion than offenders in other groups. Plaintiffs argue that the sheer number of prosecutions is indicative of a discriminatory purpose, even if not disproportionate. The Court does not agree. A criminal law passed with absolutely no discriminatory purpose will impose more punishment on the group that violates it most frequently.

*Id.* at 1102.

Defense expert Cohen found that the rate of identity theft in Arizona is more than twice that of other states and costs Arizona residents between $2.8 and $5.1 billion annually.  Doc. 584, ¶¶ 6, 13.  He found that employment-related identity theft was the most frequent type of identity theft in 2006 (39% of complaints), and the third most common in 2015 (9% of complaints).  *Id.* at ¶ 7.  Plaintiffs do not dispute these findings. Doc. 589 at 26.

Defendants also present evidence of the very real harm that results from identity theft.   According to Cohen, 49% of MCAO's prosecutions for employment related identity theft or forgery had at least one identifiable victim.  Doc. 584, ¶ 14.  He found that these victims suffer a variety of harms, including unwarranted debt collections, lawsuits, and IRS tax collection actions, as well as anxiety and other psychological injuries.  *Id.*, ¶ 18.   Additionally, identity theft in employment leads to false income reporting, and Cohen found that, as a result of this false reporting, some victims in Maricopa County were initially denied food stamps or medical, disability, or other forms of public assistance.  *Id.*, ¶ 22.  Plaintiffs do not dispute these facts.  Doc. 589 at 31-32.

Thus, the Court finds that the Arizona legislature had more than one purpose in enacting the identity theft laws.  The laws were passed in part for their effect on immigration by unauthorized aliens, but the legislature was also addressing a pressing criminal problem that adversely affected Arizona residents.

The existence of these dual motives does not end the equal protection inquiry, however, because Supreme Court precedent "does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes."  *Arlington Heights*, 429 U.S. at 265.  "Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one."  *Id.*   An equal protection inquiry will proceed if "there is proof that a discriminatory purpose has been a motivating factor in the decision."  *Id.* at 265-66; *see also Arce v. Douglas*, 793 F.3d 968, 977 (9th

Cir. 2015) ("A plaintiff does not have to prove that the discriminatory purpose was the sole purpose of the challenged action, but only that it was a 'motivating factor.'").

The Court finds that the effect of the identity theft statutes on unauthorized aliens was a motivating factor in the Arizona legislature's passage of the statutes.  As a result, Plaintiffs have presented enough evidence to show that the statutes classify unauthorized aliens for purposes of equal protection scrutiny.  The Court must therefore determine the appropriate level of scrutiny to apply to the statutes in light of this classification, and whether the statutes survive such scrutiny.  The parties agree that this is the next step in the equal protection analysis.  Doc. 588 at 25; Doc. 604 at 16.[8]

**B.    Level of Scrutiny.**

The "equal protection guarantee of the Fourteenth Amendment does not take from the States all power of classification."  *Feeney*, 442 U.S. at 271.  It is well accepted that "[m]ost laws classify, and many affect certain groups unevenly, even though the law itself treats them no differently from all other members of the class described by the law. When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern."  *Id.* at 271-72.

If a law classifies on the basis of race or alienage, however, it must satisfy strict

---

[8] When evidence of a discriminatory motive is found, a defendant may seek to show that the statute would have been passed even in the absence of the motive.  *Hunter*, 471 U.S. at 225.  Such a showing could, presumably, eliminate the statute's classification and end the equal protection inquiry.  Defendants attempt to make this showing by citing a statement from Senator Pearce explaining the high level of identity theft in Arizona and the problems it creates, as well as a legislative debate on appropriate sanctions for identity theft.  Doc. 510 at 25.  Even if this evidence might create a factual question as to whether the statutes would have been enacted without their effect on unauthorized aliens, the Court need not deny summary judgment and proceed to trial on this issue because, as explained below, the identity theft statutes survive rigorous rational basis scrutiny even if they were motivated in part by their effect on unauthorized aliens.  The Court also notes, parenthetically, that a trial on whether the statutes would have been amended without the focus on unauthorized aliens is difficult to envision.  The primary factors for determining legislative intent – the *Arlington Heights* factors set forth above – are usually addressed through briefing rather than trial.  And for more than 200 years the Supreme Court has cautioned strongly against calling individual legislators to testify in trials.  *See, e.g.*, *Arlington Heights*, 429 U.S. at 268 n.18 ("This Court has recognized, ever since *Fletcher v. Peck*, 6 Cranch 87, 130-131, 3 L.Ed. 162 (1810), that judicial inquiries into legislative or executive motivation represent a substantial intrusion into the workings of other branches of government.  Placing a decisionmaker on the stand is therefore 'usually to be avoided.'").

scrutiny – the classification will be valid only if it is necessary to achieve a compelling government purpose. *See*, e.g., *Palmore v. Sidoti*, 466 U.S. 429, 432-33 (1984). If a law classifies on the basis of gender or legitimacy, the law must satisfy intermediate scrutiny – the classification will be valid only if it has a substantial relationship to an important government purpose. *See*, *e.g.*, *United States v. Virginia*, 518 U.S. 515, 533 (1996). For all other classifications, a law must satisfy rational basis review – the classification must be rationally related to a legitimate government purpose. *See*, *e.g.*, *Pennell v. City of San Jose*, 485 U.S. 1, 14 (1988).

Plaintiffs argue that the Court should apply a non-traditional form of heightened scrutiny used in *Plyler v. Doe*, 457 U.S. 202 (1982). *Plyler* concerned a Texas law that denied a public education to the children of unauthorized aliens. *Plyler* appears to apply a hybrid form of review, stating that the law in question "can hardly be considered rational unless it furthers some substantial goal of the State." *Id.* at 224. Wherever one fits this unusual test in the established levels of equal protection scrutiny, the Court concludes that *Plyler* does not apply to this case. As the Court explained in its preliminary injunction ruling:

> Plaintiffs initially argue that some form of "heightened scrutiny" should apply. Relying on *Plyler v. Doe*, 457 U.S. 202 (1982), they argue that the Court should assess whether the identity theft laws further a substantial or important state interest. While "states must generally treat *lawfully* present aliens the same as citizens, and state classifications based on alienage are subject to strict scrutiny review," *Korab v. Fink*, 748 F.3d 875, 881 (9th Cir. 2014) (emphasis added) (citing *In re Griffiths*, 413 U.S. 717, 719-22 (1973)), the same is not true for unauthorized aliens. "Undocumented aliens cannot be treated as a suspect class because their presence in this country in violation of federal law is not a 'constitutional irrelevancy.'" *Plyler*, 457 U.S. at 223. . . . The [Supreme] Court explained that "undocumented status is not irrelevant to any proper legislative goal. Nor is undocumented status an absolutely immutable characteristic since it is the product of conscious, indeed unlawful action." *Id.* at 220. The [Supreme] Court ultimately applied a form of rational basis review to the law, finding that the law could not "be considered rational unless it furthers some substantial goal of the State." *Id.* at 224.

1
2
3
4
5
6
7
8
9
10

> This language of furthering "some substantial goal" is different from traditional rational basis review, under which a court "will uphold the legislative classification so long as it bears a rational relationship to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996). Plaintiffs argue that this "substantial goal" test should apply here. The Court disagrees. *Plyler*'s holding was expressly grounded on the unique vulnerability of children and the importance of education. The Court emphasized that the Texas law was "directed against children, and imposes its discriminatory burden on the basis of a legal characteristic over which children can have little control." *Plyler*, 457 U.S. at 220. The Court contrasted this with the situation of adult unauthorized aliens, whose presence is "the product of conscious, indeed unlawful, action." *Id.* Because the present case does not involve children and public education, the Court finds that a heightened scrutiny is not appropriate.

11
12
13

*Puente*, 76 F. Supp. 3d at 864 (emphasis in original, parallel and docket citations omitted). Plaintiffs' summary judgment arguments do not persuade the Court that this conclusion was incorrect, and the Court will adhere to it.

14
15
16
17
18
19
20
21

Given that strict scrutiny and intermediate scrutiny do not apply here, and that *Plyler* is not controlling, the Court is left with rational basis review. Ordinarily, courts apply rational basis review in a highly deferential manner, upholding a challenged law "'if there is *any* reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Heller v. Doe*, 509 U.S. 312, 320 (1993) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)) (emphasis added). This reflects "deference to legislative policy decisions" and a reluctance "to judge the wisdom, fairness, logic or desirability of those choices." *LeClerc v. Webb*, 419 F.3d 405, 421 (5th Cir. 2005).

22
23
24
25
26
27

Some cases have applied a more rigorous form of rational basis review. These include *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973), *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985), *Romer v. Evans*, 517 U.S. 620 (1996), and *Diaz v. Brewer*, 656 F.3d 1008, 1010 (9th Cir. 2011). Plaintiffs argue that these cases should control if *Plyler* does not. But even if the Court applies the more rigorous rational basis review reflected in these cases, the Arizona identity theft statutes survive.

28

C.      **Rigorous Rational Basis Review.**

In each of these cases, the Supreme Court or Ninth Circuit found that the classification in question was based on animus toward the disadvantaged group and was supported by no rational basis.  The Court will describe these findings.

In *Moreno*, the Supreme Court invalidated an amendment to the Food Stamp Act that rendered ineligible for assistance any household of unrelated individuals.  413 U.S. at 535-36.  The Supreme Court found that the law was directed at "hippies" and was "wholly without any rational basis."  *Id.*  at 538.  The Court held that a "purpose to discriminate against hippies cannot, in and of itself and without reference to (some independent) considerations in the public interest, justify the 1971 amendment."  *Id.* at 534-35.

In *Cleburne*, the Supreme Court invalidated a zoning ordinance that required a special permit for a home for the mentally disabled.  The Court noted that such special permits were not required by the city for "a boarding house, nursing home, family dwelling, fraternity house, or dormitory," and found that the permit requirement bore no rational relationship to any legitimate interest asserted by the city.  473 U.S. at 449.  Because the permit requirement was based solely "on an irrational prejudice" against the mentally disabled, the Supreme Court held that it violated equal protection.  *Id.*

In *Romer*, the Supreme Court invalidated an amendment to the Colorado constitution that prohibited any action by state government to protect individuals from discrimination based on their sexual orientation.  The Court found that the broad and undifferentiated treatment of an explicitly named group was not rationally related to the asserted government interests of protecting freedom of association and conserving resources to fight discrimination against other groups.  517 U.S. at 636.  The Court found that "the amendment seems inexplicable by anything but animus toward the class it affects; it lacks a rational relationship to legitimate state interests."  *Id.* at 632.

In *Diaz*, the Ninth Circuit applied *Moreno* to affirm a preliminary injunction against an Arizona law that made same-sex partners of state employees ineligible for

- 36 -

healthcare benefits.  The court found that the law was not rationally related to Arizona's asserted interests in promoting marriage, saving costs, or reducing administrative burden. 656 F.3d at 1015.  The court found that the law was motivated by "a bare desire to harm a politically unpopular group."  *Id.* (internal quotations and ellipses omitted).

There is a common thread in these cases.  Each found that the challenged law had *no* plausible rational basis, leaving animus as the only explanation for the enactment.  As this Court noted in its preliminary injunction order:  "If a court finds that the *only* actual reason for the law is a desire to discriminate, the court will invalidate the law, relying on the maxim that 'a *bare* congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.'" *Puente*, 76 F.3d at 865 (quoting *Moreno*, 413 U.S. at 534) (emphasis added).

### D.      Application of Rigorous Rational Basis Scrutiny.

Plaintiffs argue that the Arizona identity theft statutes are invalid under rigorous rational basis review because they were motivated solely by animus against unauthorized aliens.  In support of this assertion, Plaintiffs cite statements from three legislators – Senator Pearce, Representative Barnes, and Senator Huppenthal – which Plaintiffs characterize as "hostile, hyperbolic, and misleading."  Doc. 588 at 28-29.  Plaintiffs then assert, quite remarkably, that "[t]he failure of other legislators supporting the measures to challenge these animus-laced statements is further indication of an overall climate of hostility toward undocumented immigrants."  *Id.* at 29.  Plaintiffs also rely on what non-legislators – regular citizens – said to some legislators, as though such statements accurately reflect what the legislators were thinking.

All of this strikes the Court as a dangerous venture into legislative mind-reading. As noted above, the Supreme Court has cautioned strongly against voiding a statute on the basis of "what fewer than a handful of Congressmen said about it."  *Hunter*, 471 U.S. at 228.  "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork."  *Id.*  All the more, a court should not, as Plaintiffs suggest, rely on

what a majority of legislators did not say, or what carefully selected citizens said.

To be sure, the Court has concluded that the identity theft statutes were motivated in part by their potential effect on unauthorized aliens. But the Court cannot conclude that this was the Arizona legislature's only motive. As already discussed, the Court finds ample evidence that combatting identity theft was another purpose of the statutes, both when they were enacted and when they were later amended. The Ninth Circuit agrees. *Puente*, 821 F.3d at 1102. The Court also finds that this legislative purpose was entirely legitimate given the scope of Arizona's identity theft problem and the damage it inflicted annually on the State and its residents.

This legitimate state interest distinguishes this case from the rigorous rational basis cases discussed above. The Arizona identity theft laws are not "wholly without any rational basis" like the food stamp statute in *Moreno*. 413 U.S. at 538. They are not based solely "on an irrational prejudice" like the special permit requirement in *Cleburne*. 473 U.S. at 449. They are not "inexplicable by anything but animus toward the class [they affect]" like the constitutional amendment in *Romer*. 517 U.S. at 632. And they are not motivated by "a bare desire to harm a politically unpopular group" like the law in *Diaz*. 656 F.3d at 1015.

Plaintiffs argue that "the state fails to explain how it could be rational to single out unauthorized aliens (or even identity theft in the employment context generally) for particularly harsh treatment." Doc. 588 at 31. But the statutes do not single out unauthorized aliens; they are facially neutral. They criminalize the actions of every person who steals the identity of another to obtain employment – citizen, authorized alien, or unauthorized alien. Nor do the statutes single out identity theft in the employment context. As amended, they apply to a broad range of conduct beyond employment, as they have since their passage in 1996 and 2005. *See* A.R.S. §§ 13-2008, 13-2009. And the focus of the 2007 and 2008 amendments on the employment context was entirely rational given that Arizona led the nation in identity theft and fully one-third of those crimes occurred in employment.

Plaintiffs also complain that "H.B. 2779 § 1 imposed harsher punishment for identity theft 'to obtain employment' even if committed with the consent of the other person whose information is used," and that "this distinguishes A.R.S. § 13-2009(A)(3) from all other types of identity theft punished by A.R.S. § 13-2009(A) and A.R.S. § 13-2008(A)."  Doc. 588 at 31.  But given the magnitude of the identity theft problem Arizona faced in the employment context – employment accounted to 39% of all identity theft complains in 2006 – the Court cannot conclude that the legislature acted irrationally when it focused on employment fraud for harsh penalties.  Nor can the Court conclude that falsely using another person's identity to obtain employment is harmless simply because the other person consents.  The employer is still defrauded, as are the federal and state governments to which employment taxes are paid.

The rationality of Arizona's action is confirmed by the fact that all 50 states have enacted identity theft statutes since Arizona took the lead in 1996.  http://www.ncsl. org/research/financial-services-and-commerce/identity-theft-state-statutes.aspx.  Congress has done the same, passing 18 U.S.C. § 1028 to criminalize the theft of another's identity.  Indeed, the legislative history for § 1028 strongly encourages "State and local governments . . . to compliment the Federal role in this area with appropriate preventive and enforcement measures."  S. Rep. No. 105-274, at 9 (1998).  There can be little doubt that criminalizing the theft of another's identity is a rational government action.

The Court concludes, on the basis of undisputed facts, that amendment of the identity theft statutes in 2007 and 2008 was not motivated solely by animus against unauthorized aliens.  Arizona was addressing a major criminal problem that inflicted serious harm on Arizona residents.  Because the resulting facially neutral laws are rationally related to this legitimate state interest, this case is not like the rigorous rational basis cases discussed above, and the Court concludes that the identity theft laws survive rigorous rational basis review.  *A fortiori*, the Court concludes that the laws survive the less-rigorous traditional rational basis review.  As a result, the Court will enter summary judgment in favor of Defendants on Plaintiffs' equal protection claims.

**V.      Maricopa County's *Monell* Liability.**

Under *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 691-94 (1978), municipal liability attaches when a policy or custom of the local government produced a plaintiff's alleged constitutional deprivation.  *See also Fogel v. Collins*, 531 F.3d 824, 834 (9th Cir. 2008).  "For purposes of liability under *Monell*, a policy is a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."  *Chew v. Gates*, 27 F.3d 1432, 1444 (9th Cir. 1994) (citation and internal quotations omitted).  A municipal policy may include the decision to enforce a state law.  *Evers v. Custer Cnty.*, 745 F.2d 1196, 1203-04 (9th Cir. 1984).

Whether a state official is a final policy maker for purposes of municipal liability depends on state law, *Streit v. County of Los Angeles*, 236 F.3d 552, 560 (9th Cir. 2001), but the ultimate determination of § 1983 liability is a matter of federal law, *Goldstein v. City of Long Beach*, 715 F.3d 750, 761 (9th Cir. 2013).  "[C]ases on the liability of local governments under § 1983 instruct us to ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue."  *McMillian v. Monroe County*, 520 U.S. 781, 785 (1997) (internal citations omitted).

**A.      County Sheriff.**

The Court has already determined that Sheriff Arpaio is a final policymaker for Maricopa County, and that Maricopa County is therefore liable for his law-enforcement decisions in this case.  Defendants ask the Court to reach a different decision in this order, but the Court declines to do so for reasons stated in its preliminary injunction ruling and in its ruling on Defendants' motion for reconsideration.  *See Puente,* 76 F. Supp. 3d at 867; Doc. 164.  The Court again notes that every judge to have considered this issue has found that the County has *Monell* liability for the Sheriff's actions.  *See United States v. Maricopa Cnty.*, 915 F. Supp. 2d 1073, 1083-84 (D. Ariz. 2012); *Mora v. Arpaio*, No. CV-09-1719-PHX-DGC, 2011 WL 1562443, at *7 (D. Ariz. Apr. 25, 2011); *Lovejoy v. Arpaio*, No. CV09-1912-PHX-NVW, 2010 WL 466010, at *12 (D. Ariz. Feb.

10, 2010); *Ortega Melendres v. Arpaio*, 598 F. Supp. 2d 1025, 1038-39 (D. Ariz. 2009); *Guillory v. Greenlee Cty.*, No. CV05-352TUC DCB, 2006 WL 2816600, at *3-5 (D. Ariz. Sept. 28, 2006).

This County's liability includes the Sheriff's decision to enforce the Arizona identity theft and forgery statutes through the workplace investigations that involved the seizure of Forms I-9 and attached documents.  Defendants concede Plaintiffs' allegation that Form I-9 documents were regularly seized as part of the workplace investigations discussed above.  Doc. 621, ¶ 80; Doc. 573, ¶ 80.

**B.     County Attorney.**

Defendant Maricopa County asks the Court to rule on whether County Attorney Montgomery is an official policymaker of the County for purposes of *Monell* liability. Doc. 595 at 3.  The Court has not decided this issue.  *Puente*, 76 F. Supp. 3d at 868. There is no question that Defendant Montgomery is the relevant policymaker concerning the decision to prosecute fraud in the Form I-9 process; the issue is whether such a decision is made on behalf of the county or the state.

Under Arizona law, the county attorney, like the sheriff, is an officer of the county.  A.R.S. § 11-401.  The Arizona constitution provides that the county attorney is elected by county voters. Ariz. Const. Art. 12 § 3.  The county attorney must also reside in the county in which he or she works, A.R.S. § 11-404, and each county is responsible for determining the budget of its county attorney, A.R.S. § 11-201.  While relevant, these structural provisions and the fact that Arizona "statutory law lists [county] attorneys as county officers is not dispositive because, as discussed in *McMillian*, the function of the [government] attorney, including who can control the . . . attorney's conduct is the issue." *Weiner v. San Diego County*, 210 F.3d 1025, 103 (9th Cir. 2000).

The conduct at issue in this case is the prosecution of crimes under the identity theft and forgery statutes.   The relevant question is whether the Maricopa County Attorney, when performing this function, "acted . . . as a policymaker for the state or for the county." *Goldstein*, 715 F.3d at 753.  On this question, Arizona law provides a clear

answer: county attorneys "conduct, on behalf of the state, all prosecutions for public offenses." A.R.S. § 11-532.

The issue of Maricopa County liability for the actions of a county prosecutor was recently addressed by another judge in this District. *See Milke v. City of Phoenix*, No. CV-15-00462-PHX-ROS, 2016 WL 5339693, at \*17 (D. Ariz. Jan. 8, 2016). The *Milke* court, noting the similarities between Arizona and California law, cited a recent Ninth Circuit opinion addressing *Monell* liability for the actions of a California prosecutor. The Ninth Circuit held that "it is clear that the district attorney acts on behalf of the state when conducting prosecutions." *Goldstein*, 715 F.3d at 759. *Milke* reached the same conclusion and found that the Maricopa County Attorney is "explicitly identified as acting on behalf of the state when prosecuting crimes." 2016 WL 5339693, at \*17.

Given the clear statutory directive in § 11-532 and the analysis in *Milke* and *Goldstein,* the Court also finds that the Maricopa County Attorney acts for the state when conducting criminal prosecutions. The Court accordingly holds that Maricopa County is not liable under *Monell* for any decisions by Defendant Montgomery to bring charges under the Arizona identity theft and forgery statutes based on fraud committed in the Form I-9 and attached documents.[9]

## VI.   Injunctive Relief.

Plaintiffs seek injunctive relief against Defendants Arpaio, Montgomery, and Maricopa County. Doc. 191 at 40. Plaintiffs have requested that the Court permit additional briefing on any injunctive relief. Doc. 538 at 44. The Court concludes that additional briefing is warranted because (1) the Court has found that only actions based on the Form I-9 and attachments are preempted, (2) the Court has found that Maricopa County is not liable for the actions of the County Attorney, (3) Sheriff Arpaio recently lost a general election and will no longer be in office to pursue the policies about which Plaintiffs complain, and (4) the parties have not addressed whether expungement is an

---

[9] While this decision might at first appear to be inconsistent with the holding that the County is liable under *Monell* for actions of the Sheriff, state law contains no express declaration that the Sheriff acts on behalf of the State when discharging his duties

appropriate remedy if only the use of the Form I-9 and attachments is preempted.

Plaintiffs shall file a memorandum on this issue, not to exceed 15 pages, by December 7, 2016.  Defendants shall file a joint reply, not to exceed 15 pages, by December 21, 2016.  Plaintiffs shall file a 7 page reply by January 4, 2017.

**IT IS ORDERED:**

1.     Plaintiff's motion for summary judgment (Doc. 538) is **granted** with respect to preemption of Defendants' use of the Form I-9 and attached documents, and otherwise **denied**.

2.     Defendant State of Arizona's motion for summary judgment (Doc. 510) is **denied** with respect to preemption of Defendants' use of the Form I-9 and attached documents, **granted** with respect to Plaintiffs' other preemption claims, and **granted** with respect to Plaintiffs' equal protection claims.

3.     Defendant Montgomery's motion for summary judgment (Doc. 534) is **denied** with respect to preemption of Defendants' use of the Form I-9 and attached documents, **granted** with respect to Plaintiffs' other preemption claims, and **granted** with respect to Plaintiffs' equal protection claims.

4.     Defendant Arpaio's motion for summary judgment (Doc. 525) is **denied** with respect to preemption of Defendants' use of the Form I-9 and attached documents, **granted** with respect to Plaintiffs' other preemption claims, and **granted** with respect to Plaintiffs' equal protection claims.

5.     Defendant Maricopa County's motion for summary judgment on *Monell* liability (Doc. 511) is **denied** with respect to Defendant Arpaio and **granted** with respect to Defendant Montgomery.

6.     The motion for leave to file excess pages (Docs. 543) is **granted**.

1      **7.**    Plaintiffs shall file a memorandum on the appropriate remedy in this case, not to exceed 15 pages, on or before **December 7, 2016**.  Defendants shall file a joint reply, not to exceed 15 pages, on or before **December 21, 2016**.  Plaintiffs shall file a 7 page reply on or before **January 4, 2017**.

      Dated this 22nd day of November, 2016.


David G. Campbell
United States District Judge

- 44 -