**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Puente Arizona, et al., | No. CV-14-01356-PHX-DGC |
| Plaintiffs, | **ORDER** |
| v. | |
| Joseph M Arpaio, et al., | |
| Defendants. | |

The Court previously determined that state prosecution of fraud in the I-9 process is preempted by federal law. Doc. 623. Because the Court's definition of the preempted field was narrower than the field proposed by Plaintiffs in their motion for summary judgment, and other issues remained regarding the appropriate remedy, the Court asked the parties to file supplemental memoranda. *See* Docs. 654, 672, 676. The Court heard oral arguments on March 9, 2017. For the reasons that follow, the Court will issue a permanent injunction against Maricopa County Sheriff Paul Penzone. Readers are referred to the Court's previous decisions for relevant background information. *See*, *e.g.*, *Puente Arizona v. Arpaio*, No. CV-14-01356-PHX-DGC, 2016 WL 6873294 (D. Ariz. Nov. 22, 2016).

## I.     Standing.

Defendants contend that Plaintiffs lack standing to pursue their claim because they have not established a case or controversy related to use limitation found in 8 U.S.C. § 1324a(b)(5). That section provides that the federal I-9 form used to prove a prospective

employee's right to work in the United States, and any information contained in or appended to the form, "may not be used" for purposes other than enforcement of the federal employment verification system and prosecution under certain federal criminal statutes.  This use limitation was the primary statutory provision on which the Court relied in finding that state prosecution of identity theft or forgery in the I-9 process is preempted.  Doc. 623.

Defendants did not contest standing in their summary judgment briefs, despite arguing that federal preemption was limited to the express terms of § 1324a(b)(5).  But the Constitution limits the jurisdiction of the federal courts to live cases or controversies, and objections to subject matter jurisdiction are not waivable.  The Court therefore will consider Defendants' arguments.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992); *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434-35 (2011).

The Court determined at the preliminary injunction stage that Plaintiffs had standing to bring this suit.  *Puente Arizona v. Arpaio*, 76 F. Supp. 3d 833, 845-53 (D. Ariz. 2015).  Standing, however, must be established by the appropriate level of proof at each stage of the litigation.  *Lujan*, 504 U.S. at 561.  Although "the proof required to establish standing increases as the suit proceeds, the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed."  *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (citation omitted).

Defendants argue that "now that the Court has limited the scope of a potential injunction to the use limitation, none of the Plaintiffs can satisfy the constitutional minimum for standing."  Doc. 672 at 6.  But Defendants' contention that Plaintiffs were deprived of standing by the Court's narrowing of the preempted field is based on a misunderstanding of the standing requirement.  To establish standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to *the challenged action of the defendant*; and (3) it is likely, as opposed to merely

speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (emphasis added).  A plaintiff need not prevail on the merits of its claim to establish standing; it merely must show an actual injury from the "challenged action of the defendant" – the conduct that the plaintiff claims to be unlawful.  Even if the plaintiff ultimately fails to prove the challenged conduct unlawful, it has standing to obtain that judicial decision.  The standing doctrine ensures that litigants "have a concrete stake" in the dispute, *id.* at 191, not that they will succeed in the dispute.  Thus, the fact that Plaintiffs lost on a portion of their preemption claim does not mean that they lacked standing to bring that claim "when the suit was filed." *Davis*, 554 U.S. at 734.  Courts have made clear that "a plaintiff need not prevail on the merits before he can establish his standing to sue." *Prison Legal News v. Livingston*, 683 F.3d 201, 212 (5th Cir. 2012).

Plaintiffs challenged Defendants' application of Arizona identity theft and forgery statutes to unauthorized aliens who commit fraud in obtaining employment.  Doc. 191; Doc. 623 at 10.  The challenged action included prosecution of undocumented aliens based not only on fraud committed in the I-9 process or to obtain employment, but also based on "any false communication made in the employment context in order to be consistent with the I-9 false identity, such as false tax forms, payroll forms, or applications for employment benefits." *Id.* at 14.  The relevant question is whether, when the case was filed, Plaintiffs could show the relevant injury from this "challenged action of the defendant[s]." *Friends of the Earth*, 528 U.S. at 180-81.  For reasons stated in its earlier ruling, the Court again finds that Plaintiffs have shown sufficient injury from the conduct challenged in their complaint. *See Puente Arizona*, 76 F. Supp. 3d at 845-53.

Relying on the fact that "a plaintiff must demonstrate standing separately for each form of relief sought," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006), Defendants argue that Plaintiffs' I-9 preemption claim, on which Plaintiffs prevailed, is separate from the broader preemption claim that gave them standing.  Doc. 672 at 6-10.  The Court does not agree.  Plaintiffs made a single preemption claim in their complaint:

"In enacting Section 1 of H.B. 2779 and Section 1 of H.B. 2745, amending A.R.S. §§ 13-2008(A) and 13-2009(A), Arizona impermissibly intruded on the federal government's exclusive authority to regulate immigration, legislating in a field occupied by the federal government and imposing burdens and penalties on noncitizens not authorized by and contrary to federal law and policy, all in violation of the Supremacy Clause."  Doc. 191, ¶ 218.  The Court cannot parse this claim as Defendants suggest, finding one claim based on fraud in the I-9 process and another based on other types of fraud.  The fact that the scope of the preempted conduct was ultimately determined to be narrower than asserted in Plaintiffs' complaint does not transform one claim into two.[1]

Defendants further contend that Plaintiffs do not have standing to seek injunctive relief.  Doc. 672 at 6.  This argument confuses the question of whether there is a justiciable case or controversy with the question of whether the evidence supports the injunction Plaintiffs now request.  "Whether [a plaintiff] may ultimately be entitled to the requested injunctive relief is not the same question as whether [the plaintiff] has standing to seek injunctive relief."  *Disability Advocates, Inc. v. Paterson*, 598 F. Supp. 2d 289, 310 (E.D.N.Y. 2009).  It is true that a party attempting to establish standing to seek injunctive relief must satisfy the additional burden of showing that he "is likely to suffer future injury" absent the requested injunction.  *Lyons*, 461 U.S. at 105.  But this additional burden does not change the fact that the question of standing focuses on the conduct challenged in the complaint.  A plaintiff has standing to seek injunctive relief if he sufficiently alleges that he is likely to suffer a future injury which is fairly traceable to the defendant's challenged conduct and likely to be redressed by the injunctive relief

---

[1] Defendants' counsel emphasized during oral argument that they had always conceded that the use limitation in § 1324a(b)(5) barred application of the Arizona statutes to fraud committed in the Form I-9, leaving no case or controversy.  But the fact that defendants did not contest part of Plaintiffs' claim does not change the scope of the conduct Plaintiffs challenged – a scope broad enough to establish their standing to litigate this case.  Moreover, as evidenced by the parties' memoranda on remedies (Docs. 654, 672, 676), the parties still disagree on the scope of the use limitation and its preemptive effect.

sought.  *Id.* at 311.  The scope of injunctive relief warranted by the evidence is a separate question.  *Id.*

 With these clarifications in mind, the Court again finds that Plaintiffs have standing.  Defendants' further arguments are unpersuasive for the reasons set forth above.

**II. Mootness.**

 Even if Plaintiffs have standing to proceed, Defendants argue that the election of new Maricopa County Sheriff Paul Penzone and the 2014 written policy change by the Maricopa County Attorney's Office ("MCAO") render the case moot.  Doc. 672 at 8 n.5. The Court does not agree.

 **A. County Attorney.**

 "A case might become moot if subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.  The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness."  *Friends of the Earth*, 528 U.S. 167, 189 (internal quotation marks and citation omitted); *McCormack v. Herzog*, 788 F.3d 1017, 1024 (9th Cir. 2015).  "The voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed."  *Knox v. Serv. Employees Int'l Union, Local 1000*, 567 U.S. 298 (2012).  Voluntary cessation can moot Plaintiffs' claims, however, if Defendants can meet the "stringent standard" identified above – absolute clarity that the wrongful behavior could not reasonably be expected to recur.  *Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014).

 On September 17, 2014 – three months after Plaintiffs filed this case – County Attorney Bill Montgomery formally revised the MCAO's written policy to prohibit reliance on the Form I-9 as evidence in trial or for charging purposes.   Doc. 589, ¶ 74; Doc. 538 at 29.  Defendants allege that this policy change is permanent and entrenched because MCAO promptly dismissed all pending cases based on the Form I-9 and has not filed identity theft or forgery charges based on a Form I-9 in the last 2.5 years.  Doc. 672

at 15 (citing *White v. Lee*, 227 F.3d 1214, 1243 (9th Cir. 2000)).  They emphasize that County Attorney Montgomery and his prosecutors are committed to upholding the law, and assert that there "is no evidence showing that they are likely to disregard their sworn duties as public officials, attorneys, prosecutors and officers of the court by charging future identity theft/forgery cases in knowing violation of the Form I-9 prohibition." *Id.*

The Court does not doubt these assertions or the County Attorney's dedication to the law, but the burden of establishing mootness is heavy.  "[W]hile a statutory change is usually enough to render a case moot, an executive action that is not governed by any clear or codified procedures cannot moot a claim." *McCormack v. Herzog*, 788 F.3d 1017, 1025 (9th Cir. 2015).  Internal policies can be altered, even by successive administrations. *Id.*; *Bell v. City of Boise*, 709 F.3d 890, 900 (9th Cir. 2013).  While the Court does not question the good faith of Defendant Montgomery's assurances of compliance, "promises to refrain from future violations, no matter how well meant, are not sufficient to establish mootness." *TRW, Inc. v. F.T.C.*, 647 F.2d 942, 953 (9th Cir. 1981).

What is more, the 2014 policy only prohibits reliance on the Form I-9 itself, not on documents submitted with the Form I-9.  Doc. 612-12 at 49-50.  The policy also prohibits reliance on the Form I-9 only for trial and charging, not for other law enforcement purposes.  Thus, the policy does not address all of the conduct preempted by federal law. The Supreme Court has made clear that a "case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Employees Int'l Union, Local 1000*, 567 U.S. 298 (2012) (quotation marks and citation omitted).  Because MCAO's 2014 policy affects only a portion of the conduct found unconstitutional by this Court, a permanent injunction would provide Plaintiffs with additional relief.[2]

---

[2] As discussed below, Defendant Montgomery amended the MCAO policy shortly before the recent hearing on remedies, but this amendment also is narrower than the scope of relief granted in this case.

**B.     Sheriff.**

The Court also finds that election of a new sheriff does not moot this case.   An action against a public officer in his official capacity "does not abate" when the officer ceases to hold office while the action is pending; instead, "[t]he officer's successor is automatically substituted as a party." Fed. R. Civ. P. 25(d).[3]   A claim may become moot, however, if "a change in parties renders the need for an injunction against alleged future harm uncertain[.]"  *DuPree v. United States*, 559 F.2d 1151, 1153 (9th Cir. 1977) (citing *Spomer v. Littleton*, 414 U.S. 514, 522 (1974)).

Defendants rely on *Spomer*, a civil rights action alleging a pattern of purposeful racial discrimination by former Alexander County State's Attorney Peyton Berbling.  The plaintiffs brought suit against Berbling in his official capacity and sought injunctive relief.  *Spomer*, 414 U.S. at 520.   The district court dismissed a portion of the claim on qualified-immunity grounds.  *Id.*  The Court of Appeals reversed, and, while the case was pending before the Supreme Court, Berbling's successor (Spomer) took office and was substituted in the action.  *Id.*  Noting that "there may no longer be a controversy between respondents and any Alexander County State's Attorney concerning injunctive relief to be applied in futuro, [the Supreme Court] remand[ed] to the Court of Appeals for a determination, in the first instance, of whether the former dispute regarding the availability of injunctive relief against the State's Attorney is now moot[.]"  *Id*. at 522.  In doing so, the Court relied on the fact that the "wrongful conduct charged in the complaint is personal to Berbling, despite the fact that he was also sued in his then capacity as State's Attorney."  *Id.* at 521.

After *Spomer*, the Ninth Circuit addressed the impact of a change in administration on a court's ability to grant relief.  *Hoptowit v. Spellman*, 753 F.2d 779, 782 (9th Cir. 1985).  *Hoptowit* did not address mootness, but considered whether a court

---

[3]  The Advisory Committee Note to this rule state that automatic substitution of successor officers "will apply whenever effective relief would call for corrective behavior by the one then having official status and power, rather than one who has lost that status and power through ceasing to hold office."  Fed. R. Civ. P. 25(d) advisory committee's note.

must make "supplemental findings of fact indicating that the new officer will continue the practices of his predecessor" before granting injunctive relief.  *Id.*  The Ninth Circuit concluded that such findings were not necessary if "the continuation of the dispute is a reasonable inference."  *Id.*  It further found that continuation of a dispute can reasonably be inferred if the dispute is based on "institutional practices" rather than "idiosyncratic abuses of the particular members of the outgoing administration."  *Id.*  Thus, if the challenged conduct in this case arises from an established policy or a recurrent practice of MCSO officials, the case is not mooted by a change in sheriff.  *See Am. Civil Liberties Union of Mississippi, Inc. v. Finch*, 638 F.2d 1336, 1346 (5th Cir. 1981).

The Court cannot conclude that MCSO's extensive practice of seizing and relying on Form I-9s and accompanying documents is simply an "idiosyncratic abuse[] of the particular members of the outgoing administration."  *Hoptowit*, 753 F.2d at 782. Although many of the factual allegations in this case focused on former Sheriff Arpaio and his statements, Plaintiffs also provided evidence of an established institutional policy. Over a period of several years, MCSO conducted over 80 workplace raids resulting in the arrest of over 800 employees.  Doc. 520 at 59; Doc. 573, ¶ 80.   MCSO regularly seized Form I-9s and accompanying documents during these raids, and submitted these to MCAO when referring cases for prosecution.  Doc. 538 at 29; Doc. 573, ¶ 80; Doc. 525 at 12; Doc. 589 at 48.  What is more, MCSO used state grant monies from the Legal Arizona Workers Act ("LAWA") to fund the salaries of a specialized unit responsible for carrying out the workplace raids.  Doc. 520, ¶ 52; Doc. 573, ¶ 52.

The evidence thus supports a conclusion that MCSO's violation of the use limitation in § 1324a(b)(5) was a policy or practice, not merely the result of former Sheriff Arpaio's personal conduct.  Because the Court reasonably can infer that the dispute will continue under Sheriff Penzone, the Court cannot find that Plaintiffs' claims against Sheriff Penzone are moot.  *Hoptowit*, 753 F.2d at 782; *see also Ciudadanos Unidos De San Juan v. Hidalgo Cty. Grand Jury Comm'rs*, 622 F.2d 807, 822 (5th Cir. 1980).  This conclusion is strengthened by the general unwillingness of courts to find a

claim moot absent a clear indication "that the allegedly wrongful behavior could not reasonably be expected to recur," *Friends of the Earth*, 528 U.S. 167, 189, and the fact that Sheriff Penzone has provided the Court with no declaration or other evidence suggesting that he intends to discontinue use of I-9 forms and related documents.

## III.   Injunctive Relief.

### A.   Clarification of the Scope of Preemption.

In its previous order, the Court found that Defendants are preempted "from using the Form I-9 and accompanying documents for investigations or prosecutions of violations of the Arizona identity theft and forgery statutes." Doc. 623 at 2. Reviewing relevant statutory and regulatory language, legislative history, and other sources, the Court found that "Congress clearly and manifestly intended to preempt . . . application of the Arizona identity theft and forgery statutes to unauthorized alien fraud committed in the I-9 process." *Id.* at 28. The parties' recent briefing makes clear that the Court must be more precise in defining the scope of this preemption. Doc. 654.

Congress's most direct expression regarding the preemptive effect of the I-9 process is found in the use limitation of § 1324a(b)(5): "A form designated or established by the Attorney General under this subsection [the Form I-9,] and any information contained in or appended to such form, may not be used for purposes other than for enforcement of this chapter and sections 1001, 1028, 1546, and 1621 of Title 18." 8 U.S.C. § 1324a(b)(5); Doc. 623. The question is whether Congress intended to preempt the use of items beyond those specifically mentioned in this use limitation – the Form I-9 and information "contained in or appended to such form." Plaintiffs argue that Congress intended to preempt the use of "information and documents submitted by workers as part of the I-9 verification process – even if not attached to the I-9 by employers or if separated by law enforcement from the I-9 in the course of an investigation[.]" *Id.* at 6. Plaintiffs also argue for a broad understanding of the word "use" to include reliance on the I-9 and related documents for any law enforcement purpose, not just to prove a crime in court. *Id.* at 12. To ensure compliance with this

broadened preemptive intent, Plaintiffs would have the Court bar Defendants from even possessing I-9s or related documents in their files.  Doc. 654 at 17.[4]

Defendants argue that preemption is limited to the items specified in the use limitation – the I-9 and documents physically attached to it.  Doc. 672 at 11.  Defendants also argue that "use" means more than simply possessing the documents – that some affirmative action is required.  *Id.* at 13.

If one were to look only to the language of § 1324a(b)(5), the scope of preemption could be narrowed to the Form I-9 and documents physically attached to it.  The use limitation refers only to the Form I-9 and "information contained in or appended to such form," and append means "to attach," "affix" or "add as a supplement or appendix."  Merriam-Webster's Collegiate Dictionary at 56 (10th ed. 2001).  But other statutory provisions suggest that Congress had a broader intent.

Section 1 of the I-9 form requires a prospective employee to provide his or her name, address, date of birth, and social security number, and to swear under penalty of perjury that he or she is a citizen or national of the United States, a lawful permanent resident alien, or an alien authorized to work in the United States.  In section 2 of the form, the employer must identify documents the employer reviewed to verify the employee's identity and work authorization.  The regulations identify specific documents, referred to as "List A" documents, that can be used by a prospective employee to show both identity and authorization to work.   These include U.S. passports, permanent resident alien cards, or federal employment authorization documents.   "List B" documents can be used to show identity, and include items such as driver's licenses or state, federal, or school ID cards.  "List C" documents can be used to show employment

---

[4] Plaintiffs would provide for an exception allowing Defendants to maintain a copy of the related documents if they could show that the documents were submitted for reasons outside the I-9 process.  Doc. 654 at 17.  Additionally, "where a document typically used in the I-9 process was not in fact the document submitted by the employee to show identity and/or employment authorization, then MCAO may be permitted to retain a copy of the I-9 in the prosecutorial file for the sole purpose of showing that the documents do not correspond."  *Id.* at 17 n.11.

authorization, and include social security cards and other federally- or tribally-issued documents.  8 C.F.R. § 274a.2(b)(1)(v).

A prospective employee must show the employer either a List A document or a combination of List B and List C documents.  While an employer is not required to attach copies of List A, B, or C documents to the Form I-9, he is required to examine them in order to verify that the individual is authorized to work in the United States.  The employer then attests on the Form I-9 that he has made the verification.  8 U.S.C. § 1324a(b)(1)(A).  Thus, prospective employees must present, and employers must examine, List A, B, or C documents in order to comply with the federal employment verification system.

Section 1324a(b)(4) permits an employer to make and retain copies of any documents presented by a prospective employee in the verification process, but makes clear that the copies can be maintained "only . . . for the purpose of complying with" the verification system.  8 U.S.C. § 1324a(b)(4); *see also* 8 C.F.R. § 247a.2(b)(3).  There is no requirement that the documents or copies be attached to the Form I-9, and, under the relevant regulations, copies may "be retained with the Form I-9 *or* stored with the employee's records."  8 C.F.R. § 274a.2(b)(3) (emphasis added).  Thus, the statute and regulations contemplate that List A, B, and C documents used to satisfy the I-9 process need not be attached or appended to the I-9 form and need not be filed with the form, and yet also make clear that copies retained by the employer may be used "only" for employment verification.  This suggests that Congress intended to protect more than the I-9 and documents physically attached to it.  The Court sees no logical reason why Congress would prohibit state law-enforcement officers from using the Form I-9 and documents physically attached to it, and yet permit them to use List A, B, and C documents submitted with I-9 simply because they were never stapled to the I-9 or were stored by the employer in a folder separate from the I-9.  This is particularly true when one considers other statutory sections.

Section 1324a(d) provides guidance for future variations of the federal employment verification system.  It makes clear that even if the Form I-9 is replaced or new documentation requirements are created, the use limitation will continue to prohibit use of the employment verification system for non-enumerated purposes.  The statute states that "[t]he system may not be used for law enforcement purposes, other than for enforcement of this chapter or sections 1001, 1028, 1546, and 1621 of Title 18." 8 U.S.C. § 1324(d)(2)(F); *see also* 8 U.S.C. § 1324(d)(2)(G) (prohibiting the use for non-enumerated purposes of any new document or card designed for the federal employment verification system).  This suggests that Congress intended to bar the use of the verification process itself, not just the I-9 and physically attached documents, in state law enforcement.  Additionally, § 1324(d)(2)(C) provides that "[a]ny personal information utilized by the system may not be made available to Government agencies, employers, and other persons except to the extent necessary to verify that an individual is not an unauthorized alien."  This limitation is not restricted to information contained in or appended to any specific document, but applies generally to the federal employment verification system.

Statutes imposing criminal, civil, and immigration penalties for fraud committed in the employment verification process also reflect a congressional intent to regulate more than the Form I-9 and physically attached documents.  For example, 18 U.S.C. § 1546(a) prohibits use of false documents "prescribed by statute or regulation . . . as evidence of authorized . . . employment in the United States."  As the Court noted in its previous order, this refers to List A and C documents – documents that may be used to show federal work authorization in the I-9 process.  Doc. 623 at 15-16 (citing 8 C.F.R. § 274a.2(b)(1)(v)).  Likewise, 18 U.S.C. § 1546(b) provides criminal penalties for using false identification documents or false attestations in the I-9 process.  These criminal provisions are not limited to documents attached to the Form I-9.

Similarly, 8 U.S.C. § 1324c(a)(4) imposes civil penalties on individuals who "accept or receive or [] provide any document lawfully issued to or with respect to a

person other than the possessor (including a deceased individual) for the purpose of complying with section 1324a(b)" – the statute that creates the federal employment verification process.  Section 1324c(a)(4) also provides civil penalties for the making, using, or receiving of false documents or documents issued to another person in order to satisfy a requirement or receive a benefit under Chapter 12 of Title 8.  These statutes include no requirement that the documents be attached to a Form I-9.

With respect to federal immigration penalties, 8 U.S.C. § 1227(a)(3)(D)(i) provides that "[a]ny alien who falsely represents, or has falsely represented, himself to be a citizen of the United States for any purpose or benefit under this chapter (including section 1324a of this title) or any Federal or State law is deportable."  The parallel provision in 8 U.S.C. § 1182(a)(6)(C)(ii)(1) similarly states that "[a]ny alien who falsely represents, or has falsely represented, himself or herself to be a citizen of the United States for any purpose or benefit under this chapter (including section 1324a of this title) or any other Federal or State law is inadmissible."  These provisions impose immigration penalties on any fraud committed to demonstrate work authorization pursuant to the federal employment verification system established in § 1324a.  This includes fraud in documents used to establish work authorization or identification, regardless of whether they are attached to a Form I-9.

These statutes make clear that Congress intended to regulate more than the use of the Form I-9 and physically attached documents.  Congress specified that any future employment verification system could not be used for local law enforcement purposes.  Congress imposed criminal, civil, and immigration penalties on fraud not only in the Form I-9 and physically attached documents, but also in other documents used to prove work authorization.  The Court continues to hold the view that Congress did not intend to preempt state regulation of fraud outside the federal employment verification process, as stated in its summary judgment ruling.  Doc. 623.  But the Court concludes from the provisions reviewed above that Congress's preemptive intent was not limited to the Form I-9 and physically attached documents.  Congress also regulated – and intended to

preempt state use of – other documents used to show employment authorization under the federal system. As the Ninth Circuit has noted, "field preemption can be inferred . . . where there is a regulatory framework so pervasive . . . that Congress left no room for the States to supplement it." *Valle del Sol*, 732 F.3d at 1023 (internal quotation and brackets omitted); Laurence H. Tribe, *American Constitutional Law,* § 6-31, at 1206-07 (same).

This conclusion is supported by the legislative history of the Immigration Reform and Control Act, which reflects Congress's "[c]oncern . . . that verification information could create a 'paper trail' resulting in the utilization of this information for the purpose of apprehending undocumented aliens." H.R. Rep. 99-682(III) (1986) at 8-9. If documents presented solely to comply with the federal employment verification system could be used for state law enforcement purposes so long as they were not physically attached to a Form I-9, this congressional intent easily would be undermined.

The Court's conclusion is also supported by recent decisions from other courts. Reviewing the use limitation and several other provisions of § 1324a, the Supreme Court found that "Congress has made clear . . . that *any information employees submit to indicate their work status* 'may not be used' for purposes other than prosecution under specified federal criminal statutes for fraud, perjury, and related conduct." *Arizona v. United States*, 567 U.S. 387 (2012) (citing 8 U.S.C. §§ 1324a(b)(5), (d)(2)(F)-(G)) (emphasis added). The Ninth Circuit reached a similar conclusion. *United States v. Arizona*, 641 F.3d 339, 359 (9th Cir. 2011), *aff'd in part, rev'd in part and remanded* (reviewing 8 U.S.C. § 1324a and finding that the federal employment verification system and any personal information it contains cannot be used for any non-enumerated purpose, including investigating and prosecuting violations of Arizona law).

In summary, the Court concludes that Congress clearly and manifestly intended to prohibit the use of the Form I-9, documents attached to the Form I-9, and documents submitted as part of the I-9 employment verification process, whether attached to the form or not, for state law enforcement purposes. Further, as the Supreme Court found in *Smith v. United States*, 508 U.S. 223, 228 (1993), the ordinary meaning of the term "use"

is "'to employ' or 'to derive service from.'" *Id.* at 229 (quoting *Astor v. Merritt,* 111 U.S. 202, 213 (1884)); *see also* Black's Law Dictionary 1681 (9th ed. 2009) (defining "use" as the "application or employment of something").   The Court will adopt this ordinary meaning of the word "use."   Thus, the Court holds that Defendants are preempted from (a) employing or relying on (b) any documents or information (c) submitted to an employer solely as part of the federal employment verification process (d) for any investigative or prosecutorial purpose under the Arizona identify theft and forgery statutes.   As Plaintiffs concede, Defendants may use List A, B, or C documents submitted in the I-9 process if they were also submitted for a purpose independent of the federal employment verification system, such as to demonstrate ability to drive or as part of a typical employment application.

### B.   Irreparable Harm and Balance of Hardships.

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). In order to obtain a permanent injunction, a plaintiff must satisfy four factors: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *Id.* at 156-57.   "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

### 1.   Harm.

Plaintiffs must show that they face a "present or imminent risk of likely irreparable harm" in order to obtain injunctive relief.   *Monsanto*, 561 U.S. at 162. Although a defendant's voluntary cessation of challenged conduct does not ordinarily render a claim concerning that conduct moot, it is "an important factor bearing on the question whether a court should exercise its power to enjoin the defendant from renewing

the practice."  *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) (noting that abandonment of challenged conduct does not deprive the court of power to resolve a claim concerning the challenge case, but provides relevant information on whether the court should exercise its discretion to grant injunctive relief); *see also Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 748 (7th Cir. 1999).[5]

### a.    Likelihood of Harm Caused by MCAO.

Defendants argue that no injunction should be entered against Defendant Montgomery because Plaintiffs cannot show a present or imminent risk of likely irreparable harm.  They note that MCAO never had a written policy directing prosecutors to charge on the Form I-9, Defendant Montgomery has taken steps to ensure that MCAO prosecutors do not file Form I-9 charges, Montgomery and his prosecutors have "demonstrated compliance and responsiveness to this Court's orders" and are bound by sworn ethical and professional duties to uphold the law, and prosecutions are matters of public record subject to public scrutiny as well as judicial oversight.  Doc. 672 at 15.

On September 17, 2014, Defendant Montgomery issued a policy prohibiting MCAO prosecutors from relying on the Form I-9 as evidence to establish any element of a crime or in charging decisions, and existing cases based on the Form I-9 were

---

[5] Defendants argue that Plaintiffs must also show "a cognizable danger of a recurrent violation" before the Court may grant injunctive relief.  Doc. 672 at 14 (citing *Fed. Election Comm'n v. Furgatch*, 869 F.2d 1256, 1260 (9th Cir. 1989)) (quotation marks omitted).  But this requirement, as quoted, does not appear in the cited opinion, and *Furgatch* was addressing whether an injunction could be issued under 2 U.S.C. § 437g (now 52 U.S.C. § 30109) in response to violations of the Federal Election Campaign Act.  *Id.*  The court noted that "in cases involving statutes which give the courts the discretion to issue injunctions on the basis of past violations, the federal courts have consistently held that the party moving for the injunction must show only that there is a 'likelihood' of future violations."  *Furgatch*, 869 F.2d at 1261.  The Supreme Court has made clear that a finding of irreparable harm in the common law injunctive relief analysis requires a showing of "present or imminent risk of likely irreparable harm." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 162 (2010).  Thus, the Court will consider the present or future risk of irreparable harm without imposing a separate requirement of "a cognizable danger of recurrent violation."  *Furgatch*, 869 F.2d at 1260.

- 16 -

dismissed.  Doc. 520, ¶ 83.  The policy did not address reliance on other documents submitted in the I-9 process to show work authorization or identity.  On March 8, 2017, MCAO issued a revised policy.  Doc. 683.  The revised version states that, "[f]or the purpose of reviewing Identity Theft and Forgery submittals, Federal I-9 Forms and documents appended to the Form I-9 may not be used and/or relied upon for establishing the elements of the offense and are not to be considered as admissible evidence to establish a reasonable likelihood of conviction."  Doc. 683-1 at 8.  As Defendants make clear, the appended documents referred to in this policy are only those which are "physically attached" to the Form I-9.  Doc. 672 at 12.  Further, the revised language does not prohibit all reliance on Form I-9 and appended documents.  Rather, it focuses on evidentiary use and does not appear to prohibit use for other purposes such as interrogating suspects or obtaining warrants or subpoenas.

Although the MCAO policy changes do not "address[] all of the objectionable" conduct identified by the Court, *White*, 227 F.3d at 1243, the Court finds that Defendant Montgomery has made a good faith effort to comply with the requirements of federal law.  This fact is highly relevant in deciding whether Plaintiffs can make the showing required for injunctive relief.  As one court has explained:

> Cessation of the allegedly illegal conduct, though not rendering a claim moot, nevertheless may affect the ability to obtain injunctive relief, as by impacting the ability to show substantial and irreparable injury.  The court retains the power to grant injunctive relief, but the moving party must still satisfy the court that injunctive relief is required.  The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive.  In a situation such as this one, in which the challenged conduct has been discontinued with a representation that at least part of the challenged conduct would be rescinded, the district court will have to determine whether injunctive relief is still appropriate, or whether only declaratory relief is available.

*Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 748 (7th Cir. 1999) (citations and quotation marks omitted).  Given Defendant Montgomery's genuine efforts to comply

with federal law, the Court cannot find that Plaintiffs face a "present or imminent risk of likely irreparable harm" from I-9 related investigations or prosecutions by the MCAO. *Monsanto*, 561 U.S. at 162.  The Court will enter declaratory relief, and believes the MCAO will apply that declaration in fashioning a policy that will eliminate any risk of irreparable harm to Plaintiffs.

### b.    Likelihood of Harm Caused by MCSO.

The Court cannot reach the same conclusion with respect to the MCSO.  The MCSO engaged in a years' long practice of workplace investigations in which it regularly seized employment records, including Form I-9s.  Doc. 623 at 12.  The MCSO submitted Form I-9 and other documents from the I-9 process for charging purposes.  Evidence in the record shows that the MCSO used the Form I-9 for investigatory purposes.  *See, e.g.*, Doc. 621-16 (2012 report by MCSO regarding an interview with an employee suspected of committing employment-related identity theft or forgery, during which the employee was questioned about a seized Form I-9 on which he had provided a false social security number); Doc. 654-2 at 13 (MCSO Sergeant Brockman identifying a seized Form I-9 completed by Plaintiff Cervantes Arreola).

Defendants do not appear to dispute this finding.  Rather, they argue that the practice was unique to Sheriff Arpaio.  Doc. 672 at 16.  Defendants note that Plaintiffs brought claims only against the MCSO despite the fact that 23 different law enforcement agencies submitted identity theft and forgery cases to MCAO between 2005 and 2015. *Id.*  Defendants also argue that "Plaintiffs have not shown and cannot demonstrate that Sheriff Penzone will pursue the same policies and priorities" as Sheriff Arpaio.  *Id.*

Defendants cite a Fifth Circuit case for the proposition that "a court may not exercise its equitable discretion to grant prospective injunctive relief against the successor[] [administration] without a strong factual basis apart from the mere allegations of the complaint for concluding that they will continue the illegal practices of their predecessors." *Am. Civil Liberties Union of Mississippi, Inc. v. Finch*, 638 F.2d 1336, 1345 (5th Cir. 1981).  The issue in *Finch* was whether a claim would be dismissed as

moot following a change in administration.  *Id.*  It did not address whether a change in administration precludes injunctive relief.  What is more, *Finch* seems to indicate that where there is a basis for finding that the "challenged activities were a matter of state policy or a recurrent practice of [state] officials, rather than idiosyncratic abuses of the particular members of the outgoing administration[,]" there exists a basis for concluding that the challenged activities are likely to continue under the new administration.  *Id.* at 1346-47.

Here, seizures of documents submitted in the Form I-9 process were part of the sheriff's office practice for seven years.  Doc. 538 at 18-19, 28; Doc. 520, ¶ 59; Doc. 573, ¶ 59.  Although the workplace investigations were ultimately abandoned in late 2014, over 80 such investigations were completed and resulted in the arrest of 806 employees who were almost all unauthorized aliens.  *Id.*  Moreover, the investigations and document seizures were carried out by MCSO employees, including a specialized unit organized to investigate violations of the employer sanctions law.  Doc. 520, ¶ 94; Doc. 573, ¶ 94.  This specialized unit was overseen by two different sergeants from the time it was created in 2008 until it was disbanded in 2015.  Doc. 520, ¶ 95; Doc. 573, ¶ 95.  Thus, although the challenged activities may have occurred under the administration of former Sheriff Arpaio, there is no doubt that they were part of a wider practice of MCSO employees.

Moreover, MCSO submitted the highest number of employment-related identity theft and forgery cases to MCAO.  Doc. 623-2 at 19.  According to Defendants' expert, MCSO submitted 662 such cases, while the other 22 law enforcement agencies submitted a combined 692 cases.  *Id.*

Even more relevant, the new sheriff has not provided any evidence regarding his planned policies with respect to identity theft and forgery investigations.  Given the long and entrenched nature of the MCSO practice of relying on documents used in the Form I-9 process and the lack of any evidence of an intended change in policy, the Court concludes that Plaintiffs have satisfied the requirement for injunctive relief against the MCSO.

1

### c.  Whether the Harm is Irreparable.

2

Defendants argue that Plaintiffs have not shown that their harm is irreparable.

3

Doc. 672 at 16.  More specifically, Defendants argue that Plaintiffs have:

4

> an adequate remedy at law for any injuries to criminal defendants resulting
> from any future Form I-9 charges.  If a line prosecutor errantly files a
> charge that violates the use limitation, the state criminal court can suppress
> the Form I-9 evidence and/or dismiss the charge.  Criminal defendants can
> file direct appeals or petitions for post-conviction relief.  Habeas corpus
> petitions are also available.  And defendants whose arrests or prosecutions
> violate clearly established law can pursue a civil claim under 42 U.S.C. §
> 1983.

5

6

7

8

9

10

*Id.*

11

The Court cannot conclude that a motion to suppress, or post-conviction relief, or

12

even a later action under § 1983 will redress all of the harm caused when a person is

13

arrested, indicted, and prosecuted on criminal charges.   In *Easyriders Freedom*

14

*F.I.G.H.T. v. Hannigan*, 92 F.3d 1486 (9th Cir. 1996), the Ninth Circuit rejected the

15

argument that the availability of a defense at trial was an adequate legal remedy for a

16

violation of the Fourth Amendment.  92 F.3d at 1501.  The Ninth Circuit explained:

17

"Because the Fourth Amendment establishes the right of the people to be secure in their

18

persons against unreasonable searches and seizures, however, the wrong that the Fourth

19

Amendment is designed to prevent is completed when a motorcyclist is cited without

20

probable cause."  *Id.*  (alterations incorporated and quotation marks omitted); *see also*

21

*Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983).

22

Here, genuine harm occurs when individuals are arrested or charged with identity

23

theft or forgery based on information submitted in the federal employment authorization

24

process.  Plaintiffs are further harmed when this information is used in an investigation

25

that leads to prosecution, even if that prosecution ultimately fails or is not based on

26

documents submitted in the I-9 process.   The availability of suppression or post-

27

conviction relief simply does not remedy the harm from apprehension, arrest, and a

28

formal criminal charge.  Indeed, there is generally no adequate legal remedy for an

1    unconstitutional deprivation of liberty.  *See Seretse-Khama v. Ashcroft*, 215 F. Supp. 2d

2    37, 53 & n.20 (D.D.C. 2002) (compiling cases saying the same).  The Court concludes

3    that Plaintiffs have shown a likelihood of irreparable harm against Puente members.  As a

4    result, the Court need not determine whether the taxpayer Plaintiffs or Puente as an

5    organization independent of its members will suffer irreparable harm.

                        **2.      Balance of Hardships.**

7           In deciding whether to grant a permanent injunction, "courts must balance the

8    competing claims of injury and must consider the effect on each party of the granting or

9    withholding of the requested relief . . . [and] should pay particular regard for the public

10   consequences in employing the extraordinary remedy of injunction."  *Winter v. Nat. Res.*

11   *Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quotation marks and citations omitted); *see*

12   *Amoco Prod. Co. v. Vill. of Gambell, Alaska,* 480 U.S. 531, 546 n.12 (1987) (finding that

13   the standards for a permanent injunction are "essentially the same" as for a preliminary

14   injunction).  The Court has already concluded that Defendants' use of the Form I-9 and

15   other documents submitted in the I-9 process to investigate and prosecute undocumented

16   aliens is preempted by federal law.  The government "cannot suffer harm from an

17   injunction that merely ends an unlawful practice."  *Rodriguez v. Robbins,* 715 F.3d 1127,

18   1145 (9th Cir. 2013).  Moreover, "[i]t is clear that it would not be equitable or in the

19   public's interest to allow the state to violate the requirements of federal law, especially

20   when there are no adequate remedies available."   *Valle del Sol*, 732 F.3d at 1029

21   (quotation marks and citations omitted, alterations incorporated).

22          Although considerations of comity and federalism must factor into a court's

23   determination of whether to grant injunctive relief, *O'Shea v. Littleton*, 414 U.S. 488, 499

24   (1974), comity does not prohibit a federal court from issuing an injunction affecting state

25   law enforcement matters, *Hawkins v. Comparet-Cassani*, 251 F.3d 1230, 1237 (9th Cir.

26   2001) (finding that a plaintiff had standing to seek an injunction of state law enforcement

27   matters where he demonstrated a likelihood of irreparable injury in the absence of such

28   relief); *see also Easyriders*, 92 F.3d at 1500.  Rather, comity and federalism may properly

be considered by ensuring that the scope of the injunctive relief is narrowly tailored to address the identified harm.  *See Clark v. Coye*, 60 F.3d 600, 603-04 (9th Cir. 1995) ("Due to concerns of comity and federalism, the scope of federal injunctive relief against an agency of state government must always be narrowly tailored to enforce federal constitutional and statutory law only.")

      **C.**    **Scope of Injunction.**

      As stated, injunctive relief "must be tailored to remedy the specific harm alleged. An overbroad injunction is an abuse of discretion." *Lamb-Weston*, 941 F.2d at 974. Injunctive relief "is historically 'designed to deter, not punish[.]'" *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 62 (1975) (citation omitted).

      Plaintiffs ask the Court to enjoin Defendants from relying in investigations or prosecutions on the Form I-9 or any information or documents submitted solely in the I-9 verification process.  Doc. 654 at 12-14, 16-17.  Plaintiffs also seek the creation of a state-court presumption whereby any List A, B, or C document presented in an identity theft or forgery prosecution is presumed to have been submitted as part of the I-9 process unless MCSO can show that the I-9 does not mention the document, or there is evidence that the document was submitted for another purpose.  *Id.* at 13.  Plaintiffs ask for an additional presumption that "when the charges submitted for prosecution by MCSO include A.R.S. § 13-2008(A) for employment or A.R.S. § 13-2009(A)(3), and the other documents in the investigation file are not of the type that would be used to 'obtain' or 'maintain' employment – as opposed, for example, to selecting a tax withholding rate or opting in to a direct deposit program, MCSO should be presumed to have relied on any available I-9 or associated documents in its investigation."  *Id.* at 14.  Finally, Plaintiffs request that the Court require its injunction to be circulated as soon as possible to all relevant personnel and be incorporated into formal written policies and regular training programs of the MCSO.  *Id.* at 14, 17.  To ensure compliance, Plaintiffs ask the Court to retain jurisdiction over the case for two years to provide guidance, resolve disputes, and, if necessary, exercise its contempt power.  *Id.* at 18.

Plaintiffs' proposed injunction is too broad.  First, while it is correct that federal and state courts have created burden shifting mechanisms in the Fourth Amendment context, Plaintiffs identify no case in which a federal district court has created a presumption to be applied in state court criminal cases.  *See, e.g.*, *Dubner v. City & Cty. of San Francisco*, 266 F.3d 959, 965 (9th Cir. 2001) (cited by Plaintiffs in support of their requested presumption); *Reams v. City of Tucson*, 701 P.2d 598, 600 (Ariz. Ct. App. 1985) (same).  Even if the Court had such a power, its exercise in this case would constitute an unnecessary intrusion into the workings of state courts.  State courts are fully capable of applying the preemption law established by this case.

Nor does the Court conclude that prolonged supervision or specified training is necessary.  The Court will permanently enjoin MCSO from engaging in preempted action, and concludes that such an injunction is sufficient to afford the relief to which Plaintiffs are entitled.  The terms of the permanent injunction will be set forth at the end of this order.

Plaintiffs ask the Court to issue injunctive relief jointly against MCSO and Defendant Maricopa County.  The Court has found Maricopa County to be liable for the sheriff's actions in this case.  Doc. 623 at 40-41.  This finding of *Monell* liability was based solely on the sheriff's position as a final policy maker for Maricopa County, and Plaintiffs have submitted no evidence that officers or employees of Maricopa County outside of the MCSO or MCAO have engaged in conduct causing Plaintiffs' injuries.  Nor does it appear that the Maricopa County board has authority to control the law enforcement policies or practices of the MCSO.  *See* A.R.S §§ 11-251, 11-441(A)(1), (2); *Hounshell v. White*, 202 P.3d 466, 471 (Ariz. Ct. App. 2008).  Because injunctive relief "must be tailored to remedy the specific harm alleged[,]" and Plaintiffs have not shown how an injunction against Maricopa County would remedy their injury, the Court will not grant injunctive relief against Maricopa County.  *Lamb-Weston*, 941 F.2d at 974.  Plaintiffs do not appear to seek injunctive relief against the State of Arizona.  Doc. 654.

**IV.    Expungement.**

Plaintiffs seek expungement of the convictions of Plaintiffs Cervantes Arreola and Estrada Fernandez because "their convictions involved unconstitutional applications of [A.R.S. § 13-2009(A)(3)] in violation of the federal use limitations."  Doc. 654 at 19.

A request to expunge records of conviction is a request to "destroy or seal the records of the fact of the defendant's conviction[.]"  *United States v. Crowell*, 374 F.3d 790, 792 (9th Cir. 2004).  Expungement does not vacate, set aside, or otherwise affect the legality of the conviction.  *Id.*  "Accordingly, expungement, without more, does not alter the legality of the previous conviction and does not signify that the defendant was innocent of the crime to which he pleaded guilty."  *Id.* (quotation marks and citation omitted).

"Congress has not expressly granted to the federal courts a general power to expunge criminal records."  *Id.* at 793.  But the Ninth Circuit has identified "two sources of authority by which courts may expunge records of criminal conviction: statutes and our inherent authority."  *Id.* at 792.  Statutory authority is not at issue here, but "federal courts have inherent power to expunge criminal records when necessary to preserve basic legal rights."  *Shipp v. Todd*, 568 F.2d 133, 134 (9th Cir. 1978) (quoting *United States v. McMains*, 540 F.2d 387, 389 (8th Cir. 1976)).  This power is "limited to expunging the record of an unlawful arrest or conviction, or to correcting a clerical error."  *United States v. Sumner*, 226 F.3d 1005, 1014 (9th Cir. 2000).  Expungement constitutes "a 'narrow, extraordinary exception,' one 'appropriately used only in extreme circumstances.'"  *Crowell*, 374 F.3d at 796 (quoting *United States v. Smith,* 940 F.2d 395, 396 (9th Cir. 1991) (per curiam)); *Shipp*, 568 F.2d at 134 n.1.

The Ninth Circuit has made clear that a defendant "cannot use a motion for expungement to make an 'end-run' around recognized post-conviction remedies, such as habeas corpus, *coram nobis,* and *audita querela,* or others[.]"  *Crowell*, 374 F.3d at 796. As a result, a defendant "must first obtain a judgment that her conviction was unlawful" before seeking expungement.  *Id.*  This rule protects foundational principles, as "[t]he

expungement of an accurate record of a valid arrest and conviction necessarily disrupts this balance of power and, in doing so, violates the principles of federalism upon which our system of government is founded."  *Sumner*, 226 F.3d at 1014.

Plaintiffs acknowledge the *Crowell* rule, but argue that it does not apply here because it involved a request to expunge records of a federal conviction, whereas Plaintiffs seek to expunge state convictions.  Doc. 680 at 12-13 & n.13-14.  Plaintiffs also emphasize that their request raises the issue of "the Court's authority to expunge state convictions obtained in violation of constitutional rights under § 1983[,]" while the defendant in *Crowell* filed the motion directly in her criminal case and sought expungement "based solely on procedural deficiencies at trial."  *Id.* at 12 & n.14.  The Court does not find these distinctions meaningful.  First, considerations of federalism counsel the Court to exercise greater caution before disturbing a state court conviction.  Second, the *Crowell* defendant, like Plaintiffs, alleged that her conviction was invalid because it violated her constitutional rights, and yet the Ninth Circuit declined to grant relief.  *Id.* at 793 (alleging violations of Fourth and Sixth Amendment rights).  Third, the Supreme Court has unequivocally held that § 1983 is not the proper vehicle for challenging the validity of a conviction.  *See Heck v. Humphrey*, 512 U.S. 477, 482 (1994) ("Even a prisoner who has fully exhausted available state remedies has no cause of action under § 1983 unless and until the conviction or sentence is reversed, expunged, invalidated, or impugned by the grant of a writ of habeas corpus.").

Citing *Shipp*, 568 F.2d 133, and *Maurer v. Individually & as Members of Los Angeles Cty. Sheriff's Dep't*, 691 F.2d 434, 436 (9th Cir. 1982), Plaintiffs argue that there is "little question" that federal courts have the power to expunge state convictions obtained in violation of the Constitution in a § 1983 case.  Doc. 680 at 12 & n.13.  Neither case supports Plaintiffs' assertion.

*Shipp* reversed a district court dismissal of a § 1983 claim seeking a declaration of invalidity and expungement of a Montana state burglary conviction.  568 F.2d at 133.  The district court had dismissed the action for failure to state a claim and because it found

the state court clerk immune from such an action.  *Id.*  The Ninth Circuit held that the district court erred because "federal courts have inherent power to expunge criminal records when necessary to preserve basic legal rights[,]" and immunity for state officials in the performance of judicial functions "does not extend to suits for injunctive relief." *Id.* at 134.  The case was remanded to the district court "for a determination of the question of expungement."  *Id.*  While it does not appear that the plaintiff's conviction had previously been found invalid, the Ninth Circuit expressed no opinion as to whether expungement was available.  It did emphasize, however, that "[t]he power to order expungement of a state arrest record is a narrow one and should be reserved for unusual or extreme cases, for example, 'where the arrest itself was an unlawful one, or where the arrest represented harassing action by the police, or where the statute under which the arrestee was prosecuted was itself unconstitutional.'"  *Id.* at 134 n.1 (citation omitted).

*Maurer* is a § 1983 case in which the plaintiff sought, among other things, a declaration that his arrest by California state police was invalid on federal constitutional grounds and a permanent injunction prohibiting the dissemination of his arrest record. 691 F.2d at 435.  The Ninth Circuit found that the district court had "erred in summarily dismissing Maurer's expungement action."  *Id.* at 437.  *Maurer* cited *Shipp* for the proposition that "[i]t is well settled that the federal courts have inherent equitable power to order the expungement of local arrest records as an appropriate remedy in the wake of police action in violation of constitutional rights."  *Id.* (citations and quotation marks omitted).  The decision addressed only records of state arrests, and said nothing about expungement of state convictions.  *Maurer* does not address whether a district court may expunge state conviction records that have not previously been vacated or otherwise determined invalid.

Plaintiffs also cite a 1967 Fifth Circuit case brought pursuant to 42 U.S.C. § 1971. Doc. 768 at 12 n.13.  The Fifth Circuit found that state and local officials in Selma, Alabama had engaged in a pattern of baseless investigations, arrests, and prosecutions intended to interfere with the voting rights of African Americans, in violation of § 1971.

*United States v. McLeod*, 385 F.2d 734, 747 (5th Cir. 1967).  Section 1971(b), now 52 U.S.C. § 10101(b), provides that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote[.]"   In determining the proper remedy for the violation, *McLeod* noted that "[u]sually when a court directs the return of fines and the reversal or expungement of convictions, it is acting on direct review or sitting in habeas corpus rather than entering a statutory injunction.  Yet we cannot permit the similarity of the remedy sought here to remedies traditionally reserved to other form of proceedings to deter us from fashioning effective relief under section 1971(c)."  *Id.*  The Court emphasized that "[s]ince section 1971 stands as a bulwark against harassing and coercive prosecutions, federal courts should construe it liberally to fulfill the protective aspect of American Federalism."  *Id.* at 748.   Nothing in the opinion suggests that the court's ability to expunge valid state convictions in a civil action extends beyond claims of voter suppression brought pursuant to § 1971.  *See also United States v. Tyler*, 670 F. Supp. 2d 1346, 1348 (M.D. Fla. 2009) (discussing *McLeod* and concluding that the expungement power may only be exercised in very limited circumstances); *United States v. Pichardo*, No. 00 CR. 875, 2016 WL 4081136, at *2 (S.D.N.Y. Aug. 1, 2016) (same).

Plaintiffs contend that the Court may expunge records of convictions under a facially unconstitutional statute, and argue that "[w]hether the statute [under which Plaintiffs were convicted] is unconstitutional in all applications or unconstitutional as applied to Plaintiffs and others like them should not matter."  Doc. 538 at 42 n.11.  The Court disagrees.  If a statute is facially unconstitutional, all convictions obtained under it are by necessity unconstitutional and invalid.  Post-conviction relief proceedings are unnecessary.  But if a statute is unconstitutional only in certain applications, only certain convictions obtained under that statute will be unconstitutional and invalid.  The determination of which convictions are unconstitutional will generally require, as it would here, individual factual determinations.

This is evidenced by *State v. Reynua*, 807 N.W.2d 473 (Minn. Ct. App. 2011), a case that addressed the same preemption issue presented here.  The defendant in *Reynua* appealed a conviction for aggravated forgery and other crimes, arguing that "federal law preempts any state prosecution for conduct involving the I-9 form."  *Id.* at 478-79.  The defendant's convictions were based on the use of a false identity to obtain a forged Minnesota identification card, as well as the title certifications for two cars.  *Id.* at 479.  The false identification card had been obtained during a search of the defendant's home. *Id.*  A follow-up investigation led police to a Form I-9, which the defendant had completed with a false Social Security number.  *Id.*  The I-9 was submitted as evidence at trial, an act the State later conceded to be clear error.  *Id.*  The court of appeals found the error harmless, however, because the I-9 was submitted only as corroborating evidence. *Id.*  The decision required a close inquiry into the charges, the evidence presented at trial, and the effect of various items of evidence on the outcome of the case.

*Reynua* illustrates the kind of close record review required for a court to determine whether a conviction should be set aside on as-applied preemption grounds.  The parties have not provided the Court with sufficient information regarding the convictions of Cervantes Arreola and Estrada Fernandez to conduct such a review, nor does the Court find that so close an examination of state convictions would be an appropriate exercise for a federal court, particularly when Plaintiffs Cervantes Arreola and Estrada Fernandez have made no efforts to have their convictions set aside in state court.

Plaintiffs argue that their failure to obtain invalidation of their convictions through post-conviction relief is excused under Ninth Circuit precedent.   Doc. 606 at 25; Doc. 538 at 43.  The Supreme Court held in *Heck*:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.

1  512 U.S. 477, 486-87 (1994).  Thus, when a judgment in favor of the plaintiff in a § 1983

2  damages suit "would necessarily imply the invalidity" of an otherwise valid conviction or

3  sentence, the court must dismiss the claim.  Although *Heck* specifically addresses § 1983

4  suits for damages, the Supreme Court has made clear that the rule applies to § 1983

5  claims for all types of relief.  *See Wilkinson v. Dotson*, 544 U.S. 74, 81-82 (2005) ("a

6  state prisoner's § 1983 action is barred [under *Heck*] (absent prior invalidation) – no

7  matter the relief sought (damages or equitable relief), no matter the target of the

8  prisoner's suit (state conduct leading to conviction or internal prison proceedings) – *if*

9  success in that action would necessarily demonstrate the invalidity of confinement or its

10 duration.") (emphasis in original);  *see also Thornton v. Brown*, 757 F.3d 834, 847 (9th

11 Cir. 2013).[6]

12     For all of these reasons, the Court concludes that Plaintiffs may not obtain

13 expungement of their previous state court convictions.  Expungement constitutes a

14 narrow, extraordinary exception, appropriate only in extreme circumstances.  *Crowell*,

15 374 F.3d at 796.  Plaintiffs have not shown that they are entitled to such unusual relief.[7]

16 **V.    Supplemental Filings.**

17     Defendants assert in their reply that "MCSO submitted no more than four Form I-

18 9 cases prior to 2013 and none since."  Doc. 672 at 9, 21 n.15.  In support, Defendants

19 cite to a document that is not in the record.  They now attempt to supplement the record

20 with non-electronic documentation to support this assertion.  Docs. 687, 688.  But the

---

22 [6] The Ninth Circuit has held that an individual may challenge a revocation of good
23 time credits in a § 1983 action if the individual has been released from incarceration and
   the opportunity to pursue habeas relief was not lost by the claimant's own unjustified
24 delay.  *Nonnette v. Small*, 316 F.3d 872, 877 & n.6 (9th Cir. 2002); *see also Guerrero v.
   Gates*, 442 F.3d 697, 705 (9th Cir. 2006).  But these cases emphasize that this exception
25 to *Heck* "'affects only former prisoners challenging loss of good-time credits, revocation
   of parole or similar matters,' not challenges to an underlying conviction."  *Id.* (quoting
26 *Nonnette*, 316 F.3d at 878 n.7); *see also Lyall v. City of Los Angeles*, 807 F.3d 1178,
   1192 (9th Cir. 2015).

27 [7] Plaintiffs may attempt to obtain relief through Ariz. R. Crim. P. 32.1(f), A.R.S.
   § 13-907, a writ of *audita querela*, or some other appropriate state-court avenue.  Arizona
28 Rule 32.1(g) allows for untimely petitions for relief if there has been a significant change
   in the law, and, unlike federal habeas, Rule 32.1 does not have a custody requirement.
   The Court, of course, expresses no opinion on the merits of such attempted.

1    Court ordered Defendants to file their reply by December 21, 2016.  Doc. 623 at 423.

2    Defendants do not offer any reason why they were unable to comply with the deadline

3    established by the Court.  Moreover, even if the supplementary materials can support

4    Defendants' assertion concerning the number of Form I-9 cases submitted by MCSO, the

5    record contains sufficient evidence to establish that MCSO had a practice of violating the

6    use limitation.  The Court will deny Defendants motion to file a non-electronic form of its

7    supplementary evidence (Doc. 688) and grant Plaintiffs' motion to strike Defendants'

8    supplement (Doc. 689).

9         **IT IS ORDERED:**

10        1.    Plaintiffs' request for declaratory relief is granted.  The Court declares as

11   follows:  Under the Supremacy Clause of the United States Constitution and the

12   Immigration Reform and Control Act, Defendants are preempted from (a) employing or

13   relying on (b) the Form I-9 and any other documents or information (c) submitted to an

14   employer solely as part of the federal employment verification process (d) for purposes of

15   investigating or prosecuting violations of A.R.S. § 13-2002, A.R.S § 13-2008(A), or

16   A.R.S § 13-2009(A)(3).  This declaration does not apply to List A, B, or C documents (as

17   identified by 8 C.F.R. § 274a.2, or any successor regulation) submitted in the I-9 process

18   if they were also submitted for a purpose independent of the federal employment

19   verification system, such as to demonstrate ability to drive or as part of a typical

20   employment application.

21        2.    Plaintiffs' request for a permanent injunction against Maricopa County

22   Sheriff Paul Penzone is granted.  Defendant Penzone, as Maricopa County Sheriff, and

23   his officers, agents, servants, employees, and attorneys, and all persons acting in concert

24   with them, are permanently enjoined from (a) employing or relying on (b) the Form I-9

25   and any other documents or information (c) submitted to an employer solely as part of the

26   federal employment verification process (d) for purposes of investigating or prosecuting

27   violations of A.R.S. § 13-2002, A.R.S § 13-2008(A), or A.R.S § 13-2009(A)(3).  This

28   declaration does not apply to List A, B, or C documents (as identified by

8 C.F.R. § 274a.2, or any successor regulation) submitted in the I-9 process if they were also submitted for a purpose independent of the federal employment verification system, such as to demonstrate ability to drive or as part of a typical employment application. Defendant Penzone shall create a written policy for MCSO consistent with this permanent injunction and disseminate it within MCSO within 60 days of this order.

3.    Plaintiffs' request for injunctive relief against Defendants Montgomery and Maricopa County, and for expungement of the convictions of Plaintiffs Cervantes Arreola and Estrada Fernandez, are denied.

4.    Defendants' motion to file a non-electronic supplement (Doc. 688) is **denied**, and Plaintiffs' motion to strike (Doc. 689) is **granted.**

5.    The Clerk shall enter final judgment in accordance with this order.

Dated this 24th day of March, 2017.


_____
David G. Campbell
United States District Judge